ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
E-mail: andrew@packardlawoffices.com
          wncarlon@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>DENBESTE YARD & GARDEN, INC.,<br><br>Defendant. | Case No. 4:22-cv-01975-DMR<br><br>**SUPPLEMENTAL BRIEFING RE PLAINTIFF'S MOTION FOR ENTRY OF A DEFAULT JUDGMENT**<br><br>Magistrate Judge Donna M. Ryu<br><br>Action Filed: March 28, 2022 |

Suppl. Briefing RE Plaintiff's
Mot. for Entry of a Default Judgment

CASE NO. 4:22-cv-01975-DMR

## INTRODUCTION

On February 24, 2023, the Court denied Plaintiff's Motion for Default Judgment ("Motion"), Docket No. 19, without prejudice to Plaintiff's ability to submit supplemental briefing and evidence further addressing the *Eitel* factors. Per the Court's order, this supplemental briefing is submitted in support of the Motion.

## ARGUMENT

Plaintiff appreciates the opportunity to submit additional analysis of the third and fourth *Eitel* factors, relating to the merits of Plaintiff's substantive claims and the sufficiency of the Complaint. In this context, where entry of default has been made pursuant to Federal Rule of Civil Procedure 55(a), the Ninth Circuit has instructed that, "upon default the factual allegations of the complaint, except those relating to the amount of damages[1] will be taken as true." *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977). If the Complaint adequately alleges facts establishing a violation of the Clean Water Act's National Pollutant Discharge Elimination System ("NPDES") permit requirements, the application of these *Eitel* factors would support a default judgment.

### I.  Sufficiency of the Complaint Under the *San Francisco Baykeeper* Standard

Plaintiff's Motion seeks default judgment on its only claim for relief: that Defendant violated 33 U.S.C. § 1311(a) by discharging storm water associated with industrial activities generated at Defendant's facility into the Russian River without an NPDES permit issued pursuant to 33 U.S.C. § 1342. Docket No. 1 at ¶ 116. In order to adequately state a claim for a violation under the Clean Water Act, Plaintiff must allege that (1) a person (2) discharged (3) a pollutant (4) to navigable waters of the United States (5) from a point source (6) without a permit." *San Francisco Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 754 (N.D. Cal. 2011) (citing *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993)). As discussed more fully below, the Complaint alleges each of these required elements, and thus sufficiently states a plausible claim for relief.

---

[1] Note that Plaintiff seeks no damages in this case, only civil penalties as authorized by 33 U.S.C. § 1319(d).

### a. Defendant Is a "Person" Under the Clean Water Act

"The term 'person' means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5); *S.F. Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 754 (N.D. Cal. 2011).

The Complaint alleges that "Defendant DenBeste Yard & Garden, Inc. is a California corporation." Docket No. 1 at ¶ 9. Because a corporation is included in the definition of the term "person" under 33 U.S.C. § 1362(5), and this allegation must be taken as true, Plaintiff has established that Defendant is a "person" within the meaning of the Clean Water Act.

### b. Defendant's Discharges of Storm Water from Its Facility Are "Discharges" Under the Clean Water Act

Under the Act, "[t]he term 'discharge of a pollutant' and the term 'discharge of pollutants' each means (A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." 33 U.S.C. § 1362(12). *S.F. Baykeeper*, 791 F. Supp. 2d at 754.

The Complaint alleges that "[t]he Facility collects and discharges storm water associated with industrial activity from the Facility into the Russian River, which discharges to the Pacific Ocean. Docket No. 1 at ¶ 43. The Complaint also alleges that "Defendant discharges pollutant-contaminated storm water from the Facility into the Russian River, which discharges to the Pacific Ocean." *Id.* at ¶¶ 5, 6, 14, and 15. Therefore, Plaintiff has established a "discharge" within the meaning of the Act.

### c. Defendant's Storm Water Discharges Contain "Pollutants"

"Pollutants" are defined to include dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water. 33 U.S.C. § 1362(6). The Clean Water Act also identifies a Toxic Pollutant List at section 307(a)(1). 33 U.S.C. § 1317(a)(1). The Toxic Pollutant List is found at 40 C.F.R. § 401.15. Among the toxic pollutants are lead, 40 C.F.R. § 401.15(44), and zinc

1  (40 C.F.R. § 401.15(65).  In addition to toxic pollutants, conventional pollutants are identified,
2  including biochemical oxygen demand, total suspended solids, pH, fecal coliform, and oil and
3  grease.  40 C.F.R. § 401.16.  Notably here, soil amendments such as the compost at issue in this
4  case, have been recognized as sources of pollutants under the Clean Water Act.  *United States v.*
5  *Frezzo Bros.*, 461 F. Supp. 266, 269-270 (E.D. Pa. 1978), *aff'd*, (602 F.2d 1123 (3d Cir. 1979)
6  (runoff from pile of "mushroom compost" was discharge of "sewage" and "biological materials").

