1
2
3
4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7   CALIFORNIA SPORTFISHING                    Case No. 22-cv-01975-DMR
    PROTECTION ALLIANCE,
8
                   Plaintiff,                   REQUEST FOR REASSIGNMENT;
9                                               REPORT AND RECOMMENDATION
           v.                                   RE MOTION FOR DEFAULT
10                                              JUDGMENT

    DENBESTE YARD & GARDEN, INC.,               Re: Dkt. No. 19
11
                   Defendant.
12

13          This lawsuit alleges violations of the Clean Water Act ("CWA") against Defendant

14   DenBeste Yard & Garden Supply, a California corporation that owns and operates a yard and

15   garden supply company located in Sonoma County.  [Docket No. 1.]  After Defendant failed to

16   appear or defend itself in this action, Plaintiff California Sportfishing Protection Alliance filed this

17   motion for default judgment.  [Docket No. 19.]  This matter is suitable for determination without

18   oral argument.  Civil L.R. 7-1(b).

19          Defendant has not filed a declination or consent to the jurisdiction of a magistrate judge

20   pursuant to 28 U.S.C. § 636(c).  Therefore, the court issues this Report and Recommendation and

21   reassigns this case to a district judge for final disposition, with the recommendation that Plaintiff's

22   motion for default judgment be granted, and that Plaintiff's request for damages and attorneys'

23   fees and costs be granted in part.

24   I.     BACKGROUND

25          A.     Factual Allegations

26          Plaintiff California Sportfishing Protection Alliance is a non-profit corporation dedicated

27   to the preservation, protection, and defense of the environment, wildlife, and natural resources of

28   California water.  Compl. ¶ 13.  Defendant DenBeste Yard & Garden Supply owns a yard and

United States District Court
Northern District of California

garden supply facility located at 26916 Asti Road in Cloverdale, California (the "Facility").  *Id.* ¶¶ 5, 36.   The Facility's primary industrial activities include mixing potting soil and compost.  *Id.* ¶ 38.  Plaintiff alleges that Defendant stores industrial materials, including soil, wood, and compost outside the Facility, in areas exposed to storm water.  *Id.* ¶ 40.  Plaintiff further asserts that Defendant discharges pollutant-contaminated storm water from the Facility into the Russian River, which then discharges to the Pacific Ocean.  *Id.* ¶ 43.

Defendant has been operating the Facility without any General Permit coverage since February 25, 2016.  Compl. ¶ 66.  On October 30 and December 11, 2015, the North Coast Regional Water Quality Control Board ("Regional Board") informed Defendant that it was required to renew its General Permit coverage for the Facility.  *Id.* ¶ 46.  Defendant filed a Notice of Intent to obtain coverage under the General Permit for the Facility on July 6, 2016, but the application was returned as incomplete.  *Id.* ¶¶ 47-48.  The Regional Board subsequently issued two Notices of Non-Compliance on September 17 and October 28, 2020.  *Id.* ¶¶ 49-56.

On January 26, 2022, Plaintiff sent a 60-day notice alerting Defendant that it intended to sue for alleged violations of the CWA and the General Permit.  Compl., Ex. A ("Notice").  A copy of the Notice was sent to the Administrator of the EPA; the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board; and the Executive Officer of the Regional Water Quality Control Board, San Francisco Bay Region.  *Id.* ¶ 2.

On March 28, 2022, Plaintiff filed a complaint against Defendant alleging one claim for relief based on Defendant's violations of the CWA.  On April 14, 2022, Plaintiff served the complaint and summons on Defendant's agent for service, Paul Ray Den Beste.  [Docket No. 9.] On May 31, 2022, Plaintiff moved for entry of default.  [Docket No. 15.]  The clerk entered default against Defendant on June 17, 2022.  [Docket No. 16.]  Plaintiff filed this motion on August 19, 2022, along with supplemental briefing on March 23, 2023.  [Docket Nos. 19, 28 (First Supp. Br.).]  Pursuant to court order, Plaintiff filed a first amended complaint on August 10, 2023, and related supplemental briefing on September 8, 2023.  [Docket Nos. 32 ("FAC"), 33 (Second Supp. Br.).]

## II.     PROCEDURAL HISTORY

On April 14, 2022, Plaintiff served the complaint and summons on Defendant's agent for service Paul Ray Den Beste.  [Docket No. 9.]  On April 19, 2022, Den Beste filed a responsive pleading styled as an "answer by special appearance with notice of state court orders directed to ongoing receivership."  [Docket No. 10.]  The court construed the filing as evidencing Den Beste's intent to appear on behalf of Defendant as a shareholder, which is barred by Ninth Circuit authority requiring corporations to be represented by a lawyer admitted to practice before this court.  [Docket No. 11.]  The court ordered Defendant to retain legal counsel and file a notice of appearance of counsel by May 27, 2022.  Defendant failed to appear or otherwise respond to the court's order.  As a result, the clerk entered default against Defendant pursuant to Federal Rule of Civil Procedure 55(a) on June 17, 2022.  [Docket No. 16.]

In response to the court's order to retain legal counsel, Den Beste instead filed two documents stating that Defendant is unable to retain legal representation because the corporation was placed and remains under receivership by the Superior Court of California, County of Sonoma.  [Docket Nos. 14, 18.]  According to Den Beste's filings, the Superior Court awarded four judgments against Paul Ray Den Beste and Melody Den Beste, which, as of July 15, 2010, amounted to a total of $56,086.89.  [Docket No. 14, Ex. A.]  In light of "two . . . occasions when . . . Paul Den Beste and Melody Den Beste, moved substantial assets out of the reach of the judgment creditor immediately after an enforcement activity," the judgment creditor requested the appointment of a receiver over "all non-exempt real and personal property and business interest owned, controlled, or possessed by [Paul Den Beste and Melody Den Beste], wherever located and whether now or in the future owned, controlled or possessed by them."  *Id.* The Superior Court appointed a receiver on August 23, 2010.  [Docket No. 14, Ex. B.]  Den Beste specifically identified Patrick Bulmer and/or the California Receivership Services as Defendant's receiver and Brad Brereton as California Receivership Services' attorney.  [Docket Nos. 14 at 3; 18 at 2.]

Plaintiff then clarified that upon further research, it determined that Patrick Bulmer is deceased, and that Brad Brereton no longer has a client involved in Defendant's receivership. [Docket Nos. 23, 23-1.]  In support of its position, Plaintiff submitted an email from Brad

3

Brereton stating: "Patrick Bulmer died a couple of years ago.  So I no longer have a client involved in the matter.  I had informed the [state] court of his death, but I never received any response.  Happy to assist if I can, but I am not certain that I have any authority over anything." [Docket No. 23-1.]

