1   Paul Den Beste
P. O. Box 742
2   Cloverdale, CA 95425
3   (707) 975 5901
Email: pauldenbeste@hotmail.com
4       pauldenbestecloverdale@gmail.com

5   Specially Appearing Amicus Curiae

6

7

8              UNITED STATES DISTRICT COURT
9           NORTHERN DISTRICT OF CALIFORNIA
                OAKLAND COURTHOUSE
10

| 11 | CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, | ) Case Number: 4:22-cv-01975- Rita F. Lin )|
|----|----|----|
| 12 |           Plaintiff | ) PAUL DEN BESTE'S ADDITIONAL |
| 13 |           v | ) AMICUS CURIAE BRIEF PROVIDING |
|  | DEN BESTE YARD AND GARDEN, INC., | ) NOTICE OF REFERRAL TO THE |
| 14 |           Defendant | ) PRESIDING JUDGE OF THE |
| 15 |  | ) SUPERIOR OF CALIFORNIA, COUNTY ) OF SONOMA WHICH MAINTAINS IN |
| 16 |  | ) CUSTODIA LEGIS ALL ASSETS OF ) THE RECEIVERSHIP ESTATE OF |
| 17 |  | ) DEFENDANT DEN BESTE YARD AND ) GARDEN, INC. AND AS DIRECTLY |
| 18 |  | ) RELATED TO THE PROCEEDINGS IN ) THIS FEDERAL CASE |
| 19 |  | ) |
| 20 |  | ) PROOF OF SERVICE |

21   To the Honorable Judge Rita F. Lin

22      I, the undersigned Paul Den Beste, acting in my capacity as Amicus Curiae, provide the

23
24   following referral of this Federal case, related to the attached hereto as **Exhibit A** Document #

25   34 "REQUEST FOR REASSIGNMENT: REPORT AND RECOMMENDATION OF RE

26   MOTION FOR DEFAULT JUDGMENT, to the Honorable Presiding Judge Shelly Averill of the

27   PAUL DEN BESTE'S ADDITIONAL AMICUS CURIAE BRIEF PROVIDING NOTICE OF REFERRAL TO
28   THE PRESIDING JUDGE OF THE SUPERIOR OF CALIFORNIA, COUNTY OF SONOMA WHO
     MAINTAINS IN CUSTODIA LEGIS ALL ASSETS OF THE RECEIVERSHIP ESTATE OF DEFENDANT DEN
     BESTE YARD AND GARDEN, INC. AND AS DIRECTLY RELATED TO THE PROCEEDINGS IN THIS
     FEDERAL CASE

1   Superior Court of California, County of Sonoma, case Number MCV178973, which maintains in

2   custodia legis the receivership estate of Defendant DEN BESTE YARD AND GARDEN, INC.,

3

4   to wit;

5        As stated at **Exhibit A** Document #34 at page 3 lines 1 – 28 to page 4 lines 1 – 10, Brad

6   Brereton, the attorney for the deceased receiver Patrick Bulmer, has not been able to provide any

7   assistance to this Federal Court regarding this Federal case against Defendant DEN BESTE

8   YARD AND GARDEN, INC, which, as Demonstrated by **Exhibit B** Document #10 and **Exhibit**

9

10  **C** Document #18, said DEN BESTE YARD AND GARDEN, INC., continues to be in the

11  exclusive cuatodia legis of the Superior Court of California, County of Sonoma case Number

12  MCV178973, and therefore, pursuant to established California authorities, the undersigned

13  Amicus Curiae Paul Den Beste refers this Federal Case to Presiding Judge Shelly Averill of the

14  Superior Court of California, County of Sonoma case Number MCV178973, to wit;

15

16       A receiver neither occupies the status of an assignee <u>Wright v. Standard Engineering

17  Corp.</u> (1972) 28 Cal. App. 3d 244, 248, 104 Cal. Rptr. 539: H.D. <u>Roosen Co. v. Pacific Radio

18  Pub. Co.</u> (1932) 123 Cal. App. 525, 534, 11 P.2d 873] nor is an agent of any party to the action

19  or proceeding <u>Maggiora v. Palo Alto Inn, Inc</u> (1967) 249 Cal. App. 2d 706, 712, that states <u>"[6]

20  A receiver is not an agent of either party to the action but represents all persons interested in the

21  property involved"</u> citing United States Overseas Airlines v County of Alameda 235 Cal. App.

22  2d 347 at 353.   Rather, a receiver is an officer or representative of the court, [<u>City of Santa

23  Monica v. Gonzalez</u> (2008) 43 Cal. 4th 905~ 930, 76 Cal. Rptr. 3d 483. 182 P.3d 1027; [<u>North v.

24  Cecil B. DeMille Productions. Inc.</u> (1934) 2 Cal. 2d 55, 58, 39 P.2d 199; <u>Kreling v. Kreling</u>

25  (1897) 118 Cal. 421, 422, 50 P. 5491 and a custodian of the property committed to his or her

26

27  PAUL DEN BESTE'S ADDITIONAL AMICUS CURIAE BRIEF PROVIDING NOTICE OF REFERRAL TO

28  THE PRESIDING JUDGE OF THE SUPERIOR OF CALIFORNIA, COUNTY OF SONOMA WHO
    MAINTAINS IN CUSTODIA LEGIS ALL ASSETS OF THE RECEIVERSHIP ESTATE OF DEFENDANT DEN
    BESTE YARD AND GARDEN, INC. AND AS DIRECTLY RELATED TO THE PROCEEDINGS IN THIS
    FEDERAL CASE

                                              2

charge [Neider v. Dardi (1955) 130 Cal. App. 2d 646, 650. 279 P.2d 598]. Being an officer or representative of the court, the receiver is subject to the court's direction [Highland Secure Co. v. Superior Court (1931) 119 Cal. App. 107, 1l2, 6 P.2d 116], and the property in receivership is under the control and continuous supervision of the court [ McClenny v. Superior Court (1964) 60 CaL 2d 677. 688 n.21. 36 Cal. Rptr. 459. 388 P.2d 691; Steinberg v. Goldstein (1956) 145 Cal. App. 2d 692. 699, 303 P.2d 80]; Receiver as under control of court, as is property of which receiver is custodian; De Forrest v. Coffey (1908) 154 Cal. 444. 449, 98 P. 27: Receiver as officer of court possessing property for court; McCarthy v. Poulsen (1985) 173 cal. App. 3d 1212, 1219.219 Cal. Rptr. 375: Receivership estate consisting of property properly in receiver's hands as under control and continuous supervision of court; Turnerv. Superior Court (1977) 72 Cal. App. 3d 804, 813. 140 Cal. Rptr. 475: Receiver appointed in aid of execution as subject to continued direction and control of court; Morand v. Superior Court (1974) 38 Cal. App. 3d 347.350, 113 Cal. Rptr. 281: Receiver appointed by court as officer of court and property in receiver's custody as in custody of court; Robbins v. Bueno (1968) 262 Cal. App. 2d 79,84.68 Cal. Rptr. 347: Property subjected to receivership as under control and continuous supervision of court. Steinberg v. Goldstein (1956) 145 Cal. App. 2d 692. 699, 303 P.2d 80.

Paul Den Beste, Amicus Curiae

**Proof Service**

My name is Paul Den Beste. On November 28, 2023, in my capacity of Amicus Curiae, I mailed a complete copy of the the attached document titled "PAUL DEN BESTE'S ADDITIONAL AMICUS CURIAE BRIEF PROVIDING NOTICE OF REFERRAL TO THE

PAUL DEN BESTE'S ADDITIONAL AMICUS CURIAE BRIEF PROVIDING NOTICE OF REFERRAL TO THE PRESIDING JUDGE OF THE SUPERIOR OF CALIFORNIA, COUNTY OF SONOMA WHO MAINTAINS IN CUSTODIA LEGIS ALL ASSETS OF THE RECEIVERSHIP ESTATE OF DEFENDANT DEN BESTE YARD AND GARDEN, INC. AND AS DIRECTLY RELATED TO THE PROCEEDINGS IN THIS FEDERAL CASE

1 PRESIDING JUDGE OF THE SUPERIOR OF CALIFORNIA, COUNTY OF SONOMA WHO

2 MAINTAINS IN CUSTODIA LEGIS ALL ASSETS OF THE RECEIVERSHIP ESTATE OF

3
4 DEFENDANT DEN BESTE YARD AND GARDEN, INC. AND AS DIRECTLY RELATED

5 TO THE PROCEEDINGS IN THIS FEDERAL CASE", to the following addressees;

6 Presiding Judge Shelly Averill
Courtroom 15
7 Superior Court of California, County of Sonoma
600 Administration Drive
8 Santa Rosa, CA 95403

9
Law Offices of Andrew L. Packard
10 245 Kentucky Street, Suite B
Petaluma, CA 94952
11

12        I declare under penalty of perjury that the foregoing is true and correct.

13        Executed in Cloverdale, California on November 28, 2023.

14

15        Paul Den Beste

16

17

18

19

20

21

22

23

24

25

26

27
PAUL DEN BESTE'S ADDITIONAL AMICUS CURIAE BRIEF PROVIDING NOTICE OF REFERRAL TO
28 THE PRESIDING JUDGE OF THE SUPERIOR OF CALIFORNIA, COUNTY OF SONOMA WHO
MAINTAINS IN CUSTODIA LEGIS ALL ASSETS OF THE RECEIVERSHIP ESTATE OF DEFENDANT DEN
BESTE YARD AND GARDEN, INC. AND AS DIRECTLY RELATED TO THE PROCEEDINGS IN THIS
FEDERAL CASE
                                        4

Exhibit A

1

2

3

4                        UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    CALIFORNIA SPORTFISHING                    Case No. 22-cv-01975-DMR
     PROTECTION ALLIANCE,
8
            Plaintiff,
9                                               REQUEST FOR REASSIGNMENT;
                                                REPORT AND RECOMMENDATION
     v.                                         RE MOTION FOR DEFAULT
10                                              JUDGMENT
11   DENBESTE YARD & GARDEN, INC.,
                                                Re: Dkt. No. 19
            Defendant.
12

13          This lawsuit alleges violations of the Clean Water Act ("CWA") against Defendant

14   DenBeste Yard & Garden Supply, a California corporation that owns and operates a yard and

15   garden supply company located in Sonoma County. [Docket No. 1.] After Defendant failed to

16   appear or defend itself in this action, Plaintiff California Sportfishing Protection Alliance filed this

17   motion for default judgment. [Docket No. 19.] This matter is suitable for determination without

18   oral argument. Civil L.R. 7-1(b).

19          Defendant has not filed a declination or consent to the jurisdiction of a magistrate judge

20   pursuant to 28 U.S.C. § 636(c). Therefore, the court issues this Report and Recommendation and

21   reassigns this case to a district judge for final disposition, with the recommendation that Plaintiff's

22   motion for default judgment be granted, and that Plaintiff's request for damages and attorneys'

23   fees and costs be granted in part.

24   I.     BACKGROUND

25          A.     Factual Allegations

26          Plaintiff California Sportfishing Protection Alliance is a non-profit corporation dedicated

27   to the preservation, protection, and defense of the environment, wildlife, and natural resources of

28   California water. Compl. ¶ 13. Defendant DenBeste Yard & Garden Supply owns a yard and

1    garden supply facility located at 26916 Asti Road in Cloverdale, California (the "Facility"). *Id.* ¶¶

2    5, 36.  The Facility's primary industrial activities include mixing potting soil and compost. *Id.* ¶

3    38.  Plaintiff alleges that Defendant stores industrial materials, including soil, wood, and compost

4    outside the Facility, in areas exposed to storm water. *Id.* ¶ 40.  Plaintiff further asserts that

5    Defendant discharges pollutant-contaminated storm water from the Facility into the Russian River,

6    which then discharges to the Pacific Ocean. *Id.* ¶ 43.

7          Defendant has been operating the Facility without any General Permit coverage since

8    February 25, 2016.  Compl. ¶ 66.  On October 30 and December 11, 2015, the North Coast

9    Regional Water Quality Control Board ("Regional Board") informed Defendant that it was

10   required to renew its General Permit coverage for the Facility. *Id.* ¶ 46.  Defendant filed a Notice

11   of Intent to obtain coverage under the General Permit for the Facility on July 6, 2016, but the

12   application was returned as incomplete. *Id.* ¶¶ 47-48.  The Regional Board subsequently issued

13   two Notices of Non-Compliance on September 17 and October 28, 2020. *Id.* ¶¶ 49-56.

14         On January 26, 2022, Plaintiff sent a 60-day notice alerting Defendant that it intended to

15   sue for alleged violations of the CWA and the General Permit.  Compl., Ex. A ("Notice").  A copy

16   of the Notice was sent to the Administrator of the EPA; the Administrator of EPA Region IX; the

17   Executive Director of the State Water Resources Control Board; and the Executive Officer of the

18   Regional Water Quality Control Board, San Francisco Bay Region. *Id.* ¶ 2.

19         On March 28, 2022, Plaintiff filed a complaint against Defendant alleging one claim for

20   relief based on Defendant's violations of the CWA.  On April 14, 2022, Plaintiff served the

21   complaint and summons on Defendant's agent for service, Paul Ray Den Beste.  [Docket No. 9.]

22   On May 31, 2022, Plaintiff moved for entry of default.  [Docket No. 15.]  The clerk entered

23   default against Defendant on June 17, 2022.  [Docket No. 16.]  Plaintiff filed this motion on

24   August 19, 2022, along with supplemental briefing on March 23, 2023.  [Docket Nos. 19, 28 (First

25   Supp. Br.).]  Pursuant to court order, Plaintiff filed a first amended complaint on August 10, 2023,

26   and related supplemental briefing on September 8, 2023.  [Docket Nos. 32 ("FAC"), 33 (Second

27   Supp. Br.).]

28

United States District Court
Northern District of California

## II.    PROCEDURAL HISTORY

On April 14, 2022, Plaintiff served the complaint and summons on Defendant's agent for service Paul Ray Den Beste. [Docket No. 9.] On April 19, 2022, Den Beste filed a responsive pleading styled as an "answer by special appearance with notice of state court orders directed to ongoing receivership." [Docket No. 10.] The court construed the filing as evidencing Den Beste's intent to appear on behalf of Defendant as a shareholder, which is barred by Ninth Circuit authority requiring corporations to be represented by a lawyer admitted to practice before this court. [Docket No. 11.] The court ordered Defendant to retain legal counsel and file a notice of appearance of counsel by May 27, 2022. Defendant failed to appear or otherwise respond to the court's order. As a result, the clerk entered default against Defendant pursuant to Federal Rule of Civil Procedure 55(a) on June 17, 2022. [Docket No. 16.]

In response to the court's order to retain legal counsel, Den Beste instead filed two documents stating that Defendant is unable to retain legal representation because the corporation was placed and remains under receivership by the Superior Court of California, County of Sonoma. [Docket Nos. 14, 18.] According to Den Beste's filings, the Superior Court awarded four judgments against Paul Ray Den Beste and Melody Den Beste, which, as of July 15, 2010, amounted to a total of $56,086.89. [Docket No. 14, Ex. A.] In light of "two . . . occasions when . . . Paul Den Beste and Melody Den Beste, moved substantial assets out of the reach of the judgment creditor immediately after an enforcement activity," the judgment creditor requested the appointment of a receiver over "all non-exempt real and personal property and business interest owned, controlled, or possessed by [Paul Den Beste and Melody Den Beste], wherever located and whether now or in the future owned, controlled or possessed by them." *Id.* The Superior Court appointed a receiver on August 23, 2010. [Docket No. 14, Ex. B.] Den Beste specifically identified Patrick Bulmer and/or the California Receivership Services as Defendant's receiver and Brad Brereton as California Receivership Services' attorney. [Docket Nos. 14 at 3; 18 at 2.]

Plaintiff then clarified that upon further research, it determined that Patrick Bulmer is deceased, and that Brad Brereton no longer has a client involved in Defendant's receivership. [Docket Nos. 23, 23-1.] In support of its position, Plaintiff submitted an email from Brad

United States District Court
Northern District of California

3

1    Brereton stating: "Patrick Bulmer died a couple of years ago. So I no longer have a client

2    involved in the matter. I had informed the [state] court of his death, but I never received any

3    response. Happy to assist if I can, but I am not certain that I have any authority over anything."

4    [Docket No. 23-1.]

5          On December 7, 2022, the court ordered Den Beste to address the issue of Defendant's

6    receivership by February 1, 2023. [Docket No. 24.] Specifically, the court instructed Den Beste

7    to "take action, if he so chooses, to get a new receiver appointed and for the receiver to notify this

8    court of its intentions regarding this case." The court warned that it would adjudicate the motion

9    for default judgment after that date. Defendant failed to notify the court of the appointment of a

10   new receiver or otherwise respond to the court's order.

11         Therefore, the court proceeds to adjudicate the motion for default judgment.

12         **B.    Statutory Framework**

13         Congress enacted the CWA to "restore and maintain the chemical, physical, and biological

14   integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, the CWA makes

15   unlawful "'the discharge of any pollutant by any person' without a permit [issued under the

16   National Pollutant Elimination System (NPDES)].'" *Cnty. of Maui, Hawaii v. Hawaii Wildlife*

17   *Fund*, 140 S. Ct. 1462, 1469 (2020) (quoting 33 U.S.C. § 1311(a)). Permits are issued by the

18   Administrator of the Environmental Protection Agency ("EPA") or by states that have been

19   authorized by the EPA to act as NPDES permitting authorities. *Env't Def. Ctr., Inc. v. U.S.*

20   *E.P.A.*, 344 F.3d 832, 841 (9th Cir. 2003) (citing U.S.C. § 1342(a)-(b)).