7        The Complaint alleges that "Defendant discharges pollutant-contaminated storm water from
8  the Facility into the Russian River, which discharges to the Pacific Ocean."  Docket No. 1 at ¶¶ 5, 6,
9  14, and 15.  The Complaint describes the sources of these pollutants – Defendant's industrial
10 activities and industrial materials that are exposed to storm water.  *Id.* at ¶¶ 39-41.  Among these
11 materials are soils amendments including soils, wood, and compost, and pollutants associated with
12 the operation of heavy equipment.  *Id.* at ¶¶ 38, 39, 41.  The Complaint also alleges that the
13 industrial activities at the Facility fall under Standard Industrial Classification Code 2875
14 ("Fertilizers, Mixing Only").  *Id.* at 42.

15       California's General Industrial Storm Water Permit ("General Permit") recognizes that
16 Facilities operating under Standard Industrial Classification Code 2875 are likely to discharge
17 certain pollutants, and therefore the General Permit requires sampling and analysis of storm water
18 discharges for the following specific pollutants related to those industrial activities: iron, nitrate plus
19 nitrite nitrogen, lead, and zinc.  General Permit, Section XI.6.d; General Permit, Table 1.  The
20 General Permit also requires all dischargers to sample for total suspended solids, oil and grease, and
21 pH.  General Permit, Sections XI.6.a and b.  The pollutants that Defendant discharges include toxic
22 pollutants such as lead and zinc, and conventional pollutants such as total suspended solids, pH, oil
23 and grease, and materials, such as soil amendments that increase biological oxygen demand.  Docket
24 No. 1 at ¶¶ 39-41.  Plaintiff has established that Defendant's discharges contain pollutants.

25       **d.  Defendant Discharges Storm Water to Navigable Waters**

26       "Navigable Waters" means "the waters of the United States."  33 U.S.C. § 1362(7).  The
27 Ninth Circuit has recognized the Russian River as a navigable water of the United States protected
28 by the Clean Water Act.  *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 995 (9th Cir.

2007).

The Complaint alleges that "Defendant discharges pollutant-contaminated storm water from the Facility into the Russian River, which discharges to the Pacific Ocean. The Russian River and the Pacific Ocean (the 'Impacted Waters') are waters of the United States within the meaning of the Clean Water Act. 40 C.F.R. § 120.2(3)." Docket No. 1 at ¶ 5. Thus, Plaintiff has established that Defendant's discharges reach "navigable waters."

### e. Defendant Discharges via Point Sources

A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). "Storm water discharge associated with industrial activity means the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant." 40 C.F.R. § 122.26(14). The General Permit defines "storm water discharge associated with industrial activity" to mean "[t]he discharge from any conveyance which is used for collecting and conveying storm water and which is directly related to manufacturing, processing, or raw materials storage areas at an industrial plant as identified in Attachment A of this General Permit." General Permit, Glossary at 1. "Storm water discharge associated with industrial activity" is a "point source" under the Clean Water Act because it specifically requires the discharge to be made via a "conveyance that is used for collecting and conveying storm water." *Id.*

The Complaint alleges that "[t]he Facility *collects* and discharges storm water associated with industrial activity from the Facility into the Russian River, which discharges to the Pacific Ocean. Docket No. 1 at ¶ 43 (emphasis added); *see also* ¶ 67 ("During significant rain events Defendant continues to discharge *storm water associated with industrial activities* from the Facility") (emphasis added); and, ¶ 116 ("Plaintiff is informed and believes, and thereupon alleges, that on numerous occasions between at least March 28, 2017 and the date of the filing of [the] Complaint, Defendant violated section 301(a) of the CWA, 33 U.S.C. § 1311(a), by discharging *storm water associated with industrial activities* generated at its Facility into the Russian River without a NPDES permit issued pursuant to 33 U.S.C. § 1342") (emphasis added).

The Complaint also alleges that Defendant's Facility collects and discharges storm water via conveyances designed to convey storm water that is directly related to industrial activities at the Facility. Therefore, Plaintiff has established that Defendant discharges from a point source.

### f. Defendant Discharges Storm Water Without an NPDES Permit

Section 402 of the Act, 33 U.S.C. § 1342, establishes the NPDES program—a permitting program that regulates the discharge of pollutants into waters of the United States. Section 402(p) establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. § 1342(p), and, specifically, requires a NPDES permit for storm water discharges associated with industrial activity. 33 U.S.C. § 1342(p)(2)(B). Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges, through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(b).

Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has authorized the State Board to issue NPDES permits in California, including general permits. On November 16, 1990, the EPA promulgated Phase I storm water regulation in compliance with section 402(p) of the Act. 55 Fed. Reg. 47990, codified at 40 C.F.R. § 122.26. These regulations require operators of facilities subject to storm water permitting that discharge storm water associated with industrial activity to obtain an NPDES permit. *Id.*

The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on April 17, 1997 and again on April 1, 2014 (effective July 1, 2015), pursuant to Section 402(p). To discharge storm water associated with industrial activities lawfully in California, industrial dischargers must obtain General Permit coverage and comply with the terms of the General Permit, or obtain and comply with an individual NPDES permit. 33 U.S.C. §§ 1311(a), 1342(p).

The Complaint alleges that "Defendant's NOI [Notice of Intent to Comply with General Permit] coverage under the General Permit (Order No. 97-03-DWQ) was administratively terminated on or about February 25, 2016." Docket No. 1 at ¶ 65. The Complaint further alleges

that "Defendant has been operating its Facility without any General Permit coverage continuously since February 25, 2016." *Id.* at ¶ 66. Therefore, Plaintiff has established that Defendant has no permit covering its pollutant discharges.

Plaintiff has adequately alleged all of the necessary facts supporting its cause of action, and because these facts were properly pled and Defendant failed to deny each allegation, the Court must take the allegations as true. Fed. R. Civ. P. 8(b)(6); *see also Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977) ("The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true," *citing Pope v. United States*, 323 U.S. 1, 12 (1944)). Plaintiff's allegations are sufficient for Plaintiff to prevail on its substantive claim and therefore, the second and third *Eitel* factors weigh in favor of entering a default judgment against Defendant.

## II.   The Number of Violations

The Court also held that Plaintiff did not provide sufficient evidence to support the soundness of the methodology used to calculate the number of times Defendant violated the Act, and the assumptions underlying that methodology. Order at 2:19-25. Plaintiff retained the services of Ian Wren, hydrologist, to address the Court's concerns regarding the methodology used to determine the number of violations. Mr. Wren's qualifications are set forth in his supporting declaration, filed herewith, as well as his curriculum vitae attached to the declaration as Exhibit A.

### a.   The Methodology Used to Determine the Number of Violations Is Sound

Mr. Wren reviewed the methodology set forth in the Motion, as well as the supporting documents, and the assumptions made in support thereof. In his analysis, Mr. Wren concludes that "Plaintiff undertook a conservative analysis of rainfall data to derive a reasonable estimate of the number of days in which discharge occurred." Declaration of Ian Wren in Support of Supplemental Briefing Re Plaintiff's Motion for Entry of Default Judgment ("Wren Declaration") at ¶ 12. "Plaintiff reasonably interpreted the data to generate a conservative benchmark value against which to identify the number of days when stormwater discharges from the Facility likely occurred." *Id.* Mr. Wren concludes that Plaintiff made reasonable assumptions given the available data in order to "derive a conservative rainfall depth" that could be used to calculate days of discharge. *Id.*

### b. An Alternative Methodology Yields a Comparable Result

While Mr. Wren states that the methodology relied on in Plaintiff's Motion was valid, *id.* at ¶ 17, he performed an analysis using an alternative methodology that reflects the General Permit's focus on short-term rain events, *i.e.*, the 24-hour storm event in comparison to the 72-hour period of time used in the original methodology. *Id.* at ¶¶ 14-17. Mr. Wren concluded that the Facility likely discharges on days where the 24-hour precipitation depth exceeds 0.2 inches at the Cloverdale 3.2 ESE, CA US station. *Id.* at ¶¶ 16-17. Using that rainfall total, Mr. Wren calculated that the Facility likely discharged on 174 days between March 28, 2017 to August 8, 2022. *Id.* at ¶ 17. While Plaintiff believes it has provided the Court with enough evidence to find at least 182 violations, Plaintiff encourages the Court to use Mr. Wren's more conservative calculation of 174 days of discharge in its assessment of the civil penalty here.

### III. CONCLUSION

Plaintiff has adequately alleged and established all of the necessary facts to properly state a claim for relief under the Clean Water Act. Taken as true, these allegations provide sufficient facts to support Plaintiff's claim on the merits. Plaintiff's methodology in calculating the number of violations is supported by scientific literature and technical guidance, as well as the principles underlying the General Permit. Based on the foregoing, Plaintiff requests that the Court, in consideration with Plaintiff's Motion, enter default judgment against Defendant.

Respectfully submitted,

Dated: March 23, 2023    LAW OFFICES OF ANDREW L. PACKARD
　　　　　　　　　　　　　By: /s/ William N. Carlon
　　　　　　　　　　　　　　　William N. Carlon
　　　　　　　　　　　　　　　Attorneys for Plaintiff
　　　　　　　　　　　　　　　CALIFORNIA SPORTFISHING
　　　　　　　　　　　　　　　PROTECTION ALLIANCE