On December 7, 2022, the court ordered Den Beste to address the issue of Defendant's receivership by February 1, 2023.  [Docket No. 24.]  Specifically, the court instructed Den Beste to "take action, if he so chooses, to get a new receiver appointed and for the receiver to notify this court of its intentions regarding this case."  The court warned that it would adjudicate the motion for default judgment after that date.  Defendant failed to notify the court of the appointment of a new receiver or otherwise respond to the court's order.

Therefore, the court proceeds to adjudicate the motion for default judgment.

**B.      Statutory Framework**

Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To achieve this goal, the CWA makes unlawful "'the discharge of any pollutant by any person' without a permit [issued under the National Pollutant Elimination System (NPDES)].'"  *Cnty. of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1469 (2020) (quoting 33 U.S.C. § 1311(a)).  Permits are issued by the Administrator of the Environmental Protection Agency ("EPA") or by states that have been authorized by the EPA to act as NPDES permitting authorities.  *Env't Def. Ctr., Inc. v. U.S. E.P.A.*, 344 F.3d 832, 841 (9th Cir. 2003) (citing U.S.C. § 1342(a)-(b)).

In 1987, Congress passed amendments to the CWA, including section 402(p), 33 U.S.C. § 1342(p), to better regulate pollution from stormwater runoff.  *Env't Def. Ctr.*, 344 F.3d at 841. The CWA regulates storm water if the discharge falls into one of five categories, the second of which is at issue here:

> (A) A discharge with respect to which a permit has been issued under this section before February 4, 1987.
> (B) *A discharge associated with industrial activity.*
> (C) A discharge from a municipal separate storm sewer system serving a population of 250,000 or more.
> (D) A discharge from a municipal separate storm sewer system

United States District Court
Northern District of California

4

> serving a population of 100,000 or more but less than 250,000.
> (E) A discharge for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

33 U.S.C. § 1342 (p)(2)(A)-(E) (emphasis added).

Relevant to this action, "[d]ischargers of storm water associated with industrial activity" must apply for an individual permit or seek coverage under a promulgated storm water general permit. 40 C.F.R. § 122.26(c)(1); *see also* 33 U.S.C. § 1342(p)(3)(A). In California, industrial storm water discharges are subject to a General Permit. *See* State Water Resources Control Board Water Quality Order No. 91-13-DWQ, *as amended by* Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ, and Water Quality Order No. 2014-0057-DWQ. The General Permit requires industrial dischargers to develop and implement an effective Storm Water Pollution Prevention Plan; develop and implement a comprehensive monitoring and reporting program; identify and implement best management practices; and establish a Pollution Prevention Team, among other requirements. *Waterkeepers N. Cal. v. AG Indus. Mfg., Inc*., 375 F.3d 913, 916 (9th Cir. 2004).

Section 505(a) permits a private citizen to bring a lawsuit against any person "alleged to be in violation" of the CWA. *See* 33 U.S.C. § 1365(a)(1). Before a suit can be commenced, the citizen must give a 60–day notice of intent to sue. *See* 33 U.S.C. § 1365(b)(1)(A). The purpose of the notice is to give government agencies an opportunity to enforce environmental regulations without the need for a citizen suit, and to give the alleged violator "'an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit.'" *Ctr. For Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 800 (9th Cir. 2009) (quoting *Hallstrom v. Tillamook County*, 493 U.S. 20, 29 (1989)).

## III.   LEGAL STANDARDS

Federal Rule of Civil Procedure 55(b)(2) permits a court to enter a final judgment in a case following a defendant's default. *Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995, 999 (N.D. Cal. 2001). Whether to enter a judgment lies within the court's discretion. *Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1174 (C.D. Cal. 2002) ("A defendant's

5

1 default does not automatically entitle the plaintiff to a court-ordered judgment." (citing *Draper v.*

2 *Coombs*, 792 F.2d 915, 924-25 (9th Cir. 1986))).

3     Before assessing the merits of a default judgment, a court must ensure the adequacy of

4 service on the defendant, as well as confirm that it has subject matter jurisdiction over the case and

5 personal jurisdiction over the parties. *See In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).  If the

6 court finds these elements satisfied, it turns to the following factors ("the *Eitel* factors") to

7 determine whether it should grant a default judgment:

8         (1) the possibility of prejudice to the plaintiff, (2) the merits of
        plaintiff's substantive claim, (3) the sufficiency of the complaint, (4)

9         the sum of money at stake in the action[,] (5) the possibility of a
        dispute concerning material facts[,] (6) whether the default was due

10         to excusable neglect, and (7) the strong policy underlying the Federal
        Rules of Civil Procedure favoring decision on the merits.

11

12 *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986) (citation omitted).  In this analysis, "the

13 well-pleaded allegations of the complaint relating to a defendant's liability are taken as true."

14 *Pepsico, Inc.*, 238 F. Supp. 2d at 1175 (citing *Televideo Sys., Inc. v. Heidenthal*, 826 F.2d 915,

15 917-18 (9th Cir. 1987)).  Nevertheless, default does not compensate for essential facts not within

16 the pleadings and those legally insufficient to prove a claim.  *Cripps v. Life Ins. Co. of N. Am.*, 980

17 F.2d 1261, 1267 (9th Cir. 1992).

18 **IV.   REQUEST FOR JUDICIAL NOTICE**

19     Plaintiff filed a request for judicial notice, asking the court to take judicial notice of

20 Exhibits A through F.  [Docket No. 20.]  The exhibits contain correspondence between Defendant

21 and the Regional Board (Exs. A-C) and copies of precipitation data collection from the National

22 Oceanic and Atmospheric Administration's climate data website (Exs. D-F).

23     On a motion for default judgment, the court is not restricted to the allegations in the

24 complaint.  Under Rule 55(b)(2), if the court needs to "determine the amount of damages,"

25 "establish the truth of any allegation by evidence," or "make an investigation of any other matter,"

26 it may conduct such hearings or order such references as it deems necessary and proper.  This rule

27 gives the court "considerable leeway as to what it may require as a prerequisite to the entry of a

28 default judgment."  *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917 (9th Cir. 1987).

United States District Court
Northern District of California

1    Because Plaintiff's exhibits are properly authenticated by counsel's declaration, the court

2    considers Exhibits A through F as evidence.  The request for judicial notice is denied as moot.

3    **V.    ANALYSIS**

4    **A.  Jurisdiction**

5    Before entering default judgment, a federal court has an "affirmative duty to look into its

6    jurisdiction over both the subject matter and the parties."  *In re Tuli v. Rep. of Iraq*, 172 F.3d 707,

7    712 (9th Cir. 1999).  Here, the court has subject matter jurisdiction and personal jurisdiction over

8    the parties.