21         In 1987, Congress passed amendments to the CWA, including section 402(p), 33 U.S.C. §

22   1342(p), to better regulate pollution from stormwater runoff. *Env't Def. Ctr.*, 344 F.3d at 841.

23   The CWA regulates storm water if the discharge falls into one of five categories, the second of

24   which is at issue here:

25
26         (A) A discharge with respect to which a permit has been issued under
           this section before February 4, 1987.
27         (B) *A discharge associated with industrial activity.*
           (C) A discharge from a municipal separate storm sewer system
28         serving a population of 250,000 or more.
           (D) A discharge from a municipal separate storm sewer system

4

United States District Court
Northern District of California

1

2

3

> serving a population of 100,000 or more but less than 250,000.
> (E) A discharge for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

4   33 U.S.C. § 1342 (p)(2)(A)-(E) (emphasis added).

5   Relevant to this action, "[d]ischargers of storm water associated with industrial activity"

6   must apply for an individual permit or seek coverage under a promulgated storm water general

7   permit. 40 C.F.R. § 122.26(c)(1); *see also* 33 U.S.C. § 1342(p)(3)(A). In California, industrial

8   storm water discharges are subject to a General Permit. *See* State Water Resources Control Board

9   Water Quality Order No. 91-13-DWQ, *as amended by* Water Quality Order No. 92-12-DWQ,

10   Water Quality Order No. 97-03-DWQ, and Water Quality Order No. 2014-0057-DWQ. The

11   General Permit requires industrial dischargers to develop and implement an effective Storm Water

12   Pollution Prevention Plan; develop and implement a comprehensive monitoring and reporting

13   program; identify and implement best management practices; and establish a Pollution Prevention

14   Team, among other requirements. *Waterkeepers N. Cal. v. AG Indus. Mfg., Inc.*, 375 F.3d 913,

15   916 (9th Cir. 2004).

16   Section 505(a) permits a private citizen to bring a lawsuit against any person "alleged to be

17   in violation" of the CWA. *See* 33 U.S.C. § 1365(a)(1). Before a suit can be commenced, the

18   citizen must give a 60–day notice of intent to sue. *See* 33 U.S.C. § 1365(b)(1)(A). The purpose of

19   the notice is to give government agencies an opportunity to enforce environmental regulations

20   without the need for a citizen suit, and to give the alleged violator "'an opportunity to bring itself

21   into complete compliance with the Act and thus likewise render unnecessary a citizen suit.'" *Ctr.*

22   *For Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 800 (9th Cir. 2009) (quoting

23   *Hallstrom v. Tillamook County*, 493 U.S. 20, 29 (1989)).

24   **III.    LEGAL STANDARDS**

25   Federal Rule of Civil Procedure 55(b)(2) permits a court to enter a final judgment in a case

26   following a defendant's default. *Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d

27   995, 999 (N.D. Cal. 2001). Whether to enter a judgment lies within the court's discretion.

28   *Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1174 (C.D. Cal. 2002) ("A defendant's

1  default does not automatically entitle the plaintiff to a court-ordered judgment." (citing *Draper v.*

2  *Coombs*, 792 F.2d 915, 924-25 (9th Cir. 1986))).

3      Before assessing the merits of a default judgment, a court must ensure the adequacy of

4  service on the defendant, as well as confirm that it has subject matter jurisdiction over the case and

5  personal jurisdiction over the parties. *See In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).  If the

6  court finds these elements satisfied, it turns to the following factors ("the *Eitel* factors") to

7  determine whether it should grant a default judgment:

8           (1) the possibility of prejudice to the plaintiff, (2) the merits of
           plaintiff's substantive claim, (3) the sufficiency of the complaint, (4)
9           the sum of money at stake in the action[,] (5) the possibility of a
           dispute concerning material facts[,] (6) whether the default was due
10          to excusable neglect, and (7) the strong policy underlying the Federal
           Rules of Civil Procedure favoring decision on the merits.
11

12  *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986) (citation omitted).  In this analysis, "the

13  well-pleaded allegations of the complaint relating to a defendant's liability are taken as true."

14  *Pepsico, Inc.*, 238 F. Supp. 2d at 1175 (citing *Televideo Sys., Inc. v. Heidenthal*, 826 F.2d 915,

15  917-18 (9th Cir. 1987)).  Nevertheless, default does not compensate for essential facts not within

16  the pleadings and those legally insufficient to prove a claim.  *Cripps v. Life Ins. Co. of N. Am.*, 980

17  F.2d 1261, 1267 (9th Cir. 1992).

18  **IV.   REQUEST FOR JUDICIAL NOTICE**

19      Plaintiff filed a request for judicial notice, asking the court to take judicial notice of

20  Exhibits A through F.  [Docket No. 20.]  The exhibits contain correspondence between Defendant

21  and the Regional Board (Exs. A-C) and copies of precipitation data collection from the National

22  Oceanic and Atmospheric Administration's climate data website (Exs. D-F).

23      On a motion for default judgment, the court is not restricted to the allegations in the

24  complaint.  Under Rule 55(b)(2), if the court needs to "determine the amount of damages,"

25  "establish the truth of any allegation by evidence," or "make an investigation of any other matter,"

26  it may conduct such hearings or order such references as it deems necessary and proper.  This rule

27  gives the court "considerable leeway as to what it may require as a prerequisite to the entry of a

28  default judgment." *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917 (9th Cir. 1987).

United States District Court
Northern District of California

1    Because Plaintiff's exhibits are properly authenticated by counsel's declaration, the court

2    considers Exhibits A through F as evidence.  The request for judicial notice is denied as moot.

3    **V.    ANALYSIS**

4       **A. Jurisdiction**

5       Before entering default judgment, a federal court has an "affirmative duty to look into its

6    jurisdiction over both the subject matter and the parties."  *In re Tuli v. Rep. of Iraq*, 172 F.3d 707,

7    712 (9th Cir. 1999).  Here, the court has subject matter jurisdiction and personal jurisdiction over

8    the parties.

9          **1.   Subject Matter Jurisdiction**

10      The court has subject matter jurisdiction over this case pursuant to 33 U.S.C. §

11   1365(a)(1)(A) (empowering private citizens to sue industrial dischargers for violations of the

12   CWA) and 29 U.S.C. § 1331.  Plaintiff appears to have given timely notice to federal and state

13   agencies as required by 33 U.S.C. § 1365(b)(1)(A).  Compl. ¶ 2.

14         **2.   Personal Jurisdiction**

15      "With respect to a corporation, the place of incorporation and principal place of business

16   are 'paradig[m] . . . bases for general jurisdiction."  *Daimler AG v. Bauman*, 571 U.S. 117, 137

17   (2014) (quoting *A General Look at General Jurisdiction*, 66 Texas L. Rev. 721, 728 (1988)).

18   Either basis is sufficient for the exercise of general jurisdiction over corporations. *AM Tr. v. UBS*

19   *AG*, 681 F. App'x 587, 588 (9th Cir. 2017) ("[A] corporation is typically subject to general

20   personal jurisdiction only in a forum where it is incorporated *or* where it maintains its principal

21   place of business." (emphasis added)).

22      Here, Defendant is incorporated in California and the Facility is located in Sonoma

23   County.  Compl. ¶¶ 9, 36.  Because Defendant is a California corporation, it is subject to general

24   personal jurisdiction in California.

25         **3.   Organizational Standing**

26      "When suing on behalf of its members, an organization must show that its members would

27   have individual standing, the issues are germane to the organization's purpose, and neither the

28   claim nor the requested relief requires individual participation."  *Inland Empire Waterkeeper v.*

United States District Court
Northern District of California

7

1    *Corona Clay Co.*, 17 F.4th 825, 831 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 1444 (2022).

2          Plaintiff alleges that its members live, work, travel, and recreate near the Russian River,

3    and that pollution from the discharged storm water impacts their current and anticipated use of the

4    land for "educational, scientific, conservation, aesthetic, and spiritual" purposes. Compl. ¶¶ 13-

5    15.

6          The Ninth Circuit routinely has found evidence similar to the allegations in this case

7    sufficient to establish standing. *See Inland Empire Waterkeeper*, 17 F.4th at 832 (collecting

8    cases). Taking Plaintiff's allegations as true, the court finds that Plaintiff has standing to bring

9    this action.

10         **B.     Adequacy of Service**

11         Federal Rule of Civil Procedure Rule 4(h) allows for service of a corporation, partnership,

12   or association "by delivering a copy of the summons and of the complaint to an officer, a

13   managing or general agent, or any other agent authorized by appointment or by law to receive

14   service of process and—if the agent is one authorized by statute and the statute so requires—by

15   also mailing a copy of each to the defendant." Fed. R. Civ. P. 4(h)(1)(B). Rule 4 also allows a

16   corporation to be served "following state law for serving a summons in an action brought in courts

17   of general jurisdiction, where the district court is located or where service is made." Fed. R. Civ.

18   P. 4(h)(1)(A); Fed. R. Civ. P. 4(e)(1). In turn, California law allows for service of a corporation

19   by personally delivering a copy of the summons and the complaint to a person authorized to

20   receive service of process. Cal. Code Civ. Proc. § 416.10(a).

21         On April 14, 2022, Plaintiff served the complaint and summons on Defendant's agent for

22   service Paul Ray Den Beste. [Docket No. 9.] Therefore, the court finds that Plaintiff properly

23   served Defendant. *See* Cal. Code Civ. Proc. § 416.10(a) (authorizing service on corporation by

24   delivering summons and complaint to designated agent for service of process).

25         **C.     Application of the Eitel Factors**

26         Having found that the jurisdictional and service requirements are met, the court now turns

27   to the *Eitel* factors to determine whether default judgment should be granted.

28

United States District Court
Northern District of California

8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### 1.   Possibility of Prejudice

Plaintiff argues that in the absence of a default judgment, it will be left without other recourse and will suffer prejudice. Mot. at 6. Since Defendant has failed to appear and defend the action, Plaintiff will most likely have no other avenue for recovery. *See, e.g., Los Angeles Waterkeeper v. A & A Metal Recycling, Inc.*, No. CV154326MWFJEMX, 2015 WL 13917738, at *3 (C.D. Cal. Nov. 18, 2015) (finding prejudice to plaintiff where a defendant sued under the CWA failed to appear in the action). This factor weighs in favor of granting default judgment.

### 2.   Merits of the Substantive Claim and Sufficiency of the Complaint

"Under an *Eitel* analysis, the merits of plaintiff's substantive claims and the sufficiency of the complaint are often analyzed together." *Dr. JKL Ltd. v. HPC IT Educ. Ctr.*, 749 F. Supp. 2d 1038, 1048 (N.D. Cal. 2010). After an entry of default, well-pleaded allegations in the complaint are deemed true, except for the amount of damages. *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).

Plaintiff's sole cause of action alleges that Defendant violated 33 U.S.C. § 1311(a) by discharging storm water associated with industrial activities generated at its Facility into the Russian River without a NPDES permit issued pursuant to 33 U.S.C. § 1342. Compl. ¶ 116.

"To establish a violation of the Act's NPDES requirements, a plaintiff must prove that (1) a person (2) discharged (3) a pollutant (4) to navigable waters of the United States (5) from a point source (6) without a permit." *San Francisco Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 754 (N.D. Cal. 2011) (citing *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993)); *see also Friends of Outlet Creek v. Grist Creek Aggregates, LLC*, No. 16-CV-00431-JSW, 2019 WL 1975434, at *3 (N.D. Cal. Mar. 19, 2019) (citation omitted). The Supreme Court recently discussed the CWA's definitional language:

> First, the [Clean Water] Act defines 'pollutant' broadly, including in its definition, for example, any solid waste, incinerator residue, heat, discarded equipment, or sand (among many other things). Second, the Act defines a 'point source' as any discernible, confined and discrete conveyance from which pollutants are or may be discharged, including, for example, any container, pipe, ditch, channel, tunnel, conduit, or well. Third, it defines the term 'discharge of a pollutant' as any addition of any pollutant to navigable waters including navigable streams, rivers, the ocean, or coastal waters from any point

9

1    source.

2    *Cnty. of Maui, Hawaii*, 140 S. Ct. at 1469 (cleaned up).

3    Here, Plaintiff has alleged all six elements of the claim.  First, Defendant is a "person"

4    under 33 U.S.C. § 1362(5), which defines the term as any "individual, corporation, partnership,

5    association, State, municipality, commission, or political subdivision of a State, or any interstate

6    body."  Plaintiff alleges that Defendant is a corporation.  Compl. ¶ 9.

7    Second, Plaintiff has adequately alleged that Defendant discharges pollutants.  As

8    discussed above, the CWA defines the term "discharge of a pollutant" as "any addition of any

9    pollutant to navigable waters including navigable streams, rivers, the ocean, or coastal waters from

10   any point source."  Plaintiff asserts that Defendant "discharges pollutant-contaminated storm water

11   from the Facility into the Russian River."  Compl. ¶¶ 5, 6, 14, 15.  The complaint describes the

12   sources of these pollutants, explaining that they are the result of Defendant's industrial activities

13   and industrial materials' exposure to storm water.  *Id.* ¶¶ 38-41.  The materials include soils,

14   wood, compost, and pollutants associated with the operation of heavy equipment.  *Id.* ¶¶ 38, 39,

15   41.  The complaint also alleges that the industrial activities at the Facility fall under Standard

16   Industrial Classification Code 2875 ("Fertilizers, Mixing Only").  *Id.* ¶ 42.

17   These allegations are sufficient to establish discharge of a pollutant.  As the court in *Puget*

18   *Soundkeeper All. v. Whitley Mfg. Co.*, 145 F. Supp. 3d 1054, 1057 (W.D. Wash. 2015) explained:

19   [P]laintiff need not prove that defendant's stormwater contained a
20   particular substance in a particular quantity because Congress, in
     enacting § 1342(p), determined that defendant's stormwater is, in and
21   of itself, a pollutant. This conclusion is compelled by the statute. The
     CWA forbids the discharge of pollutants into navigable waters unless
22   the discharge is allowed by permit.

23   . . .

24   Thus, in determining that the discharge of stormwater associated with
     industrial activity requires a permit, Congress necessarily found that
25   the stormwater itself is a pollutant subject to regulation under the
     CWA.

26   In addition, facilities that fall under certain Standard Industrial Classification codes are considered

27   to be engaged in "industrial activity."  *See* 40 C.F.R. § 122.26(b)(14).  Facilities classified under

28   Standard Industrial Classification 28 – like the Facility at issue here – are considered to be

United States District Court
Northern District of California

1    engaged in "industrial activity" for purposes of section 122.26(b)(14) and are thus required to

2    obtain a permit to discharge pollutants.

3            Plaintiff also adequately alleges that Defendant adds pollutants "to navigable waters." The

4    Russian River and the Pacific Ocean are waters of the United States and "navigable waters" for

5    purposes of the CWA. *See* 33 U.S.C. § 1362(7). Accordingly, Plaintiff's allegations satisfy the

6    second, third, and fourth elements under *San Francisco Baykeeper v. W. Bay Sanitary Dist.*, 791

7    F. Supp. 2d 719 (N.D. Cal. 2011).

8            Next, Plaintiff must establish that the Facility (or a part of the Facility) is a point source.

9    "Point source" is defined as: "any discernible, confined and discrete conveyance, including but not

10   limited to any pipe, ditch, channel, tunnel, conduit . . . from which pollutants are or may be

11   discharged." 33 U.S.C. § 1362(14). The Ninth Circuit has explained that "[s]torm water presents

12   a unique problem under the CWA because it is a significant source of water pollution but is not

13   inherently a nonpoint or point source." *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713

14   F.3d 502, 505 (9th Cir. 2013) (citation and quotation omitted).

15           The complaint alleges in a conclusory way that "[t]he Facility collects and discharges

16   storm water associated with industrial activity from the Facility into the Russian River." Compl. ¶

17   43. On August 1, 2023, the court ordered Plaintiff to either amend its complaint or submit

18   additional briefing to support a determination at default judgment that Defendant discharged storm

19   water from a "point source" under the CWA. [Docket No. 30.] Plaintiff filed the FAC on August

20   8, 2023. The FAC now alleges that the Facility collects storm water associated with industrial

21   activity "into a system of storm water conveyances, including drop inlets, culverts, ditches, ponds,

22   and channels." FAC ¶ 43. The Facility allegedly discharges storm water collected by this

23   conveyance system from at least three discharge locations. *See id.* ¶¶ 44-47. These allegations are

24   sufficient to establish a point source under the CWA.

25           Finally, Plaintiff alleges that Defendant has not had a permit authorizing the Facility to

26   discharge storm water associated with industrial activity since at least February 25, 2016. Compl.

27   ¶¶ 65-72. Plaintiff has sufficiently alleged that Defendant has no permit covering its pollutant

28   discharges.

United States District Court
Northern District of California

1    In sum, the court finds that Plaintiff has sufficiently pled a claim under 33 U.S.C. §

2    1311(a).

3          **3. Sum of Money at Stake**

4          The fourth *Eitel* factor focuses on the amount of money at issue in the action. "[C]ourts

5    should be hesitant to enter default judgment in matters involving large sums of money." *Yelp Inc.*

6    *v. Catron*, 70 F. Supp. 3d 1082, 1099-1100 (N.D. Cal. 2014); *see also Bd. of Tr. v. Core Concrete*

7    *Const., Inc.*, No. 11-cv-02532-LB, 2012 WL 380304, at *1, *4 (N.D. Cal. Jan. 7, 2012) ("When

8    the money at stake in the litigation is substantial or unreasonable, default judgment is

9    discouraged."). However, when "the sum of money at stake is tailored to the specific misconduct

10   of the defendant, default judgment may be appropriate." *Id.*

11         Plaintiff seeks civil penalties in the amount of $59,973 per day per violation, amounting to

12   a total of $10,915,086. Plaintiff also requests $35,235 in attorneys' fees and $614.32 in costs.