9    **1.  Subject Matter Jurisdiction**

10   The court has subject matter jurisdiction over this case pursuant to 33 U.S.C. §

11   1365(a)(1)(A) (empowering private citizens to sue industrial dischargers for violations of the

12   CWA) and 29 U.S.C. § 1331.  Plaintiff appears to have given timely notice to federal and state

13   agencies as required by 33 U.S.C. § 1365(b)(1)(A).  Compl. ¶ 2.

14   **2.  Personal Jurisdiction**

15   "With respect to a corporation, the place of incorporation and principal place of business

16   are 'paradig[m] . . . bases for general jurisdiction."  *Daimler AG v. Bauman*, 571 U.S. 117, 137

17   (2014) (quoting *A General Look at General Jurisdiction*, 66 Texas L. Rev. 721, 728 (1988)).

18   Either basis is sufficient for the exercise of general jurisdiction over corporations.  *AM Tr. v. UBS

19   AG*, 681 F. App'x 587, 588 (9th Cir. 2017) ("[A] corporation is typically subject to general

20   personal jurisdiction only in a forum where it is incorporated *or* where it maintains its principal

21   place of business." (emphasis added)).

22   Here, Defendant is incorporated in California and the Facility is located in Sonoma

23   County.  Compl. ¶¶ 9, 36.  Because Defendant is a California corporation, it is subject to general

24   personal jurisdiction in California.

25   **3.  Organizational Standing**

26   "When suing on behalf of its members, an organization must show that its members would

27   have individual standing, the issues are germane to the organization's purpose, and neither the

28   claim nor the requested relief requires individual participation."  *Inland Empire Waterkeeper v.*

1    *Corona Clay Co.*, 17 F.4th 825, 831 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 1444 (2022).

2           Plaintiff alleges that its members live, work, travel, and recreate near the Russian River,

3    and that pollution from the discharged storm water impacts their current and anticipated use of the

4    land for "educational, scientific, conservation, aesthetic, and spiritual" purposes.  Compl. ¶¶ 13-

5    15.

6           The Ninth Circuit routinely has found evidence similar to the allegations in this case

7    sufficient to establish standing.  *See Inland Empire Waterkeeper*, 17 F.4th at 832 (collecting

8    cases).  Taking Plaintiff's allegations as true, the court finds that Plaintiff has standing to bring

9    this action.

10          **B.      Adequacy of Service**

11          Federal Rule of Civil Procedure Rule 4(h) allows for service of a corporation, partnership,

12   or association "by delivering a copy of the summons and of the complaint to an officer, a

13   managing or general agent, or any other agent authorized by appointment or by law to receive

14   service of process and—if the agent is one authorized by statute and the statute so requires—by

15   also mailing a copy of each to the defendant."  Fed. R. Civ. P. 4(h)(1)(B).  Rule 4 also allows a

16   corporation to be served "following state law for serving a summons in an action brought in courts

17   of general jurisdiction, where the district court is located or where service is made."  Fed. R. Civ.

18   P. 4(h)(1)(A); Fed. R. Civ. P. 4(e)(1).  In turn, California law allows for service of a corporation

19   by personally delivering a copy of the summons and the complaint to a person authorized to

20   receive service of process.  Cal. Code Civ. Proc. § 416.10(a).

21          On April 14, 2022, Plaintiff served the complaint and summons on Defendant's agent for

22   service Paul Ray Den Beste.  [Docket No. 9.]  Therefore, the court finds that Plaintiff properly

23   served Defendant.  *See* Cal. Code Civ. Proc. § 416.10(a) (authorizing service on corporation by

24   delivering summons and complaint to designated agent for service of process).

25          **C.      Application of the *Eitel* Factors**

26          Having found that the jurisdictional and service requirements are met, the court now turns

27   to the *Eitel* factors to determine whether default judgment should be granted.

28

United States District Court
Northern District of California

### 1. Possibility of Prejudice

Plaintiff argues that in the absence of a default judgment, it will be left without other recourse and will suffer prejudice.  Mot. at 6.  Since Defendant has failed to appear and defend the action, Plaintiff will most likely have no other avenue for recovery.  *See, e.g.*, *Los Angeles Waterkeeper v. A & A Metal Recycling, Inc.*, No. CV154326MWFJEMX, 2015 WL 13917738, at *3 (C.D. Cal. Nov. 18, 2015 (finding prejudice to plaintiff where a defendant sued under the CWA failed to appear in the action).  This factor weighs in favor of granting default judgment.

### 2. Merits of the Substantive Claim and Sufficiency of the Complaint

"Under an *Eitel* analysis, the merits of plaintiff's substantive claims and the sufficiency of the complaint are often analyzed together."  *Dr. JKL Ltd. v. HPC IT Educ. Ctr.*, 749 F. Supp. 2d 1038, 1048 (N.D. Cal. 2010).  After an entry of default, well-pleaded allegations in the complaint are deemed true, except for the amount of damages.  *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).

Plaintiff's sole cause of action alleges that Defendant violated 33 U.S.C. § 1311(a) by discharging storm water associated with industrial activities generated at its Facility into the Russian River without a NPDES permit issued pursuant to 33 U.S.C. § 1342.  Compl. ¶ 116.

"To establish a violation of the Act's NPDES requirements, a plaintiff must prove that (1) a person (2) discharged (3) a pollutant (4) to navigable waters of the United States (5) from a point source (6) without a permit."  *San Francisco Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 754 (N.D. Cal. 2011) (citing *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993)); *see also Friends of Outlet Creek v. Grist Creek Aggregates, LLC*, No. 16-CV-00431-JSW, 2019 WL 1975434, at *3 (N.D. Cal. Mar. 19, 2019) (citation omitted).  The Supreme Court recently discussed the CWA's definitional language:

> First, the [Clean Water] Act defines 'pollutant' broadly, including in its definition, for example, any solid waste, incinerator residue, heat, discarded equipment, or sand (among many other things). Second, the Act defines a 'point source' as any discernible, confined and discrete conveyance from which pollutants are or may be discharged, including, for example, any container, pipe, ditch, channel, tunnel, conduit, or well. Third, it defines the term 'discharge of a pollutant' as any addition of any pollutant to navigable waters including navigable streams, rivers, the ocean, or coastal waters from any point

source.

*Cnty. of Maui, Hawaii*, 140 S. Ct. at 1469 (cleaned up).

Here, Plaintiff has alleged all six elements of the claim. First, Defendant is a "person" under 33 U.S.C. § 1362(5), which defines the term as any "individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." Plaintiff alleges that Defendant is a corporation. Compl. ¶ 9.