13   Mot. at 9. The total amount requested is $10,950,321. Plaintiff's request is authorized by the

14   applicable statutes and the complaint tailors the amount requested to the conduct alleged. This

15   factor weighs in favor of granting default judgment.

16         **4. Possibility of Dispute Concerning Material Facts**

17         When a party "fail[s] to appear or otherwise respond . . . in defaulting, defendants are

18   deemed to have admitted all well-pleaded factual allegations contained in the complain[t]."

19   *DirecTV v. Hoa Huynh*, 503 F.3d 847, 851 (9th Cir. 2007) (citing Fed. R. Civ. P. 55(a)). All

20   allegations in the complaint are taken as true, except for those regarding damages. *TeleVideo Sys.,*

21   *Inc.*, 826 F.2d at 917-18.

22         Here, the possibility of a dispute about the material facts is unlikely. Defendant was

23   served with the complaint but failed to appear and the clerk accordingly entered default.[1] As set

24   _____

25   [1] While Plaintiff served Defendant with the motion for entry of default (Docket No. 15), the
     docket suggests that it did not serve Defendant with its motion for default judgment at the time of
26   filing. Under Federal Rule of Civil Procedure 55(b)(2), "[i]f the party against a default judgment
     is sought has appeared personally or by a representative, that party or its representative must be
27   served with written notice of the application at least 7 days before the hearing." "The appearance
     need not necessarily be a formal one, i.e., one involving a submission or presentation to the court.
28   In limited situations, informal contacts between the parties have sufficed when the party in default
     has thereby demonstrated a clear purpose to defend the suit." *Wilson v. Moore and Assocs., Inc.*,

United States District Court
Northern District of California

12

forth above, Plaintiff's well-pleaded allegations are presumed to be true, and the complaint adequately alleges a violation of the CWA. The record reflects Defendant's silence despite notice of the proceedings and several opportunities to respond.

The court finds that there is little possibility of dispute as to material facts.

### 5.  Excusable Neglect

The sixth *Eitel* factor considers whether a defendant's default resulted from excusable neglect. *Eitel*, 782 F.2d at 1472. When a defendant is properly served with the complaint and the motion for default judgment, an entry of default judgment is favored. *W. States Insulators & Allied Workers Pension Plan v. Jenco Mech. Insulation, Inc.*, No. 11-cv-0175 EMC, 2012 WL 1123229, at *3 (N.D. Cal. Apr. 3, 2012).

As detailed above, Plaintiff's complaint was filed on March 28, 2022. On April 19, 2022, Defendant purported to file an answer through its agent for service of process Paul Ray Den Beste. [Docket No. 10.] On April 27, 2022, the court struck his answer to the extent it was filed by Defendant without counsel. [Docket No. 11.] Despite notice to Defendant that it must appear and defend this action through counsel, and ample opportunity for Defendant to obtain counsel, no attorney has entered an appearance on behalf of Defendant to this date. Accordingly, it is unlikely that Defendant's failure to respond is due to excusable neglect.

This factor weighs in favor of granting default judgment.

### 6.  Favoring Decision on the Merits

Despite the policy of favoring a decision on the merits, default judgment is appropriate when a defendant refuses to litigate a case. Fed. R. Civ. P. 55(b). "Defendant's failure to answer Plaintiffs' Complaint makes a decision on the merits impractical, if not impossible." *PepsiCo,*

---

564 F.2d 366, 368 (9th Cir. 1977). Here, as previously discussed at length, Defendant never formally appeared in the proceeding or responded to the complaint, despite proper service of the complaint and of several subsequent filings in the case. [*See, e.g.*, Docket Nos. 27 (proof of service of 2/24/2023 Order Denying Motion for Default Judgment Without Prejudice to Submission of Supplemental Briefing); 31 (proof of service of 8/1/2023 Order to Submit Supplemental Briefing in Support of Default Judgment).] In addition, nothing in the record suggests "informal contacts between the parties" demonstrating a "clear purpose" on Defendant's behalf to make an appearance and defend against Plaintiff's claim. Accordingly, the court is satisfied that notice of the motion for default judgment was not required under Rule 55(b)(2).

United States District Court
Northern District of California

1    *Inc*, 238 F.2d at 1177.

2          As previously explained, Defendant has failed to appear or otherwise respond to the court's

3    order. A decision on the merits is thus impractical.

4          On balance, the *Eitel* factors weigh in favor of granting Plaintiff's motion for default

5    judgment.

6          **D.      Remedies**

7                 **1.   Declaratory Relief**

8          Under 28 U.S.C. § 2201(a), courts "may declare the rights and other legal relations of any

9    interested party seeking such declaration whether or not further relief is or could be sought." "The

10   two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when

11   the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and

12   (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving

13   rise to the proceeding. It follows that when neither of these results can be accomplished, the court

14   should decline to render the declaration prayed." *Los Angeles Waterkeeper v. A & A Metal*

15   *Recycling, Inc.*, No. CV154326MWFJEMX, 2015 WL 13917738, at *5 (C.D. Cal. Nov. 18,

16   2015) (quoting *McGraw–Edison Co. v. Preformed Line Products Co.*, 362 F.2d 339 (9th Cir.

17   1966)).

18         Plaintiff seeks a declaratory judgment that Defendant violated the CWA 153 times[2] and

19   that it continues to violate Section 301(a) of the CWA each time it discharges storm water from its

20   facility without a NPDES permit. Mot. at 10-11. The court recommends finding that Plaintiff is

21   entitled to declaratory relief. For the reasons discussed above, Plaintiff has established that there

22   is an actual controversy, and that declaratory judgment will serve a useful purpose of clarifying

23   Defendant's obligations under the CWA.

24                 **2.   Injunctive Relief**

25         Plaintiff requests that the court enter injunctive relief either requiring Defendant to obtain

26   coverage under an NPDES permit or prohibiting Defendant from discharging pollutants from its

27

28   [2] The court notes that elsewhere in its briefing Plaintiff argues that Defendant violated the CWA
     182 times. *See* Mot. at 11-13.

14

1    facility to the surface waters surrounding and downstream from the Facility. Mot. at 11.

2        "[A] district court's equitable powers under the CWA are limited to enforcing standards,

3    limitations, and orders that have been violated." *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236

4    F.3d 985, 1000 (9th Cir. 2000) (citing 33 U.S.C. § 1365(a)). "So long as the district court's

5    equitable measures are reasonably calculated to 'remedy an established wrong,' they are not an

6    abuse of discretion." *Id.* (quoting *Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981, 986 (9th Cir.

7    1994)). Injunctive relief is warranted when a plaintiff demonstrates: "(1) that it has suffered an

8    irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to

9    compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and

10   defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved

11   by a permanent." *Rogue Riverkeeper v. Bean*, No. 1:11-CV-3013-CL, 2013 WL 1785778, at *3

12   (D. Or. Jan. 23, 2013), *report and recommendation adopted*, No. 1:11-CV-3013-CL, 2013 WL

13   1785777 (D. Or. Apr. 25, 2013) (quoting *Monsanto v. Geerston Seed*, 130 S. Ct. 2743, 2756

14   (2010)).

15       Plaintiff satisfies all requirements for a permanent injunction. Plaintiff's members have

16   suffered and continue to suffer as a result of Defendant's failure to comply with the CWA.

17   Specifically, Defendant's stormwater discharges continuously impair members' recreational,

18   educational, scientific, conservation, aesthetic, and spiritual uses of the Russian River, the Pacific

19   Ocean, and the neighboring land. *See* Compl. ¶ 14. This adverse impact cannot be remedied with

20   monetary damages. The balancing of hardships also tips in Plaintiff's favor – granting a

21   permanent injunction will only require that Defendant stop engaging in illegal activities and will

22   serve the public interest in protecting the environment.

23       Accordingly, the court recommends an injunction in favor of Plaintiff. Specifically, the

24   court recommends prohibiting Defendant from discharging pollutants from its facility to the

25   surface waters surrounding and downstream from the Facility without a proper permit. *See* Fed.

26   R. Civ. P. 65(d) ("Every order granting an injunction . . . shall set forth the reasons for its

27   issuance; shall be specific in terms; [and] shall describe in reasonable detail . . . the act or acts

28   sought to be restrained.").

15

### 3. Civil Penalties

Penalties are mandatory once liability for violations of the CWA has been established. *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1397 (9th Cir. 1995). As codified, the CWA provides for civil penalties "not to exceed $25,000 per day for each violation." 33 U.S.C. § 13919(d). As adjusted pursuant to inflation, the maximum penalty has increased from $59,973 to $64,618 since the complaint was filed.[3] *See* 40 C.F.R. § 19.4. "A district court has discretion to set the amount of a penalty (up to the statutory maximum) and is instructed to consider the seriousness of the violation, any economic benefit that resulted from the violation, any history of violations by the party to be penalized, that party's good-faith efforts to comply with the applicable requirements, the economic effect of the penalty on the violator, and 'such other matters as justice may require.'" *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 1001 (9th Cir. 2000) (quoting 33 U.S.C. § 13919(d)).

In practice, courts have employed either a "top-down" or "bottom-up" approach to calculate civil penalties under the CWA. *See Californians for Alternatives to Toxics v. Kernen Constr. Co.*, No. 4:20-CV-01348 YGR, 2021 WL 1734897, at *3 n.2 (N.D. Cal. May 2, 2021) (comparing approach in different circuits). "The bottom-up approach looks first at the economic benefit of the violation, which is often difficult to ascertain." *Los Angeles Waterkeeper*, 2015 WL 13917738, at *6 (citing *Ctr. for Biological Diversity v. Marina Point Dev. Assocs.*, 434 F. Supp. 2d 789, 799 (C.D. Cal. 2006)). The top-down approach calculates the maximum penalty and then reduces it according to the statutory factors. *Id.*

Here, Plaintiff asks the court to employ a top-down approach to impose a $59,973 penalty for 182 violations, arguing that none of the six penalty factors warrant a downward adjustment. Mot. at 15. In total, Plaintiff requests that civil penalties be assessed against Defendant in the

---

[3] Under 40 C.F.R. § 19.4, any person who violates the CWA shall be subject to 1) civil penalties not to exceed $59,973 per day per violation occurring after November 2, 2015, where the penalties were assessed on or after January 12, 2022, and 2) civil penalties not to exceed $64,618 per day per violation occurring after November 2, 2015, where the penalties were assessed on or after January 6, 2023.

1    amount of $10,915,086.[4]  *Id.*

2         Plaintiff argues that Defendant violated the CWA at least 182 times, reasoning as follows:

3    Before its General Permit coverage was terminated in February 2016, Defendant collected samples

4    of stormwater discharges from its Facility as required under the General Permit. By comparing

5    the known dates of discharge with historic rain data, Plaintiff obtained a starting point to

6    determine the amount of rainfall necessary to cause a discharge. Prior to February 2016,

7    Defendant reported discharges to the Regional Board on three different dates: 12/18/2007,

8    4/1/2013, and 3/5/2014.[5]  Mot. at 7-8 (citing RJN Exs. A-C). Plaintiff relied on these reported

9    discharges and looked at the 72-hour rainfall total for each day of discharge.[6] Plaintiff used the

10   "most conservative estimate," i.e., the highest rain total, to count violations. Based on the

11   information gathered, Plaintiff concluded that the Facility discharges, and thus violates the

12   General Permit, on days where the 72-hour rainfall total is equal or greater than 0.74 inches. Since

13   March 28, 2017, three different weather stations recorded 182, 198, and 188 days where the 72-

14   hour rainfall total was equal to or greater than 0.74 inches. *See* RJN Exs. D-F. Accordingly,

15   Plaintiff contends there have been at least 182 unlawful discharges from the Facility in the last five

16   years.

17        The court accepts Plaintiff's calculation of 182 accrued violations, which is supported by

18

19   _____

20   [4] The relevant time period for the violations is unclear. *Compare* Compl. ¶¶ 65-72 (alleging that
     Defendant has been operating its Facility without the required permit since February 25, 2016),
     *with* Compl. ¶ 116 (alleging that Defendant has violated the CWA since at least March 28, 2017),

21   *and* Compl. at VII(d) (seeking civil penalties for all violations occurring after November 2, 2015).
     Under the relevant statute of limitations, Plaintiff may allege violations going back – at most –

22   five years from the filing of the complaint. *See Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d
     1517 (9th Cir. 1987); *see also* Mot. at 8 (noting the same). Accordingly, Plaintiff may only allege

23   violations since March 28, 2017.

24   [5] Exhibits A through C do not show that Defendant reported a discharge on 12/18/2007. Exhibit A
     (letter from Regional Board to Defendant dated 8/26/2013) refers to a sample dated 4/1/2013,

25   Exhibit B (letter from Regional Board to Defendant dated 9/23/2014) includes a sample from
     3/5/2014, and Exhibit C (letter from Regional Board to Defendant dated 10/17/2014) lists a

26   sample from 3/5/2014. In any event, the 12/18/2007 discharge does not appear crucial to
     Plaintiff's analysis, as Plaintiff used the highest rain total to count violations, which occurred in

27   connection with the 4/1/2013 discharge. *See* Mot. at 8.

28   [6] Plaintiff considered the 72-hour rainfall total rather than the 24-hour total to account for rainfall
     from the preceding days. *See* Mot. at 8.

                                                      17

United States District Court
Northern District of California

1    evidence and based on reasonable inferences drawn from Defendant's own discharge data and

2    publicly available rainfall data. In supplemental briefing, Plaintiff also offers the declaration of

3    hydrologist Ian Wren in support of its methodology. Wren confirms that "Plaintiff reasonably

4    interpreted the data to generate a conservative benchmark value against which to identify the

5    number of days when stormwater discharges from the Facility likely occurred." [Docket No. 28-1

6    (Ian Wren Decl., March 23, 2023) ¶ 12.] He explains that this opinion is supported by scientific

7    literature and technical guidance, as well as California's General Permit for Storm Water

8    Discharges Associated with Industrial Activities. *Id.* Finally, Wren describes alternative methods

9    for estimating the number of discharge days, each of which results in a comparable number of

10   total violations. *Id.* ¶ 17.

11        Plaintiff asks the court to impose a $59,973 penalty for each of the 182 violations. The

12   court agrees with Plaintiff that a top-down approach to calculate civil penalties offers a more

13   reliable method in this case, where Defendant has failed to participate in the litigation. *See Los*

14   *Angeles Waterkeeper*, 2015 WL 13917738, at *7 (on motion for default judgment, adopting the

15   top-down approach because the court lacked relevant facts to analyze the economic benefit

16   defendants derived from their conduct); *see also Ctr. for Biological Diversity*, 434 F. Supp. 2d at

17   799 (on motion for default judgment, finding that the top-down approach offered a more reliable

18   and less speculative method of calculating the penalty). Under that approach, the maximum

19   possible penalty for 182 violations committed since March 28, 2017 amounts to $64,618 per day

20   per violation, or $11,760,476.

21        The court finds that the statutory penalty factors discussed below support a civil penalty at

22   the rate of $25,000 per violation and recommends the imposition of $4,550,000 in total civil

23   penalties. This amount is adequate to punish and deter Defendant, while incentivizing Defendant

24   to come into prompt compliance and recognizing that Defendant does not appear to have a history

25   of violating the CWA beyond what is described in this lawsuit. *See Tull v. United States*, 481 U.S.

26   412, 422 (1987) ("[t]he legislative history of the [Clean Water] Act reveals that Congress wanted

27   the district court to consider the need for retribution and deterrence, in addition to restitution,

28   when it imposed civil penalties"); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,

United States District Court
Northern District of California

1   528 U.S. 167, 185 (2000) ("Congress has found that civil penalties in Clean Water Act cases do

2   more than promote immediate compliance by limiting the defendant's economic incentive to delay

3   its attainment of permit limits; they also deter future violations"); *see also California Sportfishing*

4   *Prot. All. v. Callaway*, No. 2:12-CV-0843 JAM CKD, 2012 WL 3561968, at *1 (E.D. Cal. Aug.

5   17, 2012), *report and recommendation adopted,* No. 2:12-CV-843 JAM CKD, 2012 WL 4834406

6   (E.D. Cal. Oct. 10, 2012) (adopting $32,500 as penalty per violation at the plaintiff's request for a

7   total of $29,925,000 in penalties); *United States v. Bayley*, No. 3:20-CV-05867-DGE, 2023 WL

8   3093126, at *11 (W.D. Wash. Apr. 26, 2023) (adopting $62,500 penalty per violation at the

9   plaintiff's request for a total of $250,000 in penalties).

### a.  The Seriousness of the Violations

11         In considering the seriousness of a defendant's conduct, courts consider "(1) the number of

12  violations; (2) the duration of noncompliance; (3) the significance of the violation (degree of

13  exceedance and relative importance of the provision violated); and (4) the actual or potential harm

14  to human health and the environment." *Hawaii's Thousand Friends v. City & Cnty. of Honolulu*,

15  821 F. Supp. 1368, 1383 (D. Haw. 1993).

16         In light of the relatively high number of violations, the significant length of time since

17  Defendant was last in compliance with its CWA obligations, and the potential harm allegedly

18  suffered by Plaintiff and its members, the court finds that Defendant's violations are serious.