Second, Plaintiff has adequately alleged that Defendant discharges pollutants. As discussed above, the CWA defines the term "discharge of a pollutant" as "any addition of any pollutant to navigable waters including navigable streams, rivers, the ocean, or coastal waters from any point source." Plaintiff asserts that Defendant "discharges pollutant-contaminated storm water from the Facility into the Russian River." Compl. ¶¶ 5, 6, 14, 15. The complaint describes the sources of these pollutants, explaining that they are the result of Defendant's industrial activities and industrial materials' exposure to storm water. *Id.* ¶¶ 38-41. The materials include soils, wood, compost, and pollutants associated with the operation of heavy equipment. *Id.* ¶¶ 38, 39, 41. The complaint also alleges that the industrial activities at the Facility fall under Standard Industrial Classification Code 2875 ("Fertilizers, Mixing Only"). *Id.* ¶ 42.

These allegations are sufficient to establish discharge of a pollutant. As the court in *Puget Soundkeeper All. v. Whitley Mfg. Co.*, 145 F. Supp. 3d 1054, 1057 (W.D. Wash. 2015) explained:

> [P]laintiff need not prove that defendant's stormwater contained a particular substance in a particular quantity because Congress, in enacting § 1342(p), determined that defendant's stormwater is, in and of itself, a pollutant. This conclusion is compelled by the statute. The CWA forbids the discharge of pollutants into navigable waters unless the discharge is allowed by permit.
>
> …
>
> Thus, in determining that the discharge of stormwater associated with industrial activity requires a permit, Congress necessarily found that the stormwater itself is a pollutant subject to regulation under the CWA.

In addition, facilities that fall under certain Standard Industrial Classification codes are considered to be engaged in "industrial activity." *See* 40 C.F.R. § 122.26(b)(14). Facilities classified under Standard Industrial Classification 28 – like the Facility at issue here – are considered to be

engaged in "industrial activity" for purposes of section 122.26(b)(14) and are thus required to obtain a permit to discharge pollutants.

Plaintiff also adequately alleges that Defendant adds pollutants "to navigable waters." The Russian River and the Pacific Ocean are waters of the United States and "navigable waters" for purposes of the CWA. *See* 33 U.S.C. § 1362(7). Accordingly, Plaintiff's allegations satisfy the second, third, and fourth elements under *San Francisco Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719 (N.D. Cal. 2011).

Next, Plaintiff must establish that the Facility (or a part of the Facility) is a point source. "Point source" is defined as: "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). The Ninth Circuit has explained that "[s]torm water presents a unique problem under the CWA because it is a significant source of water pollution but is not inherently a nonpoint or point source." *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 505 (9th Cir. 2013) (citation and quotation omitted).

The complaint alleges in a conclusory way that "[t]he Facility collects and discharges storm water associated with industrial activity from the Facility into the Russian River." Compl. ¶ 43. On August 1, 2023, the court ordered Plaintiff to either amend its complaint or submit additional briefing to support a determination at default judgment that Defendant discharged storm water from a "point source" under the CWA. [Docket No. 30.] Plaintiff filed the FAC on August 8, 2023. The FAC now alleges that the Facility collects storm water associated with industrial activity "into a system of storm water conveyances, including drop inlets, culverts, ditches, ponds, and channels." FAC ¶ 43. The Facility allegedly discharges storm water collected by this conveyance system from at least three discharge locations. *See id.* ¶¶ 44-47. These allegations are sufficient to establish a point source under the CWA.

Finally, Plaintiff alleges that Defendant has not had a permit authorizing the Facility to discharge storm water associated with industrial activity since at least February 25, 2016. Compl. ¶¶ 65-72. Plaintiff has sufficiently alleged that Defendant has no permit covering its pollutant discharges.

United States District Court
Northern District of California

1    In sum, the court finds that Plaintiff has sufficiently pled a claim under 33 U.S.C. §

2    1311(a).

### 3.  Sum of Money at Stake

4    The fourth *Eitel* factor focuses on the amount of money at issue in the action. "[C]ourts

5    should be hesitant to enter default judgment in matters involving large sums of money." *Yelp Inc.*

6    *v. Catron*, 70 F. Supp. 3d 1082, 1099-1100 (N.D. Cal. 2014); *see also Bd. of Tr. v. Core Concrete*

7    *Const., Inc.*, No. 11-cv-02532-LB, 2012 WL 380304, at *1, *4 (N.D. Cal. Jan. 7, 2012) ("When

8    the money at stake in the litigation is substantial or unreasonable, default judgment is

9    discouraged."). However, when "the sum of money at stake is tailored to the specific misconduct

10   of the defendant, default judgment may be appropriate." *Id.*

11   Plaintiff seeks civil penalties in the amount of $59,973 per day per violation, amounting to

12   a total of $10,915,086. Plaintiff also requests $35,235 in attorneys' fees and $614.32 in costs.

13   Mot. at 9. The total amount requested is $10,950,321. Plaintiff's request is authorized by the

14   applicable statutes and the complaint tailors the amount requested to the conduct alleged. This

15   factor weighs in favor of granting default judgment.

### 4.  Possibility of Dispute Concerning Material Facts

17   When a party "fail[s] to appear or otherwise respond . . . in defaulting, defendants are

18   deemed to have admitted all well-pleaded factual allegations contained in the complain[t]."

19   *DirecTV v. Hoa Huynh*, 503 F.3d 847, 851 (9th Cir. 2007) (citing Fed. R. Civ. P. 55(a)). All

20   allegations in the complaint are taken as true, except for those regarding damages. *TeleVideo Sys.,*

21   *Inc.*, 826 F.2d at 917-18.

22   Here, the possibility of a dispute about the material facts is unlikely. Defendant was

23   served with the complaint but failed to appear and the clerk accordingly entered default.[1] As set

---

[1] While Plaintiff served Defendant with the motion for entry of default (Docket No. 15), the docket suggests that it did not serve Defendant with its motion for default judgment at the time of filing. Under Federal Rule of Civil Procedure 55(b)(2), "[i]f the party against a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 7 days before the hearing." "The appearance need not necessarily be a formal one, i.e., one involving a submission or presentation to the court. In limited situations, informal contacts between the parties have sufficed when the party in default has thereby demonstrated a clear purpose to defend the suit." *Wilson v. Moore and Assocs., Inc.*,

United States District Court
Northern District of California

forth above, Plaintiff's well-pleaded allegations are presumed to be true, and the complaint adequately alleges a violation of the CWA.  The record reflects Defendant's silence despite notice of the proceedings and several opportunities to respond.

The court finds that there is little possibility of dispute as to material facts.