### b.  The Economic Benefit Resulting from the Violations

20         The court lacks information about the economic benefit to Defendant as a result of its

21  violations.  However, "it is reasonable to infer that Defendant[] derived some benefit from not

22  having to comply with the applicable regulations[,]" including not incurring "the costs of

23  developing a storm water pollution prevention plan, developing and implementing best

24  management practices, costs associated with collecting and analyzing sample results, and costs

25  associated with training its pollution prevention team." *See Los Angeles Waterkeeper*, 2015 WL

26  13917738, at *7; Mot. at 14.

### c.  Defendant's History of Violations

28         Plaintiff argues that Defendant has been out of compliance with the CWA since February

19

1   2016 and that the Regional Board has tried to bring Defendant into compliance, to no avail. *See*

2   Mot. at 14. According to Plaintiff, the circumstances in this case demonstrate Defendant's blatant

3   disregard for the requirements of the CWA.

4       Although the record supports a finding that Plaintiff has failed to comply with the CWA

5   and the General Permit since 2016, that violation is not separate from the one at issue in this case.

6   *See Californians for Alternatives to Toxics*, 2021 WL 1734897, at *7 (declining to find that

7   defendant had a history of failing to comply with the CWA based on previous case in which no

8   liability was established or on warning letters sent by Regional Board to defendants).

9           **d.   Good Faith Efforts to Comply with the Applicable Requirements**

10       Plaintiff asserts that Defendant has made minimal efforts to comply with the CWA. Mot.

11   at 14. The court agrees. As previously explained, the record indicates that Defendant has been out

12   of compliance with the CWA since 2016, and that Defendant's only attempt at obtaining the

13   required permit coverage was incomplete.

14           **e.   The Economic Impact of the Penalty on the Violator**

15       Due to Defendant's refusal to participate in this litigation, the court lacks relevant facts to

16   determine the economic impact of the penalty on the Facility.

17           **f.   Other Matters as Justice May Require**

18       The court agrees with Plaintiff that because civil penalties under the CWA are punitive in

19   nature, the penalty here should be large enough to encourage Defendant's compliance with the

20   CWA. *See* Mot. at 15 (citing *Tull v. United States*, 481 U.S. 412, 422 (1987)).

21       For the foregoing reasons, the court recommends imposition of a penalty of $4,550,000.

22           **4.   Attorneys' Fees**

23       Plaintiff requests partial reimbursement of attorneys' fees in the amount of $35,235 for

24   68.3 hours of work by two timekeepers. [Docket No. 19-1 (Andrew Packard Decl.) ¶ 9.] Plaintiff

25   also seeks $614.32 in costs. *Id.* ¶ 32-33.

26       Section 505(d) of the CWA gives courts the discretion to award attorneys' fees, including

27   litigation expenses and costs, to prevailing parties. *See Resurrection Bay Conservation All. v. City*

28   *of Seward, Alaska*, 640 F.3d 1087, 1091 n.3 (9th Cir. 2011) (citing 33 U.S.C. § 1365(d)). A

1    court's decision to award attorneys' fees under section 505(d) requires two findings: "that the fee

2    applicant is a prevailing party, and that an award of attorney's fees is appropriate." *San Francisco*

3    *Baykeeper v. W. Bay Sanitary Dist.*, No. C-09-5676 EMC, 2011 WL 6012936, at *1 (N.D. Cal.

4    Dec. 1, 2011) (citing *Resurrection Bay Conservation All.*, 640 F.3d at 1091). In general, fee

5    awards "should be the rule rather than the exception." *Rogue Riverkeeper v. Bean*, No. 1:11-CV-

6    3013-CL, 2013 WL 1785778, at *4 (D. Or. Jan. 23, 2013), *report and recommendation adopted*,

7    No. 1:11-CV-3013-CL, 2013 WL 1785777 (D. Or. Apr. 25, 2013) (citing *Saint John's Organic*

8    *Farm v. Gem Cty. Mosquito Abatement Dist.*, 574 F.3d 1054, 1058–1063 (9th Cir. 2009)).

9            District courts in the Ninth Circuit typically employ the "lodestar analysis" in calculating

10    fee awards. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Camacho v. Bridgeport Fin., Inc.*,

11    523 F.3d 973, 978 (9th Cir. 2008) (citations omitted). "The lodestar figure is calculated by

12    multiplying the number of hours the prevailing party reasonably expended on the litigation (as

13    supported by adequate documentation) by a reasonable hourly rate for the region and for the

14    experience of the lawyer." *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 546 (9th Cir.

15    2016) (internal citation omitted). Fee awards calculated under the lodestar method generally are

16    presumed to be reasonable, *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1208–09 (9th Cir.

17    2013), although the court ultimately retains discretion to modify the amount based on the specific

18    circumstances of each case. The party seeking fees bears the initial burden of establishing the

19    hours expended litigating the case and must provide detailed time records documenting the tasks

20    completed and the amount of time spent. *Hensley*, 461 U.S. at 434; *Welch v. Metro. Life Ins. Co.*,

21    480 F.3d 942, 945–46 (9th Cir. 2007). The requesting party also has the burden to demonstrate

22    that the rates requested are "in line with the prevailing market rate of the relevant community."

23    *Carson v. Billings Police Dep't*, 470 F.3d 889, 891 (9th Cir. 2006) (internal quotation marks and

24    citation omitted).

25            **a.   Reasonableness of Hourly Rates**

26            As the prevailing party, Plaintiff requests hourly rates of $825 for Andrew L. Packard and

27    $450 for William Carlon. Packard Decl. ¶¶ 18, 21. Packard has practiced public interest

28    environmental law for over 28 years. *Id.* ¶ 5. Since 1997, his firm has represented dozens of

1    declarations do not provide specific information about the hourly rates of comparable attorneys to

2    support the reasonableness of the requested rates. Likewise, Packard does not cite any cases

3    approving any rates previously requested by him or Carlon. In fact, Plaintiff's counsel fails to

4    mention that in March 2022, they received considerably lower hourly rates, particularly because

5    they do not work in the San Francisco Bay Area. *See Californians for Alternatives to Toxics v.*

6    *Kernen Constr.*, No. 20-CV-01348-YGR, ECF No. 90 at 3–5 (approving hourly rates of $660 for

7    Packard and $320 for Carlon after reducing the requested rates by twenty percent to reflect "the

8    prevailing market rates in the far northern parts of this District for cases entirely local to that

9    area").

10         Here too, the action as well as the work performed by Plaintiff's lawyers are based entirely

11    in the northern part of the Northern District of California, in Sonoma County. Adopting the

12    reasoning in *Californians for Alternatives to Toxics*, the court applies a twenty percent reduction

13    to the requested rates, resulting in hourly rates of $660 for Packard and $360 for Carlon. *See*

14    *Californians for Alternatives to Toxics v. Kernen Constr.*, No. 20-CV-01348-YGR (LB), 2023 WL

15    4991861, at *4 (N.D. Cal. Apr. 21, 2023), *report and recommendation adopted sub nom.*

16    *Californians for Alternatives to Toxics v. Kernen Constr. Co.*, No. 4:20-CV-01348 YGR, 2023

17    WL 4995716 (N.D. Cal. June 13, 2023) ("A prior award of attorney's fees to an attorney at a

18    particular hourly rate may be persuasive in establishing the reasonableness of a claimed hourly

19    rate."). This finding is also supported by this court's experience and understanding of the relevant

20    market rates.

21                    **b. Reasonableness of Hours Expended**

22         Plaintiff's counsel billed a total of 68.3 hours since January 25, 2022. Mot. at 17-18;

23    Packard Decl. ¶ 9. The requested hours are supported by itemized timeslips. Packard Decl., Ex.

24    1. Packard asserts that the contingent nature of this litigation gave counsel "a reason to put only

25    those hours into this case that were prudently necessary for advancing success." Packard Decl. ¶

26    25. In addition, Packard explains that the firm efficiently staffed the case to minimize duplication

27    and assigned the bulk of the work to Carlon (counsel with the lowest hourly rate). *Id.* ¶ 20.

28         Having carefully reviewed counsel's billing entries, the court concludes that the hours

United States District Court
Northern District of California

1  Paul Den Beste
2  P. O. Box 742
   Cloverdale, CA 95425
3  (707) 975 5901
   Email: pauldenbeste@hotmail.com
4           pauldenbestecloverdale@gmail.com
5
   Specially Appearing Amicus Curiae
6
7
8
                    UNITED STATES DISTRICT COURT
9                   NORTHERN DISTRICT OF CALIFORNIA
                         OAKLAND COURTHOUSE
10
11  CALIFORNIA SPORTFISHING PROTECTION    ) Case Number: 4:22-cv-01975- Rita F. Lin
    ALLIANCE,                             )
12           Plaintiff                    ) PAUL DEN BESTE'S ADDITIONAL
                   v                      ) AMICUS CURIAE BRIEF PROVIDING
13  DEN BESTE YARD AND GARDEN, INC.,      ) NOTICE OF REFERRAL TO THE
             Defendant                    ) PRESIDING JUDGE OF THE
14                                        ) SUPERIOR OF CALIFORNIA, COUNTY
15                                        ) OF SONOMA WHICH MAINTAINS IN
                                          ) CUSTODIA LEGIS ALL ASSETS OF
16                                        ) THE RECEIVERSHIP ESTATE OF
                                          ) DEFENDANT DEN BESTE YARD AND
17                                        ) GARDEN, INC. AND AS DIRECTLY
                                          ) RELATED TO THE PROCEEDINGS IN
18                                        ) THIS FEDERAL CASE
                                          )
19                                        ) PROOF OF SERVICE
20
21  To the Honorable Judge Rita F. Lin
22
        I, the undersigned Paul Den Beste, acting in my capacity as Amicus Curiae, provide the
23
    following referral of this Federal case, related to the attached hereto as **Exhibit A** Document #
24
    34 "REQUEST FOR REASSIGNMENT: REPORT AND RECOMMENDATION OF RE
25
26  MOTION FOR DEFAULT JUDGMENT, to the Honorable Presiding Judge Shelly Averill of the
27
    PAUL DEN BESTE'S ADDITIONAL AMICUS CURIAE BRIEF PROVIDING NOTICE OF REFERRAL TO
28  THE PRESIDING JUDGE OF THE SUPERIOR OF CALIFORNIA, COUNTY  OF SONOMA WHO
    MAINTAINS IN CUSTODIA LEGIS ALL ASSETS OF THE RECEIVERSHIP ESTATE OF DEFENDANT DEN
    BESTE YARD AND GARDEN, INC. AND AS DIRECTLY RELATED TO THE PROCEEDINGS IN THIS
    FEDERAL CASE
                                      1

Superior Court of California, County of Sonoma, case Number MCV178973, which maintains in custodia legis the receivership estate of Defendant DEN BESTE YARD AND GARDEN, INC., to wit;

As stated at **Exhibit A** Document #34 at page 3 lines 1 – 28 to page 4 lines 1 – 10, Brad Brereton, the attorney for the deceased receiver Patrick Bulmer, has not been able to provide any assistance to this Federal Court regarding this Federal case against Defendant DEN BESTE YARD AND GARDEN, INC, which, as Demonstrated by **Exhibit B** Document #10 and **Exhibit C** Document #18, said DEN BESTE YARD AND GARDEN, INC., continues to be in the exclusive cuatodia legis of the Superior Court of California, County of Sonoma case Number MCV178973, and therefore, pursuant to established California authorities, the undersigned Amicus Curiae Paul Den Beste refers this Federal Case to Presiding Judge Shelly Averill of the Superior Court of California, County of Sonoma case Number MCV178973, to wit;

A receiver neither occupies the status of an assignee Wright v. Standard Engineering Corp. (1972) 28 Cal. App. 3d 244, 248, 104 Cal. Rptr. 539: H.D. Roosen Co. v. Pacific Radio Pub. Co. (1932) 123 Cal. App. 525, 534, 11 P.2d 873] nor is an agent of any party to the action or proceeding Maggiora v. Palo Alto Inn, Inc. (1967) 249 Cal. App. 2d 706, 712, that states "[6] A receiver is not an agent of either party to the action but represents all persons interested in the property involved" citing United States Overseas Airlines v County of Alameda 235 Cal. App. 2d 347 at 353.   Rather, a receiver is an officer or representative of the court, [City of Santa Monica v. Gonzalez (2008) 43 Cal. 4th 905~ 930, 76 Cal. Rptr. 3d 483. 182 P.3d 1027; [North v. Cecil B. DeMille Productions. Inc. (1934) 2 Cal. 2d 55, 58, 39 P.2d 199; Kreling v. Kreling (1897) 118 Cal. 421, 422, 50 P. 5491 and a custodian of the property committed to his or her

PAUL DEN BESTE'S ADDITIONAL AMICUS CURIAE BRIEF PROVIDING NOTICE OF REFERRAL TO THE PRESIDING JUDGE OF THE SUPERIOR OF CALIFORNIA, COUNTY OF SONOMA WHO MAINTAINS IN CUSTODIA LEGIS ALL ASSETS OF THE RECEIVERSHIP ESTATE OF DEFENDANT DEN BESTE YARD AND GARDEN, INC. AND AS DIRECTLY RELATED TO THE PROCEEDINGS IN THIS FEDERAL CASE

2

charge [Neider v. Dardi (1955) 130 Cal. App. 2d 646, 650. 279 P.2d 598]. Being an officer or

representative of the court, the receiver is subject to the court's direction [Highland Secure Co. v.

Superior Court (1931) 119 Cal. App. 107, 112, 6 P.2d 116], and the property in receivership is

under the control and continuous supervision of the court [ McClenny v. Superior Court

(1964) 60 CaL 2d 677. 688 n.21. 36 Cal. Rptr. 459. 388 P.2d 691; Steinberg v. Goldstein (1956)

145 Cal. App. 2d 692. 699, 303 P.2d 80]; Receiver as under control of court, as is property of

which receiver is custodian; De Forrest v. Coffey (1908) 154 Cal. 444. 449, 98 P. 27: Receiver as

officer of court possessing property for court; McCarthy v. Poulsen (1985) 173 cal. App. 3d

1212, 1219.219 Cal. Rptr. 375: Receivership estate consisting of property properly in receiver's

hands as under control and continuous supervision of court; Turnerv. Superior Court (1977) 72

Cal. App. 3d 804, 813. 140 Cal. Rptr. 475: Receiver appointed in aid of execution as subject to

continued direction and control of court; Morand v. Superior Court (1974) 38 Cal. App. 3d

347.350, 113 Cal. Rptr. 281: Receiver appointed by court as officer of court and property in

receiver's custody as in custody of court; Robbins v. Bueno (1968) 262 Cal. App. 2d 79,84.68

Cal. Rptr. 347: Property subjected to receivership as under control and continuous supervision of

court. Steinberg v. Goldstein (1956) 145 Cal. App. 2d 692. 699, 303 P.2d 80.

Paul Den Beste, Amicus Curiae

## Proof Service

My name is Paul Den Beste. On November 28, 2023, in my capacity of Amicus Curiae, I

mailed a complete copy of the the attached document titled "PAUL DEN BESTE'S

ADDITIONAL AMICUS CURIAE BRIEF PROVIDING NOTICE OF REFERRAL TO THE

PAUL DEN BESTE'S ADDITIONAL AMICUS CURIAE BRIEF PROVIDING NOTICE OF REFERRAL TO THE PRESIDING JUDGE OF THE SUPERIOR OF CALIFORNIA, COUNTY OF SONOMA WHO MAINTAINS IN CUSTODIA LEGIS ALL ASSETS OF THE RECEIVERSHIP ESTATE OF DEFENDANT DEN BESTE YARD AND GARDEN, INC. AND AS DIRECTLY RELATED TO THE PROCEEDINGS IN THIS FEDERAL CASE

3

1  PRESIDING JUDGE OF THE SUPERIOR OF CALIFORNIA, COUNTY OF SONOMA WHO

2  MAINTAINS IN CUSTODIA LEGIS ALL ASSETS OF THE RECEIVERSHIP ESTATE OF

3  DEFENDANT DEN BESTE YARD AND GARDEN, INC. AND AS DIRECTLY RELATED

4
5  TO THE PROCEEDINGS IN THIS FEDERAL CASE", to the following addressees;

6  Presiding Judge Shelly Averill
   Courtroom 15
7  Superior Court of California, County of Sonoma
   600 Administration Drive
8  Santa Rosa, CA 95403

9
   Law Offices of Andrew L. Packard
10 245 Kentucky Street, Suite B
   Petaluma, CA 94952
11

12        I declare under penalty of perjury that the foregoing is true and correct.

13        Executed in Cloverdale, California on November 28, 2023.

14

15        Paul Den Beste

16

17

18

19

20

21

22

23

24

25

26

27
   PAUL DEN BESTE'S ADDITIONAL AMICUS CURIAE BRIEF PROVIDING NOTICE OF REFERRAL TO
28 THE PRESIDING JUDGE OF THE SUPERIOR OF CALIFORNIA, COUNTY OF SONOMA WHO
   MAINTAINS IN CUSTODIA LEGIS ALL ASSETS OF THE RECEIVERSHIP ESTATE OF DEFENDANT DEN
   BESTE YARD AND GARDEN, INC. AND AS DIRECTLY RELATED TO THE PROCEEDINGS IN THIS
   FEDERAL CASE
                                        4

# Exhibit A

1
2
3
4          UNITED STATES DISTRICT COURT
5          NORTHERN DISTRICT OF CALIFORNIA
6
7    CALIFORNIA SPORTFISHING                 Case No. 22-cv-01975-DMR
     PROTECTION ALLIANCE,
8
              Plaintiff,                      **REQUEST FOR REASSIGNMENT;**
9                                             **REPORT AND RECOMMENDATION**
        v.                                    **RE MOTION FOR DEFAULT**
10                                            **JUDGMENT**
     DENBESTE YARD & GARDEN, INC.,
11                                            Re: Dkt. No. 19
              Defendant.
12

13          This lawsuit alleges violations of the Clean Water Act ("CWA") against Defendant

14   DenBeste Yard & Garden Supply, a California corporation that owns and operates a yard and

15   garden supply company located in Sonoma County. [Docket No. 1.] After Defendant failed to

16   appear or defend itself in this action, Plaintiff California Sportfishing Protection Alliance filed this

17   motion for default judgment. [Docket No. 19.] This matter is suitable for determination without

18   oral argument. Civil L.R. 7-1(b).