### 5.  Excusable Neglect

The sixth *Eitel* factor considers whether a defendant's default resulted from excusable neglect.  *Eitel*, 782 F.2d at 1472.  When a defendant is properly served with the complaint and the motion for default judgment, an entry of default judgment is favored.  *W. States Insulators & Allied Workers Pension Plan v. Jenco Mech. Insulation, Inc.*, No. 11-cv-0175 EMC, 2012 WL 1123229, at *3 (N.D. Cal. Apr. 3, 2012).

As detailed above, Plaintiff's complaint was filed on March 28, 2022.  On April 19, 2022, Defendant purported to file an answer through its agent for service of process Paul Ray Den Beste. [Docket No. 10.]  On April 27, 2022, the court struck his answer to the extent it was filed by Defendant without counsel.  [Docket No. 11.]  Despite notice to Defendant that it must appear and defend this action through counsel, and ample opportunity for Defendant to obtain counsel, no attorney has entered an appearance on behalf of Defendant to this date.  Accordingly, it is unlikely that Defendant's failure to respond is due to excusable neglect.

This factor weighs in favor of granting default judgment.

### 6.  Favoring Decision on the Merits

Despite the policy of favoring a decision on the merits, default judgment is appropriate when a defendant refuses to litigate a case. Fed. R. Civ. P. 55(b).  "Defendant's failure to answer Plaintiffs' Complaint makes a decision on the merits impractical, if not impossible."  *PepsiCo,*

---

564 F.2d 366, 368 (9th Cir. 1977).  Here, as previously discussed at length, Defendant never formally appeared in the proceeding or responded to the complaint, despite proper service of the complaint and of several subsequent filings in the case.  [*See, e.g.*, Docket Nos. 27 (proof of service of 2/24/2023 Order Denying Motion for Default Judgment Without Prejudice to Submission of Supplemental Briefing); 31 (proof of service of 8/1/2023 Order to Submit Supplemental Briefing in Support of Default Judgment).]  In addition, nothing in the record suggests "informal contacts between the parties" demonstrating a "clear purpose" on Defendant's behalf to make an appearance and defend against Plaintiff's claim.  Accordingly, the court is satisfied that notice of the motion for default judgment was not required under Rule 55(b)(2).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    *Inc*, 238 F.2d at 1177.

2        As previously explained, Defendant has failed to appear or otherwise respond to the court's

3    order.  A decision on the merits is thus impractical.

4        On balance, the *Eitel* factors weigh in favor of granting Plaintiff's motion for default

5    judgment.

6        **D.    Remedies**

7            **1.  Declaratory Relief**

8        Under 28 U.S.C. § 2201(a), courts "may declare the rights and other legal relations of any

9    interested party seeking such declaration whether or not further relief is or could be sought."  "The

10   two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when

11   the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and

12   (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving

13   rise to the proceeding.  It follows that when neither of these results can be accomplished, the court

14   should decline to render the declaration prayed."  *Los Angeles Waterkeeper v. A & A Metal*

15   *Recycling, Inc.*, No. CV154326MWFJEMX, 2015 WL 13917738, at *5 (C.D. Cal. Nov. 18,

16   2015) (quoting *McGraw–Edison Co. v. Preformed Line Products Co.,* 362 F.2d 339 (9th Cir.

17   1966)).

18       Plaintiff seeks a declaratory judgment that Defendant violated the CWA 153 times[2] and

19   that it continues to violate Section 301(a) of the CWA each time it discharges storm water from its

20   facility without a NPDES permit.  Mot. at 10-11.  The court recommends finding that Plaintiff is

21   entitled to declaratory relief.  For the reasons discussed above, Plaintiff has established that there

22   is an actual controversy, and that declaratory judgment will serve a useful purpose of clarifying

23   Defendant's obligations under the CWA.

24           **2.  Injunctive Relief**

25       Plaintiff requests that the court enter injunctive relief either requiring Defendant to obtain

26   coverage under an NPDES permit or prohibiting Defendant from discharging pollutants from its

27   _____

28   [2] The court notes that elsewhere in its briefing Plaintiff argues that Defendant violated the CWA 182 times.  *See* Mot. at 11-13.

facility to the surface waters surrounding and downstream from the Facility.  Mot. at 11.

"[A] district court's equitable powers under the CWA are limited to enforcing standards, limitations, and orders that have been violated." *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 1000 (9th Cir. 2000) (citing 33 U.S.C. § 1365(a)).  "So long as the district court's equitable measures are reasonably calculated to 'remedy an established wrong,' they are not an abuse of discretion."  *Id.* (quoting *Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981, 986 (9th Cir. 1994)).  Injunctive relief is warranted when a plaintiff demonstrates: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent." *Rogue Riverkeeper v. Bean*, No. 1:11-CV-3013-CL, 2013 WL 1785778, at *3 (D. Or. Jan. 23, 2013), *report and recommendation adopted,* No. 1:11-CV-3013-CL, 2013 WL 1785777 (D. Or. Apr. 25, 2013) (quoting *Monsanto v. Geerston Seed*, 130 S. Ct. 2743, 2756 (2010)).

Plaintiff satisfies all requirements for a permanent injunction.  Plaintiff's members have suffered and continue to suffer as a result of Defendant's failure to comply with the CWA. Specifically, Defendant's stormwater discharges continuously impair members' recreational, educational, scientific, conservation, aesthetic, and spiritual uses of the Russian River, the Pacific Ocean, and the neighboring land.  *See* Compl. ¶ 14.  This adverse impact cannot be remedied with monetary damages.  The balancing of hardships also tips in Plaintiff's favor – granting a permanent injunction will only require that Defendant stop engaging in illegal activities and will serve the public interest in protecting the environment.

Accordingly, the court recommends an injunction in favor of Plaintiff.  Specifically, the court recommends prohibiting Defendant from discharging pollutants from its facility to the surface waters surrounding and downstream from the Facility without a proper permit.  *See* Fed. R. Civ. P. 65(d) ("Every order granting an injunction . . . shall set forth the reasons for its issuance; shall be specific in terms; [and] shall describe in reasonable detail . . . the act or acts sought to be restrained.").

### 3. Civil Penalties

Penalties are mandatory once liability for violations of the CWA has been established. *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1397 (9th Cir. 1995). As codified, the CWA provides for civil penalties "not to exceed $25,000 per day for each violation." 33 U.S.C. § 13919(d). As adjusted pursuant to inflation, the maximum penalty has increased from $59,973 to $64,618 since the complaint was filed.[3] *See* 40 C.F.R. § 19.4. "A district court has discretion to set the amount of a penalty (up to the statutory maximum) and is instructed to consider the seriousness of the violation, any economic benefit that resulted from the violation, any history of violations by the party to be penalized, that party's good-faith efforts to comply with the applicable requirements, the economic effect of the penalty on the violator, and 'such other matters as justice may require.'" *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 1001 (9th Cir. 2000) (quoting 33 U.S.C. § 13919(d)).