19          Defendant has not filed a declination or consent to the jurisdiction of a magistrate judge

20   pursuant to 28 U.S.C. § 636(c). Therefore, the court issues this Report and Recommendation and

21   reassigns this case to a district judge for final disposition, with the recommendation that Plaintiff's

22   motion for default judgment be granted, and that Plaintiff's request for damages and attorneys'

23   fees and costs be granted in part.

24   I.     BACKGROUND

25          A.     Factual Allegations

26          Plaintiff California Sportfishing Protection Alliance is a non-profit corporation dedicated

27   to the preservation, protection, and defense of the environment, wildlife, and natural resources of

28   California water. Compl. ¶ 13. Defendant DenBeste Yard & Garden Supply owns a yard and

1    garden supply facility located at 26916 Asti Road in Cloverdale, California (the "Facility"). *Id.* ¶¶

2    5, 36. The Facility's primary industrial activities include mixing potting soil and compost. *Id.* ¶

3    38. Plaintiff alleges that Defendant stores industrial materials, including soil, wood, and compost

4    outside the Facility, in areas exposed to storm water. *Id.* ¶ 40. Plaintiff further asserts that

5    Defendant discharges pollutant-contaminated storm water from the Facility into the Russian River,

6    which then discharges to the Pacific Ocean. *Id.* ¶ 43.

7         Defendant has been operating the Facility without any General Permit coverage since

8    February 25, 2016. Compl. ¶ 66. On October 30 and December 11, 2015, the North Coast

9    Regional Water Quality Control Board ("Regional Board") informed Defendant that it was

10   required to renew its General Permit coverage for the Facility. *Id.* ¶ 46. Defendant filed a Notice

11   of Intent to obtain coverage under the General Permit for the Facility on July 6, 2016, but the

12   application was returned as incomplete. *Id.* ¶¶ 47-48. The Regional Board subsequently issued

13   two Notices of Non-Compliance on September 17 and October 28, 2020. *Id.* ¶¶ 49-56.

14        On January 26, 2022, Plaintiff sent a 60-day notice alerting Defendant that it intended to

15   sue for alleged violations of the CWA and the General Permit. Compl., Ex. A ("Notice"). A copy

16   of the Notice was sent to the Administrator of the EPA; the Administrator of EPA Region IX; the

17   Executive Director of the State Water Resources Control Board; and the Executive Officer of the

18   Regional Water Quality Control Board, San Francisco Bay Region. *Id.* ¶ 2.

19        On March 28, 2022, Plaintiff filed a complaint against Defendant alleging one claim for

20   relief based on Defendant's violations of the CWA. On April 14, 2022, Plaintiff served the

21   complaint and summons on Defendant's agent for service, Paul Ray Den Beste. [Docket No. 9.]

22   On May 31, 2022, Plaintiff moved for entry of default. [Docket No. 15.] The clerk entered

23   default against Defendant on June 17, 2022. [Docket No. 16.] Plaintiff filed this motion on

24   August 19, 2022, along with supplemental briefing on March 23, 2023. [Docket Nos. 19, 28 (First

25   Supp. Br.).] Pursuant to court order, Plaintiff filed a first amended complaint on August 10, 2023,

26   and related supplemental briefing on September 8, 2023. [Docket Nos. 32 ("FAC"), 33 (Second

27   Supp. Br.).]

28

United States District Court
Northern District of California

2

United States District Court
Northern District of California

## II.     PROCEDURAL HISTORY

On April 14, 2022, Plaintiff served the complaint and summons on Defendant's agent for service Paul Ray Den Beste. [Docket No. 9.] On April 19, 2022, Den Beste filed a responsive pleading styled as an "answer by special appearance with notice of state court orders directed to ongoing receivership." [Docket No. 10.] The court construed the filing as evidencing Den Beste's intent to appear on behalf of Defendant as a shareholder, which is barred by Ninth Circuit authority requiring corporations to be represented by a lawyer admitted to practice before this court. [Docket No. 11.] The court ordered Defendant to retain legal counsel and file a notice of appearance of counsel by May 27, 2022. Defendant failed to appear or otherwise respond to the court's order. As a result, the clerk entered default against Defendant pursuant to Federal Rule of Civil Procedure 55(a) on June 17, 2022. [Docket No. 16.]

In response to the court's order to retain legal counsel, Den Beste instead filed two documents stating that Defendant is unable to retain legal representation because the corporation was placed and remains under receivership by the Superior Court of California, County of Sonoma. [Docket Nos. 14, 18.] According to Den Beste's filings, the Superior Court awarded four judgments against Paul Ray Den Beste and Melody Den Beste, which, as of July 15, 2010, amounted to a total of $56,086.89. [Docket No. 14, Ex. A.] In light of "two . . . occasions when . . . Paul Den Beste and Melody Den Beste, moved substantial assets out of the reach of the judgment creditor immediately after an enforcement activity," the judgment creditor requested the appointment of a receiver over "all non-exempt real and personal property and business interest owned, controlled, or possessed by [Paul Den Beste and Melody Den Beste], wherever located and whether now or in the future owned, controlled or possessed by them." *Id.* The Superior Court appointed a receiver on August 23, 2010. [Docket No. 14, Ex. B.] Den Beste specifically identified Patrick Bulmer and/or the California Receivership Services as Defendant's receiver and Brad Brereton as California Receivership Services' attorney. [Docket Nos. 14 at 3; 18 at 2.]

Plaintiff then clarified that upon further research, it determined that Patrick Bulmer is deceased, and that Brad Brereton no longer has a client involved in Defendant's receivership. [Docket Nos. 23, 23-1.] In support of its position, Plaintiff submitted an email from Brad

3

1    Brereton stating: "Patrick Bulmer died a couple of years ago. So I no longer have a client

2    involved in the matter. I had informed the [state] court of his death, but I never received any

3    response. Happy to assist if I can, but I am not certain that I have any authority over anything."

4    [Docket No. 23-1.]

5         On December 7, 2022, the court ordered Den Beste to address the issue of Defendant's

6    receivership by February 1, 2023. [Docket No. 24.] Specifically, the court instructed Den Beste

7    to "take action, if he so chooses, to get a new receiver appointed and for the receiver to notify this

8    court of its intentions regarding this case." The court warned that it would adjudicate the motion

9    for default judgment after that date. Defendant failed to notify the court of the appointment of a

10   new receiver or otherwise respond to the court's order.

11        Therefore, the court proceeds to adjudicate the motion for default judgment.

12   **B.    Statutory Framework**

13        Congress enacted the CWA to "restore and maintain the chemical, physical, and biological

14   integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, the CWA makes

15   unlawful "'the discharge of any pollutant by any person' without a permit [issued under the

16   National Pollutant Elimination System (NPDES)].'" *Cnty. of Maui, Hawaii v. Hawaii Wildlife*

17   *Fund*, 140 S. Ct. 1462, 1469 (2020) (quoting 33 U.S.C. § 1311(a)). Permits are issued by the

18   Administrator of the Environmental Protection Agency ("EPA") or by states that have been

19   authorized by the EPA to act as NPDES permitting authorities. *Env't Def. Ctr., Inc. v. U.S.*

20   *E.P.A.*, 344 F.3d 832, 841 (9th Cir. 2003) (citing U.S.C. § 1342(a)-(b)).

21        In 1987, Congress passed amendments to the CWA, including section 402(p), 33 U.S.C. §

22   1342(p), to better regulate pollution from stormwater runoff. *Env't Def. Ctr.*, 344 F.3d at 841.

23   The CWA regulates storm water if the discharge falls into one of five categories, the second of

24   which is at issue here:

25

26              (A) A discharge with respect to which a permit has been issued under
                this section before February 4, 1987.
27              (B) *A discharge associated with industrial activity.*
                (C) A discharge from a municipal separate storm sewer system
                serving a population of 250,000 or more.
28              (D) A discharge from a municipal separate storm sewer system

United States District Court
Northern District of California

1

2

3

> serving a population of 100,000 or more but less than 250,000.
> (E) A discharge for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

4      33 U.S.C. § 1342 (p)(2)(A)-(E) (emphasis added).

5      Relevant to this action, "[d]ischargers of storm water associated with industrial activity"

6      must apply for an individual permit or seek coverage under a promulgated storm water general

7      permit. 40 C.F.R. § 122.26(c)(1); *see also* 33 U.S.C. § 1342(p)(3)(A). In California, industrial

8      storm water discharges are subject to a General Permit. *See* State Water Resources Control Board

9      Water Quality Order No. 91-13-DWQ, *as amended by* Water Quality Order No. 92-12-DWQ,

10     Water Quality Order No. 97-03-DWQ, and Water Quality Order No. 2014-0057-DWQ. The

11     General Permit requires industrial dischargers to develop and implement an effective Storm Water

12     Pollution Prevention Plan; develop and implement a comprehensive monitoring and reporting

13     program; identify and implement best management practices; and establish a Pollution Prevention

14     Team, among other requirements. *Waterkeepers N. Cal. v. AG Indus. Mfg., Inc.*, 375 F.3d 913,

15     916 (9th Cir. 2004).

16     Section 505(a) permits a private citizen to bring a lawsuit against any person "alleged to be

17     in violation" of the CWA. *See* 33 U.S.C. § 1365(a)(1). Before a suit can be commenced, the

18     citizen must give a 60-day notice of intent to sue. *See* 33 U.S.C. § 1365(b)(1)(A). The purpose of

19     the notice is to give government agencies an opportunity to enforce environmental regulations

20     without the need for a citizen suit, and to give the alleged violator "'an opportunity to bring itself

21     into complete compliance with the Act and thus likewise render unnecessary a citizen suit.'" *Ctr.*

22     *For Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 800 (9th Cir. 2009) (quoting

23     *Hallstrom v. Tillamook County*, 493 U.S. 20, 29 (1989)).

24     **III.    LEGAL STANDARDS**

25     Federal Rule of Civil Procedure 55(b)(2) permits a court to enter a final judgment in a case

26     following a defendant's default. *Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d

27     995, 999 (N.D. Cal. 2001). Whether to enter a judgment lies within the court's discretion.

28     *Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1174 (C.D. Cal. 2002) ("A defendant's

United States District Court
Northern District of California

5

default does not automatically entitle the plaintiff to a court-ordered judgment." (citing *Draper v. Coombs*, 792 F.2d 915, 924-25 (9th Cir. 1986))).

Before assessing the merits of a default judgment, a court must ensure the adequacy of service on the defendant, as well as confirm that it has subject matter jurisdiction over the case and personal jurisdiction over the parties. *See In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999). If the court finds these elements satisfied, it turns to the following factors ("the *Eitel* factors") to determine whether it should grant a default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action[,] (5) the possibility of a dispute concerning material facts[,] (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decision on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986) (citation omitted). In this analysis, "the well-pleaded allegations of the complaint relating to a defendant's liability are taken as true." *Pepsico, Inc.*, 238 F. Supp. 2d at 1175 (citing *Televideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987)). Nevertheless, default does not compensate for essential facts not within the pleadings and those legally insufficient to prove a claim. *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992).

## IV.    REQUEST FOR JUDICIAL NOTICE

Plaintiff filed a request for judicial notice, asking the court to take judicial notice of Exhibits A through F. [Docket No. 20.] The exhibits contain correspondence between Defendant and the Regional Board (Exs. A-C) and copies of precipitation data collection from the National Oceanic and Atmospheric Administration's climate data website (Exs. D-F).

On a motion for default judgment, the court is not restricted to the allegations in the complaint. Under Rule 55(b)(2), if the court needs to "determine the amount of damages," "establish the truth of any allegation by evidence," or "make an investigation of any other matter," it may conduct such hearings or order such references as it deems necessary and proper. This rule gives the court "considerable leeway as to what it may require as a prerequisite to the entry of a default judgment." *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917 (9th Cir. 1987).

United States District Court
Northern District of California

6

1    Because Plaintiff's exhibits are properly authenticated by counsel's declaration, the court

2    considers Exhibits A through F as evidence. The request for judicial notice is denied as moot.

3    **V.    ANALYSIS**

4    **A.  Jurisdiction**

5    Before entering default judgment, a federal court has an "affirmative duty to look into its

6    jurisdiction over both the subject matter and the parties." *In re Tuli v. Rep. of Iraq*, 172 F.3d 707,

7    712 (9th Cir. 1999). Here, the court has subject matter jurisdiction and personal jurisdiction over

8    the parties.

9    **1.  Subject Matter Jurisdiction**

10   The court has subject matter jurisdiction over this case pursuant to 33 U.S.C. §

11   1365(a)(1)(A) (empowering private citizens to sue industrial dischargers for violations of the

12   CWA) and 29 U.S.C. § 1331. Plaintiff appears to have given timely notice to federal and state

13   agencies as required by 33 U.S.C. § 1365(b)(1)(A). Compl. ¶ 2.

14   **2.  Personal Jurisdiction**

15   "With respect to a corporation, the place of incorporation and principal place of business

16   are 'paradig[m] . . . bases for general jurisdiction." *Daimler AG v. Bauman*, 571 U.S. 117, 137

17   (2014) (quoting *A General Look at General Jurisdiction*, 66 Texas L. Rev. 721, 728 (1988)).

18   Either basis is sufficient for the exercise of general jurisdiction over corporations. *AM Tr. v. UBS*

19   *AG*, 681 F. App'x 587, 588 (9th Cir. 2017) ("[A] corporation is typically subject to general

20   personal jurisdiction only in a forum where it is incorporated *or* where it maintains its principal

21   place of business." (emphasis added)).

22   Here, Defendant is incorporated in California and the Facility is located in Sonoma

23   County. Compl. ¶¶ 9, 36. Because Defendant is a California corporation, it is subject to general

24   personal jurisdiction in California.

25   **3.  Organizational Standing**

26   "When suing on behalf of its members, an organization must show that its members would

27   have individual standing, the issues are germane to the organization's purpose, and neither the

28   claim nor the requested relief requires individual participation." *Inland Empire Waterkeeper v.*

United States District Court
Northern District of California

7

*Corona Clay Co.*, 17 F.4th 825, 831 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 1444 (2022).

Plaintiff alleges that its members live, work, travel, and recreate near the Russian River, and that pollution from the discharged storm water impacts their current and anticipated use of the land for "educational, scientific, conservation, aesthetic, and spiritual" purposes. Compl. ¶¶ 13-15.

The Ninth Circuit routinely has found evidence similar to the allegations in this case sufficient to establish standing. *See Inland Empire Waterkeeper*, 17 F.4th at 832 (collecting cases). Taking Plaintiff's allegations as true, the court finds that Plaintiff has standing to bring this action.

## B. Adequacy of Service

Federal Rule of Civil Procedure Rule 4(h) allows for service of a corporation, partnership, or association "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process and—if the agent is one authorized by statute and the statute so requires—by also mailing a copy of each to the defendant." Fed. R. Civ. P. 4(h)(1)(B). Rule 4 also allows a corporation to be served "following state law for serving a summons in an action brought in courts of general jurisdiction, where the district court is located or where service is made." Fed. R. Civ. P. 4(h)(1)(A); Fed. R. Civ. P. 4(e)(1). In turn, California law allows for service of a corporation by personally delivering a copy of the summons and the complaint to a person authorized to receive service of process. Cal. Code Civ. Proc. § 416.10(a).

On April 14, 2022, Plaintiff served the complaint and summons on Defendant's agent for service Paul Ray Den Beste. [Docket No. 9.] Therefore, the court finds that Plaintiff properly served Defendant. *See* Cal. Code Civ. Proc. § 416.10(a) (authorizing service on corporation by delivering summons and complaint to designated agent for service of process).

## C. Application of the *Eitel* Factors

Having found that the jurisdictional and service requirements are met, the court now turns to the *Eitel* factors to determine whether default judgment should be granted.

United States District Court
Northern District of California

8

### 1. Possibility of Prejudice

Plaintiff argues that in the absence of a default judgment, it will be left without other recourse and will suffer prejudice. Mot. at 6. Since Defendant has failed to appear and defend the action, Plaintiff will most likely have no other avenue for recovery. *See, e.g., Los Angeles Waterkeeper v. A & A Metal Recycling, Inc.*, No. CV154326MWFJEMX, 2015 WL 13917738, at *3 (C.D. Cal. Nov. 18, 2015 (finding prejudice to plaintiff where a defendant sued under the CWA failed to appear in the action). This factor weighs in favor of granting default judgment.

### 2. Merits of the Substantive Claim and Sufficiency of the Complaint

"Under an *Eitel* analysis, the merits of plaintiff's substantive claims and the sufficiency of the complaint are often analyzed together." *Dr. JKL Ltd. v. HPC IT Educ. Ctr.*, 749 F. Supp. 2d 1038, 1048 (N.D. Cal. 2010). After an entry of default, well-pleaded allegations in the complaint are deemed true, except for the amount of damages. *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).