In practice, courts have employed either a "top-down" or "bottom-up" approach to calculate civil penalties under the CWA. *See Californians for Alternatives to Toxics v. Kernen Constr. Co.*, No. 4:20-CV-01348 YGR, 2021 WL 1734897, at *3 n.2 (N.D. Cal. May 2, 2021) (comparing approach in different circuits). "The bottom-up approach looks first at the economic benefit of the violation, which is often difficult to ascertain." *Los Angeles Waterkeeper*, 2015 WL 13917738, at *6 (citing *Ctr. for Biological Diversity v. Marina Point Dev. Assocs.*, 434 F. Supp. 2d 789, 799 (C.D. Cal. 2006)). The top-down approach calculates the maximum penalty and then reduces it according to the statutory factors. *Id.*

Here, Plaintiff asks the court to employ a top-down approach to impose a $59,973 penalty for 182 violations, arguing that none of the six penalty factors warrant a downward adjustment. Mot. at 15. In total, Plaintiff requests that civil penalties be assessed against Defendant in the

---

[3] Under 40 C.F.R. § 19.4, any person who violates the CWA shall be subject to 1) civil penalties not to exceed $59,973 per day per violation occurring after November 2, 2015, where the penalties were assessed on or after January 12, 2022, and 2) civil penalties not to exceed $64,618 per day per violation occurring after November 2, 2015, where the penalties were assessed on or after January 6, 2023.

United States District Court
Northern District of California

1    amount of $10,915,086.[4]  *Id.*

2           Plaintiff argues that Defendant violated the CWA at least 182 times, reasoning as follows:

3    Before its General Permit coverage was terminated in February 2016, Defendant collected samples

4    of stormwater discharges from its Facility as required under the General Permit.  By comparing

5    the known dates of discharge with historic rain data, Plaintiff obtained a starting point to

6    determine the amount of rainfall necessary to cause a discharge.  Prior to February 2016,

7    Defendant reported discharges to the Regional Board on three different dates: 12/18/2007,

8    4/1/2013, and 3/5/2014.[5]  Mot. at 7-8 (citing RJN Exs. A-C).  Plaintiff relied on these reported

9    discharges and looked at the 72-hour rainfall total for each day of discharge.[6]  Plaintiff used the

10   "most conservative estimate," i.e., the highest rain total, to count violations.  Based on the

11   information gathered, Plaintiff concluded that the Facility discharges, and thus violates the

12   General Permit, on days where the 72-hour rainfall total is equal or greater than 0.74 inches.  Since

13   March 28, 2017, three different weather stations recorded 182, 198, and 188 days where the 72-

14   hour rainfall total was equal to or greater than 0.74 inches.  *See* RJN Exs. D-F.  Accordingly,

15   Plaintiff contends there have been at least 182 unlawful discharges from the Facility in the last five

16   years.

17          The court accepts Plaintiff's calculation of 182 accrued violations, which is supported by

---

[4] The relevant time period for the violations is unclear.  *Compare* Compl. ¶¶ 65-72 (alleging that Defendant has been operating its Facility without the required permit since February 25, 2016), *with* Compl. ¶ 116 (alleging that Defendant has violated the CWA since at least March 28, 2017), *and* Compl. at VII(d) (seeking civil penalties for all violations occurring after November 2, 2015).  Under the relevant statute of limitations, Plaintiff may allege violations going back – at most – five years from the filing of the complaint.  *See Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517 (9th Cir. 1987); *see also* Mot. at 8 (noting the same).  Accordingly, Plaintiff may only allege violations since March 28, 2017.

[5] Exhibits A through C do not show that Defendant reported a discharge on 12/18/2007.  Exhibit A (letter from Regional Board to Defendant dated 8/26/2013) refers to a sample dated 4/1/2013, Exhibit B (letter from Regional Board to Defendant dated 9/23/2014) includes a sample from 3/5/2014, and Exhibit C (letter from Regional Board to Defendant dated 10/17/2014) lists a sample from 3/5/2014.  In any event, the 12/18/2007 discharge does not appear crucial to Plaintiff's analysis, as Plaintiff used the highest rain total to count violations, which occurred in connection with the 4/1/2013 discharge.  *See* Mot. at 8.

[6] Plaintiff considered the 72-hour rainfall total rather than the 24-hour total to account for rainfall from the preceding days.  *See* Mot. at 8.

United States District Court
Northern District of California

1  evidence and based on reasonable inferences drawn from Defendant's own discharge data and

2  publicly available rainfall data.  In supplemental briefing, Plaintiff also offers the declaration of

3  hydrologist Ian Wren in support of its methodology.  Wren confirms that "Plaintiff reasonably

4  interpreted the data to generate a conservative benchmark value against which to identify the

5  number of days when stormwater discharges from the Facility likely occurred."  [Docket No. 28-1

6  (Ian Wren Decl., March 23, 2023) ¶ 12.]  He explains that this opinion is supported by scientific

7  literature and technical guidance, as well as California's General Permit for Storm Water

8  Discharges Associated with Industrial Activities.  *Id.*  Finally, Wren describes alternative methods

9  for estimating the number of discharge days, each of which results in a comparable number of

10  total violations.  *Id.* ¶ 17.

11       Plaintiff asks the court to impose a $59,973 penalty for each of the 182 violations.  The

12  court agrees with Plaintiff that a top-down approach to calculate civil penalties offers a more

13  reliable method in this case, where Defendant has failed to participate in the litigation.  *See Los*

14  *Angeles Waterkeeper*, 2015 WL 13917738, at *7 (on motion for default judgment, adopting the

15  top-down approach because the court lacked relevant facts to analyze the economic benefit

16  defendants derived from their conduct); *see also Ctr. for Biological Diversity*, 434 F. Supp. 2d at

17  799 (on motion for default judgment, finding that the top-down approach offered a more reliable

18  and less speculative method of calculating the penalty).  Under that approach, the maximum

19  possible penalty for 182 violations committed since March 28, 2017 amounts to $64,618 per day

20  per violation, or $11,760,476.

21       The court finds that the statutory penalty factors discussed below support a civil penalty at

22  the rate of $25,000 per violation and recommends the imposition of $4,550,000 in total civil

23  penalties.  This amount is adequate to punish and deter Defendant, while incentivizing Defendant

24  to come into prompt compliance and recognizing that Defendant does not appear to have a history

25  of violating the CWA beyond what is described in this lawsuit.  *See Tull v. United States*, 481 U.S.