Plaintiff's sole cause of action alleges that Defendant violated 33 U.S.C. § 1311(a) by discharging storm water associated with industrial activities generated at its Facility into the Russian River without a NPDES permit issued pursuant to 33 U.S.C. § 1342. Compl. ¶ 116.

"To establish a violation of the Act's NPDES requirements, a plaintiff must prove that (1) a person (2) discharged (3) a pollutant (4) to navigable waters of the United States (5) from a point source (6) without a permit." *San Francisco Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 754 (N.D. Cal. 2011) (citing *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993)); *see also Friends of Outlet Creek v. Grist Creek Aggregates, LLC*, No. 16-CV-00431-JSW, 2019 WL 1975434, at *3 (N.D. Cal. Mar. 19, 2019) (citation omitted). The Supreme Court recently discussed the CWA's definitional language:

> First, the [Clean Water] Act defines 'pollutant' broadly, including in its definition, for example, any solid waste, incinerator residue, heat, discarded equipment, or sand (among many other things). Second, the Act defines a 'point source' as any discernible, confined and discrete conveyance from which pollutants are or may be discharged, including, for example, any container, pipe, ditch, channel, tunnel, conduit, or well. Third, it defines the term 'discharge of a pollutant' as any addition of any pollutant to navigable waters including navigable streams, rivers, the ocean, or coastal waters from any point

9

source.

*Cnty. of Maui, Hawaii*, 140 S. Ct. at 1469 (cleaned up).

Here, Plaintiff has alleged all six elements of the claim. First, Defendant is a "person" under 33 U.S.C. § 1362(5), which defines the term as any "individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." Plaintiff alleges that Defendant is a corporation. Compl. ¶ 9.

Second, Plaintiff has adequately alleged that Defendant discharges pollutants. As discussed above, the CWA defines the term "discharge of a pollutant" as "any addition of any pollutant to navigable waters including navigable streams, rivers, the ocean, or coastal waters from any point source." Plaintiff asserts that Defendant "discharges pollutant-contaminated storm water from the Facility into the Russian River." Compl. ¶¶ 5, 6, 14, 15. The complaint describes the sources of these pollutants, explaining that they are the result of Defendant's industrial activities and industrial materials' exposure to storm water. *Id.* ¶¶ 38-41. The materials include soils, wood, compost, and pollutants associated with the operation of heavy equipment. *Id.* ¶¶ 38, 39, 41. The complaint also alleges that the industrial activities at the Facility fall under Standard Industrial Classification Code 2875 ("Fertilizers, Mixing Only"). *Id.* ¶ 42.

These allegations are sufficient to establish discharge of a pollutant. As the court in *Puget Soundkeeper All. v. Whitley Mfg. Co.*, 145 F. Supp. 3d 1054, 1057 (W.D. Wash. 2015) explained:

> [P]laintiff need not prove that defendant's stormwater contained a particular substance in a particular quantity because Congress, in enacting § 1342(p), determined that defendant's stormwater is, in and of itself, a pollutant. This conclusion is compelled by the statute. The CWA forbids the discharge of pollutants into navigable waters unless the discharge is allowed by permit.
>
> …
>
> Thus, in determining that the discharge of stormwater associated with industrial activity requires a permit, Congress necessarily found that the stormwater itself is a pollutant subject to regulation under the CWA.

In addition, facilities that fall under certain Standard Industrial Classification codes are considered to be engaged in "industrial activity." *See* 40 C.F.R. § 122.26(b)(14). Facilities classified under Standard Industrial Classification 28 – like the Facility at issue here – are considered to be

United States District Court
Northern District of California

10

1   engaged in "industrial activity" for purposes of section 122.26(b)(14) and are thus required to

2   obtain a permit to discharge pollutants.

3       Plaintiff also adequately alleges that Defendant adds pollutants "to navigable waters." The

4   Russian River and the Pacific Ocean are waters of the United States and "navigable waters" for

5   purposes of the CWA. *See* 33 U.S.C. § 1362(7). Accordingly, Plaintiff's allegations satisfy the

6   second, third, and fourth elements under *San Francisco Baykeeper v. W. Bay Sanitary Dist.*, 791

7   F. Supp. 2d 719 (N.D. Cal. 2011).

8       Next, Plaintiff must establish that the Facility (or a part of the Facility) is a point source.

9   "Point source" is defined as: "any discernible, confined and discrete conveyance, including but not

10  limited to any pipe, ditch, channel, tunnel, conduit . . . from which pollutants are or may be

11  discharged." 33 U.S.C. § 1362(14). The Ninth Circuit has explained that "[s]torm water presents

12  a unique problem under the CWA because it is a significant source of water pollution but is not

13  inherently a nonpoint or point source." *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713

14  F.3d 502, 505 (9th Cir. 2013) (citation and quotation omitted).

15      The complaint alleges in a conclusory way that "[t]he Facility collects and discharges

16  storm water associated with industrial activity from the Facility into the Russian River." Compl. ¶

17  43. On August 1, 2023, the court ordered Plaintiff to either amend its complaint or submit

18  additional briefing to support a determination at default judgment that Defendant discharged storm

19  water from a "point source" under the CWA. [Docket No. 30.] Plaintiff filed the FAC on August

20  8, 2023. The FAC now alleges that the Facility collects storm water associated with industrial

21  activity "into a system of storm water conveyances, including drop inlets, culverts, ditches, ponds,

22  and channels." FAC ¶ 43. The Facility allegedly discharges storm water collected by this

23  conveyance system from at least three discharge locations. *See id.* ¶¶ 44-47. These allegations are

24  sufficient to establish a point source under the CWA.

25      Finally, Plaintiff alleges that Defendant has not had a permit authorizing the Facility to

26  discharge storm water associated with industrial activity since at least February 25, 2016. Compl.

27  ¶¶ 65-72. Plaintiff has sufficiently alleged that Defendant has no permit covering its pollutant

28  discharges.

United States District Court
Northern District of California

11

United States District Court
Northern District of California

1    In sum, the court finds that Plaintiff has sufficiently pled a claim under 33 U.S.C. §

2    1311(a).

3    **3.  Sum of Money at Stake**

4    The fourth *Eitel* factor focuses on the amount of money at issue in the action. "[C]ourts

5    should be hesitant to enter default judgment in matters involving large sums of money." *Yelp Inc.*

6    *v. Catron*, 70 F. Supp. 3d 1082, 1099-1100 (N.D. Cal. 2014); *see also Bd. of Tr. v. Core Concrete*

7    *Const., Inc.*, No. 11-cv-02532-LB, 2012 WL 380304, at *1, *4 (N.D. Cal. Jan. 7, 2012) ("When

8    the money at stake in the litigation is substantial or unreasonable, default judgment is

9    discouraged."). However, when "the sum of money at stake is tailored to the specific misconduct

10   of the defendant, default judgment may be appropriate." *Id.*

11   Plaintiff seeks civil penalties in the amount of $59,973 per day per violation, amounting to

12   a total of $10,915,086. Plaintiff also requests $35,235 in attorneys' fees and $614.32 in costs.

13   Mot. at 9. The total amount requested is $10,950,321. Plaintiff's request is authorized by the

14   applicable statutes and the complaint tailors the amount requested to the conduct alleged. This

15   factor weighs in favor of granting default judgment.

16   **4.  Possibility of Dispute Concerning Material Facts**

17   When a party "fail[s] to appear or otherwise respond . . . in defaulting, defendants are

18   deemed to have admitted all well-pleaded factual allegations contained in the complain[t]."

19   *DirecTV v. Hoa Huynh*, 503 F.3d 847, 851 (9th Cir. 2007) (citing Fed. R. Civ. P. 55(a)). All

20   allegations in the complaint are taken as true, except for those regarding damages. *TeleVideo Sys.,*

21   *Inc.*, 826 F.2d at 917-18.

22   Here, the possibility of a dispute about the material facts is unlikely. Defendant was

23   served with the complaint but failed to appear and the clerk accordingly entered default.[1] As set

24

25   ────────────────────────
     [1] While Plaintiff served Defendant with the motion for entry of default (Docket No. 15), the
26   docket suggests that it did not serve Defendant with its motion for default judgment at the time of
     filing. Under Federal Rule of Civil Procedure 55(b)(2), "[i]f the party against whom a default judgment
27   is sought has appeared personally or by a representative, that party or its representative must be
     served with written notice of the application at least 7 days before the hearing." "The appearance
     need not necessarily be a formal one, i.e., one involving a submission or presentation to the court.
28   In limited situations, informal contacts between the parties have sufficed when the party in default
     has thereby demonstrated a clear purpose to defend the suit." *Wilson v. Moore and Assocs., Inc.*,

1    forth above, Plaintiff's well-pleaded allegations are presumed to be true, and the complaint

2    adequately alleges a violation of the CWA. The record reflects Defendant's silence despite notice

3    of the proceedings and several opportunities to respond.

4          The court finds that there is little possibility of dispute as to material facts.

5          **5.  Excusable Neglect**

6          The sixth *Eitel* factor considers whether a defendant's default resulted from excusable

7    neglect. *Eitel*, 782 F.2d at 1472. When a defendant is properly served with the complaint and the

8    motion for default judgment, an entry of default judgment is favored. *W. States Insulators & Allied*

9    *Workers Pension Plan v. Jenco Mech. Insulation, Inc.*, No. 11-cv-0175 EMC, 2012 WL 1123229,

10   at *3 (N.D. Cal. Apr. 3, 2012).

11         As detailed above, Plaintiff's complaint was filed on March 28, 2022. On April 19, 2022,

12   Defendant purported to file an answer through its agent for service of process Paul Ray Den Beste.

13   [Docket No. 10.] On April 27, 2022, the court struck his answer to the extent it was filed by

14   Defendant without counsel. [Docket No. 11.] Despite notice to Defendant that it must appear and

15   defend this action through counsel, and ample opportunity for Defendant to obtain counsel, no

16   attorney has entered an appearance on behalf of Defendant to this date. Accordingly, it is unlikely

17   that Defendant's failure to respond is due to excusable neglect.

18         This factor weighs in favor of granting default judgment.

19         **6.  Favoring Decision on the Merits**

20         Despite the policy of favoring a decision on the merits, default judgment is appropriate

21   when a defendant refuses to litigate a case. Fed. R. Civ. P. 55(b). "Defendant's failure to answer

22   Plaintiffs' Complaint makes a decision on the merits impractical, if not impossible." *PepsiCo,*

23

24   564 F.2d 366, 368 (9th Cir. 1977). Here, as previously discussed at length, Defendant never
     formally appeared in the proceeding or responded to the complaint, despite proper service of the
25   complaint and of several subsequent filings in the case. [*See, e.g.*, Docket Nos. 27 (proof of
     service of 2/24/2023 Order Denying Motion for Default Judgment Without Prejudice to
26   Submission of Supplemental Briefing); 31 (proof of service of 8/1/2023 Order to Submit
     Supplemental Briefing in Support of Default Judgment).] In addition, nothing in the record
27   suggests "informal contacts between the parties" demonstrating a "clear purpose" on Defendant's
     behalf to make an appearance and defend against Plaintiff's claim. Accordingly, the court is
28   satisfied that notice of the motion for default judgment was not required under Rule 55(b)(2).

                                                   13

United States District Court
Northern District of California

*Inc*, 238 F.2d at 1177.

As previously explained, Defendant has failed to appear or otherwise respond to the court's order. A decision on the merits is thus impractical.

On balance, the *Eitel* factors weigh in favor of granting Plaintiff's motion for default judgment.

### D.    Remedies

#### 1.    Declaratory Relief

Under 28 U.S.C. § 2201(a), courts "may declare the rights and other legal relations of any interested party seeking such declaration whether or not further relief is or could be sought." "The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding. It follows that when neither of these results can be accomplished, the court should decline to render the declaration prayed." *Los Angeles Waterkeeper v. A & A Metal Recycling, Inc.*, No. CV154326MWFJEMX, 2015 WL 13917738, at \*5 (C.D. Cal. Nov. 18, 2015) (quoting *McGraw–Edison Co. v. Preformed Line Products Co.*, 362 F.2d 339 (9th Cir. 1966)).

Plaintiff seeks a declaratory judgment that Defendant violated the CWA 153 times[2] and that it continues to violate Section 301(a) of the CWA each time it discharges storm water from its facility without a NPDES permit. Mot. at 10-11. The court recommends finding that Plaintiff is entitled to declaratory relief. For the reasons discussed above, Plaintiff has established that there is an actual controversy, and that declaratory judgment will serve a useful purpose of clarifying Defendant's obligations under the CWA.

#### 2.    Injunctive Relief

Plaintiff requests that the court enter injunctive relief either requiring Defendant to obtain coverage under an NPDES permit or prohibiting Defendant from discharging pollutants from its

---

[2] The court notes that elsewhere in its briefing Plaintiff argues that Defendant violated the CWA 182 times. *See* Mot. at 11-13.

14

1  facility to the surface waters surrounding and downstream from the Facility. Mot. at 11.

2      "[A] district court's equitable powers under the CWA are limited to enforcing standards,

3  limitations, and orders that have been violated." *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236

4  F.3d 985, 1000 (9th Cir. 2000) (citing 33 U.S.C. § 1365(a)). "So long as the district court's

5  equitable measures are reasonably calculated to 'remedy an established wrong,' they are not an

6  abuse of discretion." *Id.* (quoting *Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981, 986 (9th Cir.

7  1994)). Injunctive relief is warranted when a plaintiff demonstrates: "(1) that it has suffered an

8  irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to

9  compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and

10  defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved

11  by a permanent." *Rogue Riverkeeper v. Bean*, No. 1:11-CV-3013-CL, 2013 WL 1785778, at *3

12  (D. Or. Jan. 23, 2013), *report and recommendation adopted,* No. 1:11-CV-3013-CL, 2013 WL

13  1785777 (D. Or. Apr. 25, 2013) (quoting *Monsanto v. Geerston Seed,* 130 S. Ct. 2743, 2756

14  (2010)).

15      Plaintiff satisfies all requirements for a permanent injunction. Plaintiff's members have

16  suffered and continue to suffer as a result of Defendant's failure to comply with the CWA.

17  Specifically, Defendant's stormwater discharges continuously impair members' recreational,

18  educational, scientific, conservation, aesthetic, and spiritual uses of the Russian River, the Pacific

19  Ocean, and the neighboring land. *See* Compl. ¶ 14. This adverse impact cannot be remedied with

20  monetary damages. The balancing of hardships also tips in Plaintiff's favor – granting a

21  permanent injunction will only require that Defendant stop engaging in illegal activities and will

22  serve the public interest in protecting the environment.

23      Accordingly, the court recommends an injunction in favor of Plaintiff. Specifically, the

24  court recommends prohibiting Defendant from discharging pollutants from its facility to the

25  surface waters surrounding and downstream from the Facility without a proper permit. *See* Fed.

26  R. Civ. P. 65(d) ("Every order granting an injunction . . . shall set forth the reasons for its

27  issuance; shall be specific in terms; [and] shall describe in reasonable detail . . . the act or acts

28  sought to be restrained.").

United States District Court
Northern District of California

15

1

### 3. Civil Penalties

2          Penalties are mandatory once liability for violations of the CWA has been established.

3    *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1397 (9th Cir. 1995). As codified, the CWA

4    provides for civil penalties "not to exceed $25,000 per day for each violation." 33 U.S.C. §

5    13919(d). As adjusted pursuant to inflation, the maximum penalty has increased from $59,973 to

6    $64,618 since the complaint was filed.[3] *See* 40 C.F.R. § 19.4. "A district court has discretion to

7    set the amount of a penalty (up to the statutory maximum) and is instructed to consider the

8    seriousness of the violation, any economic benefit that resulted from the violation, any history of

9    violations by the party to be penalized, that party's good-faith efforts to comply with the

10   applicable requirements, the economic effect of the penalty on the violator, and 'such other

11   matters as justice may require.'" *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 1001

12   (9th Cir. 2000) (quoting 33 U.S.C. § 13919(d)).

13         In practice, courts have employed either a "top-down" or "bottom-up" approach to

14   calculate civil penalties under the CWA. *See Californians for Alternatives to Toxics v. Kernen*

15   *Constr. Co.*, No. 4:20-CV-01348 YGR, 2021 WL 1734897, at *3 n.2 (N.D. Cal. May 2, 2021)

16   (comparing approach in different circuits). "The bottom-up approach looks first at the economic

17   benefit of the violation, which is often difficult to ascertain." *Los Angeles Waterkeeper*, 2015 WL

18   13917738, at *6 (citing *Ctr. for Biological Diversity v. Marina Point Dev. Assocs.*, 434 F. Supp.

19   2d 789, 799 (C.D. Cal. 2006)). The top-down approach calculates the maximum penalty and then

20   reduces it according to the statutory factors. *Id.*

21         Here, Plaintiff asks the court to employ a top-down approach to impose a $59,973 penalty

22   for 182 violations, arguing that none of the six penalty factors warrant a downward adjustment.

23   Mot. at 15. In total, Plaintiff requests that civil penalties be assessed against Defendant in the

24

25

26   [3] Under 40 C.F.R. § 19.4, any person who violates the CWA shall be subject to 1) civil penalties
     not to exceed $59,973 per day per violation occurring after November 2, 2015, where the penalties
27   were assessed on or after January 12, 2022, and 2) civil penalties not to exceed $64,618 per day
     per violation occurring after November 2, 2015, where the penalties were assessed on or after
28   January 6, 2023.