26  412, 422 (1987) ("[t]he legislative history of the [Clean Water] Act reveals that Congress wanted

27  the district court to consider the need for retribution and deterrence, in addition to restitution,

28  when it imposed civil penalties"); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,

United States District Court
Northern District of California

18

528 U.S. 167, 185 (2000) ("Congress has found that civil penalties in Clean Water Act cases do more than promote immediate compliance by limiting the defendant's economic incentive to delay its attainment of permit limits; they also deter future violations"); *see also California Sportfishing Prot. All. v. Callaway*, No. 2:12-CV-0843 JAM CKD, 2012 WL 3561968, at *1 (E.D. Cal. Aug. 17, 2012), *report and recommendation adopted,* No. 2:12-CV-843 JAM CKD, 2012 WL 4834406 (E.D. Cal. Oct. 10, 2012) (adopting $32,500 as penalty per violation at the plaintiff's request for a total of $29,925,000 in penalties); *United States v. Bayley*, No. 3:20-CV-05867-DGE, 2023 WL 3093126, at *11 (W.D. Wash. Apr. 26, 2023) (adopting $62,500 penalty per violation at the plaintiff's request for a total of $250,000 in penalties).

### a. The Seriousness of the Violations

In considering the seriousness of a defendant's conduct, courts consider "(1) the number of violations; (2) the duration of noncompliance; (3) the significance of the violation (degree of exceedance and relative importance of the provision violated); and (4) the actual or potential harm to human health and the environment." *Hawaii's Thousand Friends v. City & Cnty. of Honolulu*, 821 F. Supp. 1368, 1383 (D. Haw. 1993).

In light of the relatively high number of violations, the significant length of time since Defendant was last in compliance with its CWA obligations, and the potential harm allegedly suffered by Plaintiff and its members, the court finds that Defendant's violations are serious.

### b. The Economic Benefit Resulting from the Violations

The court lacks information about the economic benefit to Defendant as a result of its violations. However, "it is reasonable to infer that Defendant[] derived some benefit from not having to comply with the applicable regulations[,]" including not incurring "the costs of developing a storm water pollution prevention plan, developing and implementing best management practices, costs associated with collecting and analyzing sample results, and costs associated with training its pollution prevention team." *See Los Angeles Waterkeeper*, 2015 WL 13917738, at *7; Mot. at 14.

### c. Defendant's History of Violations

Plaintiff argues that Defendant has been out of compliance with the CWA since February

1   2016 and that the Regional Board has tried to bring Defendant into compliance, to no avail. *See*

2   Mot. at 14.  According to Plaintiff, the circumstances in this case demonstrate Defendant's blatant

3   disregard for the requirements of the CWA.

4       Although the record supports a finding that Plaintiff has failed to comply with the CWA

5   and the General Permit since 2016, that violation is not separate from the one at issue in this case.

6   *See Californians for Alternatives to Toxics*, 2021 WL 1734897, at *7 (declining to find that

7   defendant had a history of failing to comply with the CWA based on previous case in which no

8   liability was established or on warning letters sent by Regional Board to defendants).

9       **d.   Good Faith Efforts to Comply with the Applicable Requirements**

10       Plaintiff asserts that Defendant has made minimal efforts to comply with the CWA.  Mot.

11   at 14.  The court agrees.  As previously explained, the record indicates that Defendant has been out

12   of compliance with the CWA since 2016, and that Defendant's only attempt at obtaining the

13   required permit coverage was incomplete.

14       **e.   The Economic Impact of the Penalty on the Violator**

15       Due to Defendant's refusal to participate in this litigation, the court lacks relevant facts to

16   determine the economic impact of the penalty on the Facility.

17       **f.   Other Matters as Justice May Require**

18       The court agrees with Plaintiff that because civil penalties under the CWA are punitive in

19   nature, the penalty here should be large enough to encourage Defendant's compliance with the

20   CWA.  *See* Mot. at 15 (citing *Tull v. United States*, 481 U.S. 412, 422 (1987)).

21       For the foregoing reasons, the court recommends imposition of a penalty of $4,550,000.

22       **4.   Attorneys' Fees**

23       Plaintiff requests partial reimbursement of attorneys' fees in the amount of $35,235 for

24   68.3 hours of work by two timekeepers.  [Docket No. 19-1 (Andrew Packard Decl.) ¶ 9.]  Plaintiff

25   also seeks $614.32 in costs.  *Id.* ¶ 32-33.

26       Section 505(d) of the CWA gives courts the discretion to award attorneys' fees, including

27   litigation expenses and costs, to prevailing parties.  *See Resurrection Bay Conservation All. v. City*

28   *of Seward, Alaska*, 640 F.3d 1087, 1091 n.3 (9th Cir. 2011) (citing 33 U.S.C. § 1365(d)).  A

United States District Court
Northern District of California

1  court's decision to award attorneys' fees under section 505(d) requires two findings: "that the fee

2  applicant is a prevailing party, and that an award of attorney's fees is appropriate." *San Francisco*

3  *Baykeeper v. W. Bay Sanitary Dist.*, No. C-09-5676 EMC, 2011 WL 6012936, at *1 (N.D. Cal.

4  Dec. 1, 2011) (citing *Resurrection Bay Conservation All.*, 640 F.3d at 1091.  In general, fee

5  awards "should be the rule rather than the exception." *Rogue Riverkeeper v. Bean*, No. 1:11-CV-

6  3013-CL, 2013 WL 1785778, at *4 (D. Or. Jan. 23, 2013), *report and recommendation adopted,*

7  No. 1:11-CV-3013-CL, 2013 WL 1785777 (D. Or. Apr. 25, 2013) (citing *Saint John's Organic*

8  *Farm v. Gem Cty. Mosquito Abatement Dist.*, 574 F.3d 1054, 1058–1063 (9th Cir. 2009)).

9         District courts in the Ninth Circuit typically employ the "lodestar analysis" in calculating

10  fee awards.  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Camacho v. Bridgeport Fin., Inc.*,

11  523 F.3d 973, 978 (9th Cir. 2008) (citations omitted).  "The lodestar figure is calculated by

12  multiplying the number of hours the prevailing party reasonably expended on the litigation (as

13  supported by adequate documentation) by a reasonable hourly rate for the region and for the

14  experience of the lawyer." *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 546 (9th Cir.

15  2016) (internal citation omitted).  Fee awards calculated under the lodestar method generally are

16  presumed to be reasonable, *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1208–09 (9th Cir.