United States District Court
Northern District of California

1   amount of $10,915,086.[4] *Id.*

2        Plaintiff argues that Defendant violated the CWA at least 182 times, reasoning as follows:

3   Before its General Permit coverage was terminated in February 2016, Defendant collected samples

4   of stormwater discharges from its Facility as required under the General Permit. By comparing

5   the known dates of discharge with historic rain data, Plaintiff obtained a starting point to

6   determine the amount of rainfall necessary to cause a discharge. Prior to February 2016,

7   Defendant reported discharges to the Regional Board on three different dates: 12/18/2007,

8   4/1/2013, and 3/5/2014.[5] Mot. at 7-8 (citing RJN Exs. A-C). Plaintiff relied on these reported

9   discharges and looked at the 72-hour rainfall total for each day of discharge.[6] Plaintiff used the

10  "most conservative estimate," i.e., the highest rain total, to count violations. Based on the

11  information gathered, Plaintiff concluded that the Facility discharges, and thus violates the

12  General Permit, on days where the 72-hour rainfall total is equal or greater than 0.74 inches. Since

13  March 28, 2017, three different weather stations recorded 182, 198, and 188 days where the 72-

14  hour rainfall total was equal to or greater than 0.74 inches. *See* RJN Exs. D-F. Accordingly,

15  Plaintiff contends there have been at least 182 unlawful discharges from the Facility in the last five

16  years.

17       The court accepts Plaintiff's calculation of 182 accrued violations, which is supported by

18

19  [4] The relevant time period for the violations is unclear. *Compare* Compl. ¶¶ 65-72 (alleging that
20  Defendant has been operating its Facility without the required permit since February 25, 2016),
    *with* Compl. ¶ 116 (alleging that Defendant has violated the CWA since at least March 28, 2017),
21  *and* Compl. at VII(d) (seeking civil penalties for all violations occurring after November 2, 2015).
    Under the relevant statute of limitations, Plaintiff may allege violations going back – at most –
22  five years from the filing of the complaint. *See Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d
    1517 (9th Cir. 1987); *see also* Mot. at 8 (noting the same). Accordingly, Plaintiff may only allege
23  violations since March 28, 2017.

24  [5] Exhibits A through C do not show that Defendant reported a discharge on 12/18/2007. Exhibit A
    (letter from Regional Board to Defendant dated 8/26/2013) refers to a sample dated 4/1/2013,
25  Exhibit B (letter from Regional Board to Defendant dated 9/23/2014) includes a sample from
    3/5/2014, and Exhibit C (letter from Regional Board to Defendant dated 10/17/2014) lists a
26  sample from 3/5/2014. In any event, the 12/18/2007 discharge does not appear crucial to
    Plaintiff's analysis, as Plaintiff used the highest rain total to count violations, which occurred in
27  connection with the 4/1/2013 discharge. *See* Mot. at 8.

28  [6] Plaintiff considered the 72-hour rainfall total rather than the 24-hour total to account for rainfall
    from the preceding days. *See* Mot. at 8.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  evidence and based on reasonable inferences drawn from Defendant's own discharge data and

2  publicly available rainfall data. In supplemental briefing, Plaintiff also offers the declaration of

3  hydrologist Ian Wren in support of its methodology. Wren confirms that "Plaintiff reasonably

4  interpreted the data to generate a conservative benchmark value against which to identify the

5  number of days when stormwater discharges from the Facility likely occurred." [Docket No. 28-1

6  (Ian Wren Decl., March 23, 2023) ¶ 12.] He explains that this opinion is supported by scientific

7  literature and technical guidance, as well as California's General Permit for Storm Water

8  Discharges Associated with Industrial Activities. *Id.* Finally, Wren describes alternative methods

9  for estimating the number of discharge days, each of which results in a comparable number of

10  total violations. *Id.* ¶ 17.

11  Plaintiff asks the court to impose a $59,973 penalty for each of the 182 violations. The

12  court agrees with Plaintiff that a top-down approach to calculate civil penalties offers a more

13  reliable method in this case, where Defendant has failed to participate in the litigation. *See Los

14  Angeles Waterkeeper*, 2015 WL 13917738, at *7 (on motion for default judgment, adopting the

15  top-down approach because the court lacked relevant facts to analyze the economic benefit

16  defendants derived from their conduct); *see also Ctr. for Biological Diversity*, 434 F. Supp. 2d at

17  799 (on motion for default judgment, finding that the top-down approach offered a more reliable

18  and less speculative method of calculating the penalty). Under that approach, the maximum

19  possible penalty for 182 violations committed since March 28, 2017 amounts to $64,618 per day

20  per violation, or $11,760,476.

21  The court finds that the statutory penalty factors discussed below support a civil penalty at

22  the rate of $25,000 per violation and recommends the imposition of $4,550,000 in total civil

23  penalties. This amount is adequate to punish and deter Defendant, while incentivizing Defendant

24  to come into prompt compliance and recognizing that Defendant does not appear to have a history

25  of violating the CWA beyond what is described in this lawsuit. *See Tull v. United States*, 481 U.S.

26  412, 422 (1987) ("[t]he legislative history of the [Clean Water] Act reveals that Congress wanted

27  the district court to consider the need for retribution and deterrence, in addition to restitution,

28  when it imposed civil penalties"); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,

18

1   528 U.S. 167, 185 (2000) ("Congress has found that civil penalties in Clean Water Act cases do

2   more than promote immediate compliance by limiting the defendant's economic incentive to delay

3   its attainment of permit limits; they also deter future violations"); *see also California Sportfishing*

4   *Prot. All. v. Callaway*, No. 2:12-CV-0843 JAM CKD, 2012 WL 3561968, at *1 (E.D. Cal. Aug.

5   17, 2012), *report and recommendation adopted*, No. 2:12-CV-843 JAM CKD, 2012 WL 4834406

6   (E.D. Cal. Oct. 10, 2012) (adopting $32,500 as penalty per violation at the plaintiff's request for a

7   total of $29,925,000 in penalties); *United States v. Bayley*, No. 3:20-CV-05867-DGE, 2023 WL

8   3093126, at *11 (W.D. Wash. Apr. 26, 2023) (adopting $62,500 penalty per violation at the

9   plaintiff's request for a total of $250,000 in penalties).

### a. The Seriousness of the Violations

11          In considering the seriousness of a defendant's conduct, courts consider "(1) the number of

12  violations; (2) the duration of noncompliance; (3) the significance of the violation (degree of

13  exceedance and relative importance of the provision violated); and (4) the actual or potential harm

14  to human health and the environment." *Hawaii's Thousand Friends v. City & Cnty. of Honolulu*,

15  821 F. Supp. 1368, 1383 (D. Haw. 1993).

16          In light of the relatively high number of violations, the significant length of time since

17  Defendant was last in compliance with its CWA obligations, and the potential harm allegedly

18  suffered by Plaintiff and its members, the court finds that Defendant's violations are serious.

### b. The Economic Benefit Resulting from the Violations

20          The court lacks information about the economic benefit to Defendant as a result of its

21  violations. However, "it is reasonable to infer that Defendant[] derived some benefit from not

22  having to comply with the applicable regulations[,]" including not incurring "the costs of

23  developing a storm water pollution prevention plan, developing and implementing best

24  management practices, costs associated with collecting and analyzing sample results, and costs

25  associated with training its pollution prevention team." *See Los Angeles Waterkeeper*, 2015 WL

26  13917738, at *7; Mot. at 14.

### c. Defendant's History of Violations

28          Plaintiff argues that Defendant has been out of compliance with the CWA since February

19

United States District Court
Northern District of California

United States District Court
Northern District of California

1   2016 and that the Regional Board has tried to bring Defendant into compliance, to no avail. *See*

2   Mot. at 14. According to Plaintiff, the circumstances in this case demonstrate Defendant's blatant

3   disregard for the requirements of the CWA.

4         Although the record supports a finding that Plaintiff has failed to comply with the CWA

5   and the General Permit since 2016, that violation is not separate from the one at issue in this case.

6   *See Californians for Alternatives to Toxics*, 2021 WL 1734897, at *7 (declining to find that

7   defendant had a history of failing to comply with the CWA based on previous case in which no

8   liability was established or on warning letters sent by Regional Board to defendants).

9         **d.  Good Faith Efforts to Comply with the Applicable Requirements**

10         Plaintiff asserts that Defendant has made minimal efforts to comply with the CWA. Mot.

11   at 14. The court agrees. As previously explained, the record indicates that Defendant has been out

12   of compliance with the CWA since 2016, and that Defendant's only attempt at obtaining the

13   required permit coverage was incomplete.

14         **e.  The Economic Impact of the Penalty on the Violator**

15         Due to Defendant's refusal to participate in this litigation, the court lacks relevant facts to

16   determine the economic impact of the penalty on the Facility.

17         **f.  Other Matters as Justice May Require**

18         The court agrees with Plaintiff that because civil penalties under the CWA are punitive in

19   nature, the penalty here should be large enough to encourage Defendant's compliance with the

20   CWA. *See* Mot. at 15 (citing *Tull v. United States*, 481 U.S. 412, 422 (1987)).

21         For the foregoing reasons, the court recommends imposition of a penalty of $4,550,000.

22         **4.  Attorneys' Fees**

23         Plaintiff requests partial reimbursement of attorneys' fees in the amount of $35,235 for

24   68.3 hours of work by two timekeepers. [Docket No. 19-1 (Andrew Packard Decl.) ¶ 9.] Plaintiff

25   also seeks $614.32 in costs. *Id.* ¶ 32-33.

26         Section 505(d) of the CWA gives courts the discretion to award attorneys' fees, including

27   litigation expenses and costs, to prevailing parties. *See Resurrection Bay Conservation All. v. City*

28   *of Seward, Alaska*, 640 F.3d 1087, 1091 n.3 (9th Cir. 2011) (citing 33 U.S.C. § 1365(d)). A

1  court's decision to award attorneys' fees under section 505(d) requires two findings: "that the fee

2  applicant is a prevailing party, and that an award of attorney's fees is appropriate." *San Francisco*

3  *Baykeeper v. W. Bay Sanitary Dist.*, No. C-09-5676 EMC, 2011 WL 6012936, at *1 (N.D. Cal.

4  Dec. 1, 2011) (citing *Resurrection Bay Conservation All.*, 640 F.3d at 1091). In general, fee

5  awards "should be the rule rather than the exception." *Rogue Riverkeeper v. Bean*, No. 1:11-CV-

6  3013-CL, 2013 WL 1785778, at *4 (D. Or. Jan. 23, 2013), *report and recommendation adopted,*

7  No. 1:11-CV-3013-CL, 2013 WL 1785777 (D. Or. Apr. 25, 2013) (citing *Saint John's Organic*

8  *Farm v. Gem Cty. Mosquito Abatement Dist.*, 574 F.3d 1054, 1058–1063 (9th Cir. 2009)).

9      District courts in the Ninth Circuit typically employ the "lodestar analysis" in calculating

10  fee awards. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Camacho v. Bridgeport Fin., Inc.*,

11  523 F.3d 973, 978 (9th Cir. 2008) (citations omitted). "The lodestar figure is calculated by

12  multiplying the number of hours the prevailing party reasonably expended on the litigation (as

13  supported by adequate documentation) by a reasonable hourly rate for the region and for the

14  experience of the lawyer." *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 546 (9th Cir.

15  2016) (internal citation omitted). Fee awards calculated under the lodestar method generally are

16  presumed to be reasonable, *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1208–09 (9th Cir.

17  2013), although the court ultimately retains discretion to modify the amount based on the specific

18  circumstances of each case. The party seeking fees bears the initial burden of establishing the

19  hours expended litigating the case and must provide detailed time records documenting the tasks

20  completed and the amount of time spent. *Hensley*, 461 U.S. at 434; *Welch v. Metro. Life Ins. Co.*,

21  480 F.3d 942, 945–46 (9th Cir. 2007). The requesting party also has the burden to demonstrate

22  that the rates requested are "in line with the prevailing market rate of the relevant community."

23  *Carson v. Billings Police Dep't*, 470 F.3d 889, 891 (9th Cir. 2006) (internal quotation marks and

24  citation omitted).

25          **a.  Reasonableness of Hourly Rates**

26      As the prevailing party, Plaintiff requests hourly rates of $825 for Andrew L. Packard and

27  $450 for William Carlon. Packard Decl. ¶¶ 18, 21. Packard has practiced public interest

28  environmental law for over 28 years. *Id.* ¶ 5. Since 1997, his firm has represented dozens of

21

1    local, regional and statewide environmental non-profit organizations and individuals in over 140

2    public interest cases to advance environmental, consumer protection, and "right-to-know" laws.

3    *Id.* ¶ 3. Carlon joined Packard's firm in 2016, when he began litigating various environmental

4    enforcement cases. *Id.* ¶ 19. He has represented a number of non-profit organizations against

5    industrial facilities that discharge storm water in violation of their permit requirements. *Id.*

6        Packard asserts that the requested hourly rates are consistent with other attorneys in the

7    Northern District of California with similar skill, experience, and reputation. Packard Decl. ¶ 18,

8    21. To calculate Packard and Carlon's respective rates, Packard asserts that he reviewed fee

9    awards in cases involving citizen suit environmental enforcement actions in the Northern District

10   of California and engaged in discussions about prevailing market rates with other public interest

11   environmental litigators who practice in this district. *Id.*

12       Packard submits two declarations in support of the requested rates. The first is a

13   declaration by William Verick, whose principal focus is the private enforcement of California's

14   Safe Drinking Water & Toxic Enforcement Act; he also litigates in other practice areas, including

15   the Clean Water Act, the Resource Conservation and Recovery Act, the California Timber

16   Practices Act, and the California Environmental Quality Act. [Docket No. 19-3 (William Verick

17   Decl., Aug. 15, 2022) ¶ 1-2.] According to Verick, the requested hourly rates are within the range

18   of prevailing market rates for attorneys with comparable experience, expertise, and skill practicing

19   during this period in the San Francisco Bay Area. *Id.* ¶ 5.

20       The second declaration is proffered by David Williams, who has prosecuted cases as lead

21   counsel or co-counsel under a number of environmental statutes, including the Clean Water Act,

22   the Endangered Species Act, the National Environmental Policy Act, the California Environmental

23   Quality Act, the California Timber Practices Act, and California's Safe Drinking Water & Toxic

24   Enforcement Act. [Docket No. 19-4 (David Williams, Decl., Aug. 19, 2022) ¶ 5.] Like Verick,

25   Williams contends that the requested rates in this case are within the range of prevailing market

26   rates for attorneys with comparable experience, expertise, and skill practicing during this period in

27   the San Francisco Bay Area. *Id.* ¶ 6.

28       The declarations submitted by Plaintiff are vague and conclusory. The supporting

United States District Court
Northern District of California

22

1   declarations do not provide specific information about the hourly rates of comparable attorneys to

2   support the reasonableness of the requested rates.  Likewise, Packard does not cite any cases

3   approving any rates previously requested by him or Carlon.  In fact, Plaintiff's counsel fails to

4   mention that in March 2022, they received considerably lower hourly rates, particularly because

5   they do not work in the San Francisco Bay Area.  *See Californians for Alternatives to Toxics v.*

6   *Kernen Constr.*, No. 20-CV-01348-YGR, ECF No. 90 at 3–5 (approving hourly rates of $660 for

7   Packard and $320 for Carlon after reducing the requested rates by twenty percent to reflect "the

8   prevailing market rates in the far northern parts of this District for cases entirely local to that

9   area").

10      Here too, the action as well as the work performed by Plaintiff's lawyers are based entirely

11   in the northern part of the Northern District of California, in Sonoma County.  Adopting the

12   reasoning in *Californians for Alternatives to Toxics*, the court applies a twenty percent reduction

13   to the requested rates, resulting in hourly rates of $660 for Packard and $360 for Carlon.  *See*

14   *Californians for Alternatives to Toxics v. Kernen Constr.*, No. 20-CV-01348-YGR (LB), 2023 WL

15   4991861, at *4 (N.D. Cal. Apr. 21, 2023), *report and recommendation adopted sub nom.*

16   *Californians for Alternatives to Toxics v. Kernen Constr. Co.*, No. 4:20-CV-01348 YGR, 2023

17   WL 4995716 (N.D. Cal. June 13, 2023) ("A prior award of attorney's fees to an attorney at a

18   particular hourly rate may be persuasive in establishing the reasonableness of a claimed hourly

19   rate.").  This finding is also supported by this court's experience and understanding of the relevant

20   market rates.

21                              **b.  Reasonableness of Hours Expended**

22      Plaintiff's counsel billed a total of 68.3 hours since January 25, 2022.  Mot. at 17–18;

23   Packard Decl. ¶ 9.  The requested hours are supported by itemized timeslips.  Packard Decl., Ex.

24   1.  Packard asserts that the contingent nature of this litigation gave counsel "a reason to put only

25   those hours into this case that were prudently necessary for advancing success."  Packard Decl. ¶

26   25.  In addition, Packard explains that the firm efficiently staffed the case to minimize duplication

27   and assigned the bulk of the work to Carlon (counsel with the lowest hourly rate).  *Id.* ¶ 20.

28      Having carefully reviewed counsel's billing entries, the court concludes that the hours

United States District Court
Northern District of California

23

1    charged in this case are reasonable.  Accordingly, the court recommends granting Plaintiff's

2    request for attorneys' fees in the reduced amount of $28,188, detailed as follows:

| Attorney | Rate | Hours | Total |
|---|---|---|---|
| Andrew Packard | $660 | 12 | $7,920 |
| William Carlon | $360 | 56.3 | $20,268 |

6           The court further recommends granting Plaintiff's request for costs in the amount of

7    $614.32, as these costs were reasonably incurred in connection with filing, serving, and litigating

8    this action.  *See* Packard Decl., Ex. 2.