17  2013), although the court ultimately retains discretion to modify the amount based on the specific

18  circumstances of each case.  The party seeking fees bears the initial burden of establishing the

19  hours expended litigating the case and must provide detailed time records documenting the tasks

20  completed and the amount of time spent.  *Hensley*, 461 U.S. at 434; *Welch v. Metro. Life Ins. Co.*,

21  480 F.3d 942, 945–46 (9th Cir. 2007).  The requesting party also has the burden to demonstrate

22  that the rates requested are "in line with the prevailing market rate of the relevant community."

23  *Carson v. Billings Police Dep't*, 470 F.3d 889, 891 (9th Cir. 2006) (internal quotation marks and

24  citation omitted).

25                          **a.  Reasonableness of Hourly Rates**

26         As the prevailing party, Plaintiff requests hourly rates of $825 for Andrew L. Packard and

27  $450 for William Carlon.  Packard Decl. ¶¶ 18, 21.  Packard has practiced public interest

28  environmental law for over 28 years. *Id.* ¶ 5.  Since 1997, his firm has represented dozens of

local, regional and statewide environmental non-profit organizations and individuals in over 140 public interest cases to advance environmental, consumer protection, and "right-to-know" laws. *Id.* ¶ 3. Carlon joined Packard's firm in 2016, when he began litigating various environmental enforcement cases. *Id.* ¶ 19. He has represented a number of non-profit organizations against industrial facilities that discharge storm water in violation of their permit requirements. *Id.*

Packard asserts that the requested hourly rates are consistent with other attorneys in the Northern District of California with similar skill, experience, and reputation. Packard Decl. ¶ 18, 21. To calculate Packard and Carlon's respective rates, Packard asserts that he reviewed fee awards in cases involving citizen suit environmental enforcement actions in the Northern District of California and engaged in discussions about prevailing market rates with other public interest environmental litigators who practice in this district. *Id.*

Packard submits two declarations in support of the requested rates. The first is a declaration by William Verick, whose principal focus is the private enforcement of California's Safe Drinking Water & Toxic Enforcement Act; he also litigates in other practice areas, including the Clean Water Act, the Resource Conservation and Recovery Act, the California Timber Practices Act, and the California Environmental Quality Act. [Docket No. 19-3 (William Verick Decl., Aug. 15, 2022) ¶ 1-2.] According to Verick, the requested hourly rates are within the range of prevailing market rates for attorneys with comparable experience, expertise, and skill practicing during this period in the San Francisco Bay Area. *Id.* ¶ 5.

The second declaration is proffered by David Williams, who has prosecuted cases as lead counsel or co-counsel under a number of environmental statutes, including the Clean Water Act, the Endangered Species Act, the National Environmental Policy Act, the California Environmental Quality Act, the California Timber Practices Act, and California's Safe Drinking Water & Toxic Enforcement Act. [Docket No. 19-4 (David Williams, Decl., Aug. 19, 2022) ¶ 5.] Like Verick, Williams contends that the requested rates in this case are within the range of prevailing market rates for attorneys with comparable experience, expertise, and skill practicing during this period in the San Francisco Bay Area. *Id.* ¶ 6.

The declarations submitted by Plaintiff are vague and conclusory. The supporting

declarations do not provide specific information about the hourly rates of comparable attorneys to support the reasonableness of the requested rates.  Likewise, Packard does not cite any cases approving any rates previously requested by him or Carlon.  In fact, Plaintiff's counsel fails to mention that in March 2022, they received considerably lower hourly rates, particularly because they do not work in the San Francisco Bay Area.  *See Californians for Alternatives to Toxics v. Kernen Constr.*, No. 20-CV-01348-YGR, ECF No. 90 at 3–5 (approving hourly rates of $660 for Packard and $320 for Carlon after reducing the requested rates by twenty percent to reflect "the prevailing market rates in the far northern parts of this District for cases entirely local to that area").

Here too, the action as well as the work performed by Plaintiff's lawyers are based entirely in the northern part of the Northern District of California, in Sonoma County.  Adopting the reasoning in *Californians for Alternatives to Toxics*, the court applies a twenty percent reduction to the requested rates, resulting in hourly rates of $660 for Packard and $360 for Carlon.  *See Californians for Alternatives to Toxics v. Kernen Constr.*, No. 20-CV-01348-YGR (LB), 2023 WL 4991861, at *4 (N.D. Cal. Apr. 21, 2023), *report and recommendation adopted sub nom. Californians for Alternatives to Toxics v. Kernen Constr. Co.*, No. 4:20-CV-01348 YGR, 2023 WL 4995716 (N.D. Cal. June 13, 2023) ("A prior award of attorney's fees to an attorney at a particular hourly rate may be persuasive in establishing the reasonableness of a claimed hourly rate.").  This finding is also supported by this court's experience and understanding of the relevant market rates.

### b.  Reasonableness of Hours Expended

Plaintiff's counsel billed a total of 68.3 hours since January 25, 2022.  Mot. at 17-18; Packard Decl. ¶ 9.  The requested hours are supported by itemized timeslips.  Packard Decl., Ex. 1.  Packard asserts that the contingent nature of this litigation gave counsel "a reason to put only those hours into this case that were prudently necessary for advancing success."  Packard Decl. ¶ 25.  In addition, Packard explains that the firm efficiently staffed the case to minimize duplication and assigned the bulk of the work to Carlon (counsel with the lowest hourly rate).  *Id.* ¶ 20.

Having carefully reviewed counsel's billing entries, the court concludes that the hours

United States District Court
Northern District of California

charged in this case are reasonable.  Accordingly, the court recommends granting Plaintiff's request for attorneys' fees in the reduced amount of $28,188, detailed as follows:

| Attorney | Rate | Hours | Total |
| --- | --- | --- | --- |
| Andrew Packard | $660 | 12 | $7,920 |
| William Carlon | $360 | 56.3 | $20,268 |

The court further recommends granting Plaintiff's request for costs in the amount of $614.32, as these costs were reasonably incurred in connection with filing, serving, and litigating this action.  *See* Packard Decl., Ex. 2.

## VI.    CONCLUSION

For the foregoing reasons, the court recommends that Plaintiff's motion for default judgment be granted.  The court further recommends granting Plaintiff's requests for 1) declaratory relief, 2) injunctive relief, 3) civil penalties in the amount of $4,550,000, and 4) attorneys' fees and costs in the amount of $28,802.32.

Not later than three days from the date of this report and recommendation, Plaintiff shall serve Defendant with a copy of the report and recommendation by any means reasonably calculated to provide actual notice, **and file proof of service to that effect**.  Any party may file objections to this report and recommendation with the District Judge within 14 days of being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(a); N.D. Civ. L.R. 72-2.

**IT IS SO ORDERED.**

Dated: November 17, 2023

_____
DONNA M. RYU
Chief Magistrate Judge

United States District Court
Northern District of California

24