9    **VI.    CONCLUSION**

10          For the foregoing reasons, the court recommends that Plaintiff's motion for default

11   judgment be granted.  The court further recommends granting Plaintiff's requests for 1)

12   declaratory relief, 2) injunctive relief, 3) civil penalties in the amount of $4,550,000, and 4)

13   attorneys' fees and costs in the amount of $28,802.32.

14          Not later than three days from the date of this report and recommendation, Plaintiff shall

15   serve Defendant with a copy of the report and recommendation by any means reasonably

16   calculated to provide actual notice, **and file proof of service to that effect**.  Any party may file

17   objections to this report and recommendation with the District Judge within 14 days of being

18   served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(a); N.D. Civ. L.R. 72-2.

19          **IT IS SO ORDERED.**

20   Dated: November 17, 2023

21

22                                                       DONNA M. RYU
                                                         Chief Magistrate Judge
23

24

25

26

27

28

United States District Court
Northern District of California

Exhibit B

1  Paul Den Beste
2  P. O. Box 742
   Cloverdale, CA 95425
3  (707) 975 5901
   Email: pauldenbeste@hotmail.com
4          pauldenbestecloverdale@gmail.com
5  Defendant Specially Appearing
6



**FILED**

APR 19 2022

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

7

8
9              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
10                   OAKLAND COURTHOUSE

11 CALIFORNIA SPORTFISHING PROTECTION      ) Case Number: 4:22-cv-01975-DMR
   ALLIANCE,                               )
12              Plaintiff                  ) ANSWER BY SPECIAL APPEARANCE
                    v                      ) WITH NOTICE OF STATE COURT
13 DEN BESTE YARD AND GARDEN, INC.,        ) ORDERS DIRECTED TO ONGOING
                Defendant                  ) RECEIVERSHIP
14
15

16 1.     Defendant DEN BESTE YARD AND GARDEN, INC. is a corporation closely held by

17 stockholder by the undersigned Paul Den Beste and because the purported complaint in this

18 matter claims a potential, distinct and palpable injury that could result in said injury being

19 directly traceable to him, Paul Den Beste has capacity and standing to present this document.

20 See *Whelan v. Abell*, 953 F. 2d 663 - Court of Appeals, Dist. of Columbia Circuit 1992, pages

21
22 671- 672 with emphasis added:

23           Appellees recharacterize their real-party-in-interest defense on appeal (using the
             terminology employed by the district court) and assert that the Whelans lacked
24           Article III standing, a jurisdictional issue that can be raised at any time. To be
             sure, courts have on occasion denied stockholders' suits alleging injury, asserting
25           that the 672*672 stockholders lacked "standing" to bring such an action because
             the stockholders, "experiencing no direct harm, possess[] no *primary* right to sue."
26           *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 732 (3d Cir.1970) (emphasis
27           added), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); *accord*
             *EMI Ltd. v. Bennett*, 738 F.2d 994, 996-97 (9th Cir.), *cert. denied*, 469 U.S. 1073,
28

ANSWER BY SPECIAL APPEARANCE WITH NOTICE OF STATE COURT ORDERS DIRECTED TO
ONGOING RECEIVERSHIP
                                         1

1   105 S.Ct. 567, 83 L.Ed.2d 508 (1984); *Stevens v. Lowder*, 643 F.2d 1078, 1080
    (5th Cir.1981). *But we do not read these cases as actually turning on the*
2   *question whether the stockholder has suffered a sufficiently direct injury to*
    *establish Article III injury or causation. The courts do not conduct that kind of*
3   *analysis. It may well be that if a minor injury is suffered by a large corporation*
4   *it would be difficult to trace a "distinct and palpable injury" to a shareholder,*
    *Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975),*
5   *but that would certainly not be so if the damage was to a closely held*
6   *corporation. Conceptually, then, the problem is not an Article III one. See*
    *Association of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 152, 90*
7   *S.Ct. 827, 829, 25 L.Ed.2d 184 (1970) (economic injury satisfies Article III).*

8   See also with emphasis added *Shell Petroleum, NV v. Graves*, 709 F. 2d 593 - Court of

9
    Appeals, 9th Circuit 1983 page 595;
10

11      To have standing to maintain an action, a shareholder must assert more than
        personal economic injury resulting from a wrong to the corporation. *Von Brimer*
12      *v. Whirlpool*, 536 F.2d at 846. A shareholder must be injured directly and
        independently of the corporation. *Id.; Erlich v. Glasner*, 418 F.2d at 228.
13

14  See also with emphasis added *Sutter v. General Petroleum Corp.*, 28 Cal. 2d 525 - Cal:

15  Supreme Court 1946 page 530:

16      [1] *Generally*, a stockholder may not maintain an action in his own behalf for a
        wrong done by a third person to the corporation on the theory that such wrong
17      devalued his stock and the stock of the other shareholders, for such an action
18      would authorize multitudinous litigation and ignore the corporate entity. [2]
        Under proper circumstances a stockholder may bring a representative action or
19      derivative action on behalf of the corporation. (Klopstock v. Superior Court, 17
20      Cal.2d 13 [108 P.2d 906, 135 A.L.R. 318]; Nessbit v. Superior Court, 214 Cal. 1
        [3 P.2d 558]; Difani v. Riverside County Oil Co., 201 Cal. 210 [256 P. 210];
21      Gorham v. Gilson, 28 Cal. 479; 6A Cal.Jur. 456, et seq.) *But "If the injury is one*
22      *to the plaintiff as a stockholder and to him individually, and not to the*
        *corporation, as where the action is based on a contract to which he is a party, or*
23      *on a right belonging severally to him, or on a fraud affecting him directly, it is*
24      *an individual action, ...* The action is derivative, i.e., in the corporate right, if the
        gravamen of the complaint is injury to the corporation, or to the whole body of its
25      stock or property without any severance or distribution among individual holders,
        or if it seeks to recover assets for the corporation or to prevent the dissipation of
26      its assets." (Fletcher Cyc. Corps. (perm. ed.) 5911.) (See Shenberg v. De Garmo,
        61 Cal.App.2d 326 [143 P.2d 74].) *[3] And a stockholder may sue as an*
27      *individual where he is directly and individually injured although the*
28      *corporation may also have a cause of action for the same wrong. (Coronado*

ANSWER BY SPECIAL APPEARANCE WITH NOTICE OF STATE COURT ORDERS DIRECTED TO
ONGOING RECEIVERSHIP

2

1          *Development Corp. v. Millikin, 175 Misc. 1 [22 N.Y.2d 670]; Hammer v.*

2          *Werner, 239 App.Div. 38 [265 N.Y.S. 172]; Witherbee v. Bowles, 201 N.Y. 427*
         *[95 N.E. 27]; Von Au v. Magenheimer, 110 N.Y.S. 629, Aff'd, 196 N.Y. 510 [89*

3          *N.E. 1114]; Stinnet v. Paramount-Famous Lasky Corp. (Tex.Com.App,), 37*
         *S.W.2d 145; White v. First Nat. Bank. 252 Pa. 205 [97 A. 403]; Brachman v.*

4          *Hyman, 298 Mich. 344 [299 N.W. 101]; 18 C.J.S. Corporations, 559.)*

5      See also *Esposito v. United States* (10th Cir. 2004) 368 F3d 1271 , 1273; "Capacity"

6 refers to a party's personal *right to litigate* in federal court, whereas "real party in interest" refers

7

8 to whether that person possesses the *substantive right* being sued upon.

9                     **FIRST AFFIRMATIVE DEFENSE**
      **INDEMNIFICATION BY RECEIVERSHIP STATE COURT ORDERS**

10

11 2.     Defendant incorporates by reference foregoing paragraph 1 as if fully set forth and states

12 that attached hereto as **Exhibit A** is a true and correct copy of RULING ON APPLICATION

13 FOR ORDER APPOINTING RECEIVER, ORDER TO SHOW CAUSE WHY RECEIVER

14 SHOULD NOT BE CONFIRMED AND FOR TEMPORARY RESTRAINING ORDER.

15

16 Paragraph (c) commencing on page 8 to page 9 of **Exhibit A** states with emphasis added;

17          (c.) The Receiver may, in his discretion , operate and conduct Den Beste

18          Yard & Garden, Inc. in the ordinary and usual course of business, to preserve and
         maintain said business pending hearing on the order to show cause to confirm

19          Receiver's appointment Receiver is hereby authorized to employ servants, agents,
         employees, clerks and accountants to purchase materials, supplies, and services

20          and to pay therefore at ordinary and usual rates and prices out of funds that shall
         come into his possession as such Receiver; to bring suit in his own name without

21          further leave of court as the Receiver deems necessary to protect, preserve and
         maintain the rights, privileges and property of the receivership estate; to

22          compromise debts and to do all things and to incur the risks and obligations

23          ordinarily incurred by owners, managers, and operators of similar properties and
         enterprises and that no such risk or obligation so incurred shall be the personal

24          risk or obligation of said Receiver but shall be a risk or obligation of the
         Receivership Estate, **Without limiting the generality of the foregoing, the**

25          **Receiver shall have the exclusive right to exercise all powers, privileges, and**

26          **rights of the Judgment Debtors with respect to any stocks, bonds,**
         **partnership interests, *licenses, permits, authorizations,* and the like**

27          **constituting or comprising the Property, including, but not limited to, voting**

28          **and proxy rights, if any,**

ANSWER BY SPECIAL APPEARANCE WITH NOTICE OF STATE COURT ORDERS DIRECTED TO
ONGOING RECEIVERSHIP

3.     **Exhibit B** attached hereto is a true and correct copy of AMENDED ORDER APPOINTING RECEIVER FORTHWITH, which confirms **Exhibit A**.

4.     **Exhibit C** attached hereto is THIRD INTERIM REPORT OF RECEIVER dated December 5, 2013.

5.     **Exhibit D** attached hereto is RECEIVER'S SEVENTH INTERIM REPORT with proof of service dated January 25, 2016.

6.     As of the date of preparation of this document, Patrick Bulmer, and or, his California Receivership Services, have not been released as the receiver for Defendant Den Beste Yard and Garden, Inc., which is therefore indemnified in this lawsuit by paragraph (c) of attached **Exhibit A**.

## RELIEF REQUESTED

7.     Defendant incorporates by reference foregoing paragraphs 1 – 6 as if fully set forth and based thereon and therefore, defendant demands this case be dismissed with prejudice forthwith.

Paul Den Beste

ANSWER BY SPECIAL APPEARANCE WITH NOTICE OF STATE COURT ORDERS DIRECTED TO ONGOING RECEIVERSHIP

4

Case 3:22-cv-01975-RFL Document 10 Filed 04/19/22 Page 62 of 71

Exhibit A

Exhibit A

1   Den Beste and Melody Den Beste ("Judgment Debtors"). The DeMeo's later assigned

2   the judgment to Walter Steinmann dba Judgment Enforcement USA ("Steinmann") by

3   assignment filed in this action on December 24, 2008. Steinmann subsequently

4   assigned the judgment to Mandy Power dba Judgment Enforcement USA ("Power") on

5
    April 14, 2010.
6

7        Three additional judgments in two other cases were also awarded by this court in

8   favor of the DeMeo's and against Judgment Debtors Paul Den Beste and Melody

9   DenBeste. Likewise, they were assigned to Steinmann, who assigned them to current

10  assignee, Power, on or about April 14, 2010.

11       The amount owing on all four judgment awards as of July 15, 2010 is $56,086.89

12  with statutory daily interest accruing of $11.45.

13
         Judgment Creditor requests appointment of receiver over all non-exempt real
14

15  and personal property and business interest owned, controlled, or possessed by

16  Judgment Debtors, wherever located and whether now or in the future owned,

17  controlled or possessed by them.

18  **MOTION:**

19       Judgment Creditor requests appointment of receiver over all non-exempt real

20
    and personal property and business interest ("Property") owned, controlled, or
21

22  possessed by Judgment Debtors, wherever located and whether now or in the future

23  owned, controlled or possessed by them. The application is made in light of the two

24  recent occasions when Judgment Debtors, Paul Den Beste and Melody Den Beste,

25  moved substantial assets out of the reach of the judgment creditor immediately after an

26  enforcement activity, indicating that further transfer of remaining assets is likely in

27  response to further enforcement efforts.

28

1    The Court initially received the Application for Appointment of a Receiver as an

2    ex parte order.  The Court declined to grant the ex parte request, but instead issued an

3    Order to Show Cause to give judgment debtors Paul Den Beste and Melody Den Beste

4    the chance to respond to what has been characterized as a drastic collection means.

5    The TRO applied for requests relief directing judgment debtors to refrain from

6    engaging in or performing certain acts regarding the property assets. The list is long,

7    and is found at pages 2-3 of the Ex Parte Application.

8

9    Judgment Creditor nominates Patrick Bulmer of California Receivership Services

10   as the receiver in this matter.

11   **OPPOSITION:**

12   A 39 page opposition was delivered to the court on July 29, 2010 by the

13   judgment debtors, Paul Den Beste and Melody Den Beste.

14

15   Judgment Debtors devote much effort in claiming and explaining the judgment(s)

16   in this case is/are void, and that the court lacks jurisdiction to hear this matter.

17   First, Judgment Debtors claim that Judgment Enforcement, USA does not

18   disclose to the court that it is suspended, or how in its suspended status it has standing

19   to apply for appointment of a receiver.  Attached to Judgment Debtor's Opposition as

20   Exhibit 1 is a document that purports to be a print out from California Secretary of State

21   Debra Bowen's website, listing Judgment Enforcement USA, Inc. as a suspended

22   corporation as of September 19, 2009.  The document is inadmissible hearsay because

23

24   it is not supported by a declaration attesting to its authenticity.  Nonetheless, Judgment

25   Creditors have replied with significant documentation of their own averring their

26   separateness from Judgment Enforcement USA, Inc. Indeed, Mandy Powers has

27   satisfactorily demonstrated to this Court that she is a sole proprietorship and is the

28   lawfully designated assignee of the rights of collection on these judgments.

-3-

1    Judgment Debtors do not present a less harsh alternative to appointment of

2    receiver in his Points and Authorities in Opposition, nor did he offer any alternatives at

3    oral argument.

4    **ANALYSIS:**

5    C.C.P. §564(b)(9), on which Plaintiffs rely, allows the court to appoint a receiver

6

7    in all cases where necessary to preserve the property or rights of any party. More

8    specifically, subsection (b)(1) states that the court may appoint a receiver in, amongst

9    others, an action between partners or others jointly owning or interested in any property

10   on the application of a party "and where it is shown that the property or fund is in danger

11   of being lost, removed, or materially injured."

12   Courts have appointed receivers in cases involving dissolution of partnerships.

13

14   See *Albertson v. Warriner* (1962) 199 Cal.App.2d 560, 565; *Breedlove v. Breedlove*

15   *(J.W. & E.M.) Excavating Co.* (1942) 56 Cal.App.2d 141; see also 6 Witkin, Cal.Proc.

16   (4th Ed.1997) Provisional Remedies, section 425. In fact, in cases of partnership

17   dissolution and accounting, a partner's interest is usually considered clear and the

18   danger of removal or loss normally great so that this presents "a typical case for

19   receivership, and the appointment is frequently made." 6 Witkin, supra. However, a

20

21   receiver will not automatically be granted; the moving party must make the required

22   showing. *McCaslin v. Kenney* (1950) 100 Cal.App.2d 87, 95.

23   According to *Steinberg v. Goldstein* (1954) 129 Cal.App.2d 682, at 686, a

24   receiver is simply intended to aid in ensuring a smooth and proper outcome for the

25   action by preserving the property during litigation so that any judgment may provide

26   effective relief. In fact, the Supreme Court stated in *Goes v. Perry* (1941) 18 Cal.2d

27   373, 381, that where litigation involves a dispute over ownership of property, and it

28

-4-

1   satisfactorily appears that the property is a type that may be lost, secreted, reduced in

2   value, etc., before the matter is concluded, and Plaintiff has adequately shown a

3   reasonably certain interest in the property; then the court may appoint a receiver to take

4   custody of the property.

5

6       The rule is established that the appointment of a receiver rests largely in the

7   discretion of the trial court and that its action in appointing a receiver or its refusal of an

8   application for the appointment of such an officer will not be disturbed in the absence of

9   a showing that the court's discretion has been abused. However, appointment of a

10  receiver is a drastic remedy to be employed only in exceptional circumstances. As

11  stated by the court in *Elson v. Nyhan*, supra, 45 Cal.App.2d at page 5, "[r]eceivers are

12  often legal luxuries, frequently representing an extravagant cost to a losing litigant.

13

14  When it appears that no reasonably certain benefit will result to one litigant, and a

15  distinct disadvantage will result to another, courts should weigh carefully the propriety of

16  appointing a receiver." A trial court must consider the availability and efficacy of other

17  remedies in determining whether to employ the extraordinary remedy of a receivership:

18  *City and County of San Francisco v. Daley* (1993) 16 Cal.App.4th 734, 744-745.

19      To date there has been no satisfaction of any of the judgments. If anything,

20  Judgment Debtors have attempted to place their assets out of reach of Judgment

21

22  Creditor.

23      The assets that Judgment Creditor claims could be used to satisfy judgments are

24  listed at pages 5-8 in Judgment Creditors Ex Parte Application.

25  **Assets Transferred Out of Reach of Judgment Creditor Despite Execution of Lien**

26      Judgment Creditor declares that the four most recent bank levies, all served on

27  December 15, 2009, yielded $117.06. See Declaration of Steinmann ¶8 and Exh. "13"

28